ALEXIS MILLER BUESE (SBN: 259812)
alexis.buese@sidley.com
LOGAN P. BROWN (SBN: 308081)
lbrown@sidley.com
RYAN STASELL (SBN: 307431)
rstasell@sidley.com
SUMMER A. WALL (SBN: 331303)
summer.wall@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: +1 310 595-9668
Facsimile: +1 310 595-9501

MORGAN A. PINO
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10009
Telephone: +1 212 839-5425
Facsimile: +1 212 839-5599

MICHAEL H. PORRAZZO† (SBN: 121260)
mhporrazzo@porrazzolaw.com
THE PORRAZZO LAW FIRM
30212 Tomas, Suite 365
Rancho Santa Margarita, CA 92688
Telephone +1 949 348-7778
Facsimile +1 949 209-3514

GORDON D. TODD*
gtodd@sidley.com
DAVID S. PÉTRON*
dpetron@sidley.com
ERIKA L. MALEY*
emaley@sidley.com
ELLEN CRISHAM PELLEGRINI*
epellegrini@sidley.com
DINO L. LAVERGHETTA*
dlaverghetta@sidley.com
LUCAS W.E. CROSLOW*
lcroslow@sidley.com
DANIEL J. HAY
CHRISTOPHER S. ROSS
ROBIN WRIGHT CLEARY
DANIEL S. BROOKINS
CODY L. REAVES‡
BROOKE E. BOYD‡
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736-8760
Facsimile: +1 202 736-8711

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

SAMUEL A. FRYER YAVNEH ACADEMY, MONTEBELLO CHRISTIAN SCHOOL, GINDI MAIMONIDES ACADEMY, SAINT JOSEPH ACADEMY, YESHIVA RAV ISACSOHN TORAS EMES ACADEMY, CHRIS AMBUUL, MICHELLE AMBUUL, RABBI MOSHE AMSTER, LEA AUST, RABBI MOSHE BRULL, HOLLY BURGESS, ROBERT A. EVANS, JR., TZVI

No. 2:20-cv-7408

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

FLEISCHMANN, HEATHER GRAVES,
ROBERT GRAVES, KEREN KATZ, AL-
LEN MANN, RABBI MORDECHAI
MCKENNEY, ASHER PERETZ,
MARISA RODRIGUEZ, OFELIA SAND-
OVAL, LIAT SHAMULIAN, JEROME
TOLIVER, VERONICA TOLIVER, AL-
ETE TSFIRA, and VICKIE ZARAZUA,

               Plaintiffs,

        *v.*

GAVIN NEWSOM, in his official capacity
as the Governor of California; XAVIER
BECERRA, in his official capacity as the
Attorney General of California; TONY
THURMOND, in his official capacity as
State Superintendent of Public Instruction
and Director of Education; SANDRA
SHEWRY, in her official capacity as the
Acting Director of the California Depart-
ment of Public Health; and ERICA PAN,
in her official capacity as the Acting State
Public Health Officer,

               Defendants.

---

\* *Application for admission pro hac vice to be submitted*

† *Counsel for Plaintiff Montebello Christian School only*

‡ *Mr. Reaves and Ms. Boyd are admitted only in New York and Virginia, respectively, and are practicing law in the District of Columbia pending admission to the D.C. Bar and under the supervision of principals of the firm who are members in good standing of the D.C. Bar.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs bring this lawsuit to vindicate their constitutional rights as parents, students, and educators to the free exercise of religion and due process of law. Defendants, elected and appointed public health officials, have ordered that virtually all schools in the State of California, public and private, remain closed this fall. In so doing, they risk replacing the most serious public health challenge in a generation with a public health disaster that will reverberate for generations. Plaintiffs would have all school systems in the state free to make their own individualized determination as to whether and when to resume in-person education, consistent with sound science, data, and their own individual circumstances. That issue is already being litigated elsewhere. Plaintiffs bring this particular suit to advance their rights as religious schools, parents, students, and educators to choose—again, consistent with sound science, data, and their own individual circumstances—to hold in-person religious education in a manner consistent with their faith.

"For centuries now, people have come to this country from every corner of the world to share in the blessing of religious freedom," because "[o]ur Constitution promises that they may worship in their own way, without fear of penalty or danger." *Town of Greece v. Galloway*, 572 U.S. 565, 615 (2014) (Kagan, J., dissenting). In times of joy and times of sorrow, in times of plenty and times of lean, in end-times and times of rebirth, Americans of all creeds turn to faith in thanks and supplication. Here, unlike in many other countries, government does not declare what is orthodox, does not select ministers, and does not define what it is to be ministering. Matters of faith are left, appropriately, to the faithful. This includes, for many faith traditions, education in a religious setting. Indeed, "[t]he religious education and formation of students is the very reason for the existence of most private religious schools …." *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055, 2064 (2020).

The COVID-19 pandemic has stressed religion as it has all our institutions. In the early, darkest days of the pandemic, most houses of worship and religious schools

closed their doors voluntarily at the recommendation, and then the insistence, of public health officials to help slow the spread of this novel and unknown virus. This was as it should have been. Love for one's neighbors, known and unknown, from time to time requires some personal sacrifice. Now months later, armed with a vastly better understanding of the virus, and with reinvigorated public health services, states are managing the reopening process. Public officials must weigh the risks and costs of reopening particular institutions against the risks and costs of not doing so.

In so doing, government must take particular care to respect and protect fundamental civil liberties. As the Sixth Circuit observed, "[w]hile the law may take periodic naps during a pandemic, we will not let it sleep through one." *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 615 (6th Cir. 2020) (per curiam). While the challenge remains, constitutional norms must be respected and reinstituted. Our laws are clear that government shall make no law abridging the free exercise of religion. Laws that treat religious institutions, including schools, unequally must be narrowly tailored to minimize the burden they place on a fundamental right. Parents have the right to direct the education of their children in the religious setting of their choice. Government cannot dictate, without the most compelling of justifications, where and how religious instruction may occur. And even a compelling justification can only support the narrowest possible imposition by the state.

Defendants, sadly, have not respected these rights. They have opened daycare centers and summer camps, but not schools. They have allowed gatherings in the very same buildings where instruction might take place, but have prohibited that in-person instruction. Defendants have mandated that the vast majority of schools only conduct instruction online. When considered in the context of religious education, the documented failings of online education present more than just a pedagogical disaster. When the state prohibits religious schools from conducting in-person education, it is preventing faith communities from observing religious ritual, conducting religious worship, and inculcating religious values.

Defendants have made the judgment that parents', teachers', and religious leaders' beliefs that faith mandates in-person instruction where possible are of little value and may be disregarded. This the Constitution does not allow. Because Defendant public officials have elected to not protect fundamental religious freedoms, Plaintiffs bring this suit asking the Court to do so.

## INTRODUCTION

1.      Defendants have shuttered nearly all religious schools in California, including the School Plaintiffs. Defendants have done so contrary to sound science and against the advice of the Centers for Disease Control and Prevention ("CDC"), the American Academy of Pediatrics ("AAP"), and other organizations and experts.

2.      Defendants have closed religious schools while simultaneously allowing similarly situated entities, such as camps and childcare facilities, to conduct in-person operations. Tens of thousands of childcare facilities are open for business in the same jurisdictions where religious schools are prevented from opening. In fact, childcare is being provided in some of the very same school buildings that have been closed to educational instruction.

3.      Defendants have created a framework whereby a group of children can gather in a room for play, but those very same children in that very same room are prohibited from learning and praying.

4.      Plaintiff Schools, Parents, Students, and Teachers hold the firm conviction that, consistent with their religious beliefs, education must be conducted in person to the extent possible. For Jewish schools, for example, the communal study of the Torah is itself a form of worship. Depriving students of this ability and forcing such study online creates a unique form of religious injury. So too for many Catholic and Christian schools, offering the sacraments and communal religious instruction is existential to their mission. These cannot be replicated in whole—or indeed in part—through video chats.

5.     Defendants made no effort to ascertain whether in-person instruction is essential to the religious educational institutions they have shut down. Defendants made no effort to discern whether a more tailored, individualized approach to school opening would achieve the same public health outcome while being more protective of fundamental religious liberties. To the contrary, Defendants imposed their shut-down orders without any prior process or prospective procedural protections whatso-ever. Plaintiffs' constitutional liberties persist only at the mercy of Defendants bound-less discretion.

6.     Under the United States Constitution and the California Constitution, this framework cannot stand.

7.     The Defendants' actions are clear violations of Plaintiffs' rights to the free exercise of religion and both substantive and procedural due process.

8.     As the Supreme Court recently held: "Religious education is vital to many faiths practiced in the United States" and "[t]he religious education and for-mation of students is the very reason for the existence of most private religious schools …." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2055, 2064.

9.     Accordingly, Defendants' shuttering of religious schools is subject to strict scrutiny. First, Defendants' actions are not neutral or generally applicable. Sec-ond, even if they were, those actions would still be subject to strict scrutiny. "[W]hen the interests of parenthood are combined with a free exercise claim …, more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's" actions under the First Amendment. *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972).

10.     Strict scrutiny requires Defendants to prove that religious education, con-ducted in compliance with social distancing requirements and other preventative measures, poses a unique public health risk not present in *any* other permitted activi-ties. Put differently, Defendants must prove that time spent gathering in childcare fa-

cilities and camps does *not* present a public-health risk—but socially-distanced, hygienic in-person religious education somehow *does*. Defendants cannot meet this burden.

11. Plaintiffs accordingly seek declaratory and injunctive relief to prevent the enforcement of the school closure order and protect their constitutional rights to conduct in-person religious education in compliance with applicable public-health guidelines.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. This action arises under the Constitution and laws of the United States.

13. This Court has the authority to issue the relief sought pursuant to 28 U.S.C. §§ 1343(a), 2201, and 2202 and 42 U.S.C. § 1988.

14. Venue lies in this district under 28 U.S.C. § 1391(b)(1) and (2). All Defendants maintain offices and perform their official duties in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

### School Plaintiffs

15. Plaintiff Samuel A. Fryer Yavneh Academy ("Yavneh") is located in Los Angeles, California. Yavneh is a school devoted to Orthodox Jewish education.

a. Teaching Orthodox Judaism, developing the faith of students, and ministering to students are central to the mission and curriculum of Yavneh. Yavneh believes that Judaism, when practiced soundly, is meant to be part and parcel with academic excellence. The school strives for a high level of religious observance and recognizes education as part of the development of the whole person in a contemporary society. Yavneh is not only central to the religious

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

practice and education of its students, but through celebrations and communal activities, also serves to unite the students' families in their faith.

b. In-person education is critical for Yavneh's free exercise of religion. Religious education at Yavneh is a combination of ritual, prayer, and study all geared towards the inculcation of Jewish values and socialization of students into the Orthodox Jewish community. For that reason, religious education at Yavneh is largely experiential: the school year revolves around in-person communal prayer, Torah study, and ritual celebrations that cannot be accomplished via distance learning. Remote learning is simply not up to the task of providing an environment where religious education can successfully impart the Jewish values and identity central to Yavneh's religious mission.

c. Yavneh wants to open for in-person education, and would do so but for the School Closure Order. Yavneh has a reopening plan that is at least as protective, if not more, than applicable guidance from the CDC and state and local public health agencies. If allowed to resume in-person education, Yavneh is willing to take appropriate additional steps to accommodate faculty compromised by COVID-19.

d. The School Closure Order deprives Yavneh of the right to the free exercise of religion.

16. Plaintiff Montebello Christian School ("Montebello") is located in Montebello, California. Montebello is a school devoted to providing its students with a Christian education.

a. Teaching the Christian faith, developing the faith of students, and ministering to students are central to the mission and curriculum of Montebello. Montebello was founded 50 years ago and serves a primarily Hispanic population. The school focuses on the academic, social, and spiritual development of each student, with a mission to impact the young lives studying at Montebello in order for those students to become Gospel ministers. Montebello is not only

central to the religious practice and education of its students, but through celebrations and communal activities, also serves to unite the students' families in their faith.

b.      In-person education is critical for Montebello's free exercise of religion. Montebello's mission is to teach its students what it means to be a disciple of Jesus. Montebello and its students and faculty believe that the Bible mandates that in order to practice the Christian faith, and in order to learn how to be a disciple of Christ, you need to gather together with your fellow Christians. Montebello cannot effectively provide a Christian education to its students if the students are not meeting in person.

c.      Montebello wants to open for in-person education, and would do so but for the School Closure Order. Montebello has a reopening plan that is at least as protective, if not more, than applicable guidance from the CDC and state and local public health agencies. If allowed to resume in-person education, Montebello will accommodate faculty members unable to return on account of COVID-19.

d.      The School Closure Order deprives Montebello of the right to the free exercise of religion.

e.      The School Closure Order also causes additional harm to Montebello, including threatening the very existence of the school, which is prepared to celebrate its 50th anniversary this year. During the 2019–2020 school year, approximately 103 students attended Montebello. However, due to the uncertainty as to whether Montebello will be able to provide an in-person Christian education this school year, only 40 students are currently enrolled. Many families are unable and unwilling to pay the tuition for their children to receive a Christian education at Montebello if the school year will be taking place remotely. If the school's enrollment remains at 40 students, there is a strong likelihood that Montebello will have to shut its doors for good.

17.     Plaintiff Gindi Maimonides Academy ("Maimonides") is located in Los Angeles, California. Maimonides is a school devoted to Orthodox Judaism.

a.     Religious education plays a central role at Maimonides. For elementary students, half of their day consists of Judaic studies. From a young age, these students learn to speak and read Hebrew, study Judaic texts, and partake in religious services. Even in middle school, these students continue taking a mix of academic and religious classes. Maimonides is not only central to the religious practice and education of its students, but through celebrations and communal activities, also serves to unite the students' families in their faith.

b.     Teaching Orthodox Judaism, developing the faith of students, and ministering to students are central to the mission and curriculum of Maimonides. Students at Maimonides partake in a variety of daily religious activities such as prayer. They also attend weekly Shabbat services on Fridays.

c.     It is the aim of Maimonides that each student feels a connection to the Jewish people and has a relationship with God. These religious goals cannot be adequately accomplished over Zoom or other remote learning platforms. Information may be shared through remote learning, but community cannot. Students do not learn what it means to be part of the Jewish community, personally partake in services, and share their faith with other students. This communal aspect of the religious experience is the core of Judaism. The information, although obviously important, is secondary to the community that these students form with one another and their instructors.

d.     Maimonides wants to open for in-person education, and would do so but for the School Closure Order. Maimonides has a reopening plan that is at least as protective, if not more, than applicable guidance from the CDC and state and local public health agencies. If allowed to resume in-person education, Maimonides is willing to take additional steps to accommodate faculty compromised by COVID-19.

e.     The School Closure Order deprives Maimonides of the right to the free exercise of religion.

18.     Plaintiff Saint Joseph Academy ("Saint Joseph") is located in San Marcos, California. Saint Joseph is a school devoted to Catholic education.

a.     Teaching Catholicism, developing the faith of students, and ministering to students are central to the mission and curriculum of Saint Joseph. Prayer and devotion to the Catholic faith are central to every part of the day at Saint Joseph, and parents specifically choose Saint Joseph because of the centrality of Catholicism in the school's mission. The students pray as a school every morning, and each class prays before and after lunch and at the end of the day. In addition, there is a weekly celebration of Holy Mass for the entire school. There is also a celebration of Holy Mass for staff members that is held once a week. Saint Joseph is not only central to the religious practice and education of its students, but through celebrations and communal activities, also serves to unite the students' families in their faith.

b.     In-person education is critical for Saint Joseph's free exercise of religion. Distance learning prevented its students from joining together as the Body of Christ, which is an essential aspect of the Catholic faith. The students were prevented from living out the teachings of their faith during distance learning, and teachers were prevented from cultivating the virtues of Catholicism in their students.

c.     Saint Joseph wants to open for in-person education, and would do so but for the School Closure Order. Saint Joseph has a reopening plan that is at least as protective, if not more, than applicable guidance from the CDC and state and local public health agencies. If allowed to resume in-person education, Saint Joseph will accommodate faculty members unable to return on account of COVID-19.

d.     The School Closure Order deprives Saint Joseph of the right to the free exercise of religion.

19.     Plaintiff Yeshiva Rav Isacsohn Toras Emes Academy ("Toras Emes") is located in Los Angeles, California. Toras Emes is a school devoted to Jewish education in the Orthodox tradition.

a.     Educating students about Orthodox Judaism and teaching them about how to live according to the values and ethics of Orthodox Judaism are central to the mission and curriculum of Toras Emes. The school provides an education built on the Jewish values of the study of the Bible and other foundational Jewish texts, instruction in prayer, and the development of character according to Jewish laws and ethics. Life at the school is based upon the communal experience of prayer and study and the curriculum relies upon the strong, personal connection between a teacher and student to transmit the core values and ways of life that are central to the religion, especially the practice of Orthodox Judaism. Toras Emes is not only central to the religious practice and education of its students, but through celebrations and communal activities, also serves to unite the students' families in their faith.

b.     In-person education is critical for Toras Emes' free exercise of religion. Consistent with the Jewish tradition, Toras Emes recognizes that it is the experience of Judaism that is most essential to educating the next generation about the religion. This experience cannot be replicated through a video call. Remote learning deprives students of any communal experience, so they cannot experience the joy and efficacy of prayer performed with others. Additionally, teachers use their in-person interactions with students to model how to live as observant Jews, including how to behave and treat others in the community according to Jewish ethics.

c.     Toras Emes wants to open for in-person education, and would do so but for the School Closure Order. Toras Emes has a reopening plan that is at

least as protective, if not more, than applicable guidance from the CDC and state and local public health agencies. If allowed to resume in-person education, Toras Emes will accommodate faculty members unable to return on account of COVID-19.

d.      The School Closure Order deprives Toras Emes of the right to the free exercise of religion. Remote learning precludes the meaningful personal moments and modeling how to be an observant Jew that are fundamental to Toras Emes's religious mission.

**Parent Plaintiffs**

20.     Plaintiffs Chris and Michelle Ambuul reside in Valley Center, California. The Ambuuls are practicing Roman Catholics. They are suing on behalf of themselves and their six minor children who are enrolled at Saint Joseph. The Ambuul children at Saint Joseph are entering kindergarten and first, sixth, seventh and 12th grades.

a.      The Ambuuls decided to enroll their children in Saint Joseph because they wanted them to be educated as Catholics, and Catholic principles are integrated into every course at Saint Joseph. They also wanted their children to be surrounded with friends taught in the same way and of the same faith.

b.      In-person education is critical for the Ambuuls' children's free exercise of religion and religious education. The children normally attend Mass and receive the Eucharist at least once during each week. To the Ambuuls, receiving the Eucharist is the holiest thing a Catholic can do. Because the sacrament of confession and the Eucharist can only be received in person from a priest or Eucharistic minister, the School Closure Order has caused the Ambuuls' children to miss out on these essential elements of their religion.

c.      For the Ambuuls, the sense of religious community their children feel at Saint Joseph is incredibly important. One of their daughters is struggling with malaise and depression because she misses her community and participating in religious sacraments together with her friends. The daughter has lost 15

pounds from stress and depression caused by not being able to attend Saint Joseph in person.

  d. The Ambuuls' son in sixth grade has dyslexia and an auditory processing disorder that often makes him unable to understand information conveyed through remote instruction. At Saint Joseph, the Ambuuls' son normally has a dedicated resource teacher that assists him in the classroom by sitting with him and reading instructional materials to him. Since the son cannot attend Saint Joseph in person, Michelle Ambuul has to serve this role herself, which means she cannot dedicate sufficient time to her other children.

  e. Another of the Ambuuls' sons was supposed to start second grade in the fall, but because of his difficulties with distance learning the Ambuuls have decided to hold him back a grade year. This has affected his spiritual development as well, because Saint Joseph students prepare to receive their first Holy Communion during their second grade year. Instead, because of the harm caused by remote learning, the Ambuuls will have to wait another year before reaching this milestone in the life of a Catholic.

  f. The Ambuuls want their children to attend Saint Joseph in person, and their children would attend in person but for the School Closure Order.

  g. The School Closure order harms the Ambuuls and their children, deprives them of the right to direct their children's education, and deprives the Ambuuls and their children of the free exercise of religion.

  h. The School Closure Order also causes additional harm to the Ambuuls, including monetary damages in the form of tuition they continue to pay for services that Saint Joseph Academy is forbidden to provide.

21. Plaintiff Tzvi Fleischmann is a resident of Los Angeles, California. He is a practicing Orthodox Jew. He is suing in his individual capacity on behalf of himself and his minor child. He is the parent of five children, including his 13-year-old son who is currently enrolled at Toras Emes and entering the eighth grade. Fleischmann's

other four children previously attended and graduated from Toras Emes, as did Fleischmann and his wife.

a.   Fleischmann enrolled his son in Toras Emes to provide him with a strong religious and ethical education.

b.   Attending Toras Emes is central to the free exercise of religion for Fleischmann and his son. Fleischmann believes that the strong Jewish education Toras Emes provides is necessary to be able to fulfill one's religious responsibility to pray, study foundational Jewish texts and ethics, and live an ethical life.

c.   In-person education is critical for the free exercise of religion for Fleischmann and his son because a large part of the education of an Orthodox Jew is experiential. At Toras Emes, teachers model for the children how to manifest Judaism's values and ethics, and use moments throughout the day as practical opportunities to teach the children how to apply the teachings of Judaism to life's everyday challenges. Fleischmann believes these moments are essential to the education of an Orthodox Jew. Additionally, the teachers and other children at Toras Emes provide the communal support that is necessary to support Fleischmann's son as he undertakes the study of complex religious texts and deepens his understanding of daily prayers and other religious practices.

d.   Fleischmann wants his son to attend Toras Emes in person, and his child would attend Toras Emes in person but for the School Closure Order.

e.   The School Closure Order harms Fleischmann and his son, deprives Fleischmann of the right to direct his son's education, and deprives Fleischmann and his son of the free exercise of religion.

f.   The School Closure Order also causes additional harm to Fleischmann and his son, including monetary damages in the form of tuition Fleischmann continues to pay to the school for an education Toras Emes cannot provide remotely.

22.     Plaintiffs Robert and Heather Graves reside in San Marcos, California. They are practicing Roman Catholics. They are suing in their individual capacity on behalf of themselves and their minor children. The Graveses have five children, three of whom are entering grades five, six, and eight at Saint Joseph.

a.     The Graveses decided to enroll their children in Saint Joseph principally because of their Catholic faith and to further their children's religious education.

b.     In-person education is critical for the Graveses and their children's free exercise of religion. The children normally attend Mass and receive the Eucharist at least once during each week, and regularly participate in confession with a priest at Saint Joseph. The School Closure Order has prevented them from participating in these sacred religious practices, which are key to the development of their faith.

c.     The Graveses' 11-year-old son entering sixth grade is especially affected by the School Closure Order because he has Down Syndrome. Saint Joseph practices integration and inclusion for students with special needs, so the Graveses' son is fully integrated into his class, rather than separated into a designated special-education classroom. His spiritual, academic, and social experience at Saint Joseph is dependent on his interactions with and the support he receives from the faculty and his fellow students. Because of the School Closure Order, the Graveses' son is struggling greatly to focus on the computer screen, and his ability to learn and grow through social interaction has been greatly harmed.

d.     The Graveses also do not have enough electronic devices for all of their children to participate in distance learning at the same time. This has caused added stress to the Graveses and their children as they attempt to coordinate devices for scheduled class time. As a result, the Graveses' children have

missed classes, or been forced to watch recorded lectures where they lose all ability to participate in both the religious and academic aspects of the class.

e. The Graveses want their children to attend Saint Joseph in person, and their children would attend in person but for the School Closure Order.

f. The School Closure Order harms the Graveses and their children, deprives the Graveses of the right to direct their children's education, and deprives the Graveses and their children of the free exercise of religion.

g. The School Closure Order also causes additional harm to the Graveses, including monetary damages in the form of tuition the Graveses continue to pay for services that Saint Joseph is forbidden to provide, added emotional stress to the entire family from the need to coordinate class time on electronic devices, and the Graveses need to be significantly more involved in teaching and answering questions that would have been fielded by teachers, but for the School Closure Order.

23. Plaintiff Keren Katz is a resident of Los Angeles, California. She is an observant Jew. Katz is suing in her individual capacity on behalf of herself and her three minor children, ages 8, 6, and 4, who are entering grades pre-one, one, and three at Maimonides.

a. Katz's children's attendance at Maimonides is central to the free exercise of Katz and her children's religion. Katz believes that academic and spiritual development are predicated on dialogue, which requires learning from multiple people with a diversity of understandings and opinions. Katz and her children's religious practice is almost entirely communal, rather than individual, and Maimonides is the primary religious community where their faith has its communal expression.

b. In-person education is critical for Katz and her children's free exercise of religion because the dialogue that Katz believes is fundamental to religious education cannot take place over a video call. Central to Katz and her

children's practice of Judaism is the concept of *chavrutah*, which can be translated "friendship" or "companionship," and is also a traditional rabbinic approach to small-group study of a shared text, including the Talmud. In fact, the Talmud itself says "give me a *chavrutah* or give me death." According to Katz's belief, religious and educational development is about more than individual perception; it is inherently communal.

c.     Katz's belief in the centrality of *chavrutah* has also motivated her to teach at Maimonides for the past six years. She currently teaches seventh and eighth grade literature. Katz feels that she has a religious calling to teach at Maimonides in order to show students what it means to be a strong Jewish leader and how the Jewish faith ties into all aspects of life, including the study of literature.

d.     Katz wants Maimonides to reopen in person, and for her children to attend in person. Katz would resume teaching at Maimonides in person and sending her children to Maimonides in person but for the School Closure Order.

e.     The School Closure order harms Katz and her children, deprives Katz of the right to direct her children's education, and deprives Katz and her children of the free exercise of religion. Without being able to attend Maimonides, Katz and her children are frequently unable to pray in the communal fashion prescribed by their faith. Katz's children have suffered spiritually as a result, and have also suffered academically due to the inability of their teachers to engage them in the experience of Judaism as they would do in person. Moreover, as a teacher, Katz is unable to work individually with her students as she would in person, especially students with special needs who require extra attention, and this has impaired Katz's ability to fulfil her religious vocation to educate the students entrusted to her.

f.     The School Closure Order also causes additional harm to Katz, including the significant difficulties imposed on her by the need to manage her

own children's remote learning while also remotely educating her students. As a result, she has frequently had to leave her children in the house and teach her remote classes from her car.

24.     Plaintiff Asher Peretz is a resident of Los Angeles, California. He is a practicing Orthodox Jew. He is suing in his individual capacity on behalf of himself and his minor children. He is the parent of four boys enrolled at Toras Emes in first grade, fifth grade, sixth grade and eighth grade.

a.     Peretz enrolled his children in Toras Emes to provide them with a strong religious education and to experience the communal prayer and experiential learning that are core to the practice of Orthodox Judaism. Because neither Peretz nor his wife were raised as Orthodox Jews, they rely upon the religious educators and rabbinical faculty at Toras Emes to provide engaging and historically- and religiously-accurate instruction about Jewish traditions, observance, prayer, and the study of ancient texts.

b.     Peretz's children's attendance at Toras Emes is central to the free exercise of Orthodox Judaism for Peretz and his children. The school is the only place that provides formal religious instruction to Peretz's children, which includes learning prayers and how to pray, and the communal study of ancient texts, such as the Talmud. Additionally, when at school, the children learn by example—from their teachers, religious figures and older children—how to properly conduct themselves as Orthodox Jews, including respecting elders, resolving interpersonal disputes consistently with Jewish ethics, and practicing lovingkindness in all aspects of one's life.

c.     In-person instruction is critical for Peretz's and his children's free exercise of religion and religious education. The children cannot effectively partake in the communal experience of religious learning and prayer through remote meetings. The children are not able to learn, practice or recite entire sections of the daily prayer service remotely because according to Jewish law,

those prayers can only be recited within a *minyan*, a quorum of 10 males aged 13 or over. Additionally, by not being in the presence of learned teachers and religious figures, the children are not able to receive the important experiential education about how to live as an Orthodox Jew that the religion requires be transmitted from one generation to the next.

     d.    Peretz wants his children to attend Toras Emes in person, and his children would attend Toras Emes in person but for the School Closure Order.

     e.    The School Closure Order harms Peretz and his children, deprives Peretz of the right to direct his children's education, and deprives Peretz and his children of the free exercise of religion.

25.    Plaintiff Marisa Rodriguez is a resident of Whittier, California. Rodriguez is a practicing Christian. She is suing on behalf of herself and her two minor children who are enrolled at Montebello and entering grades four and seven.

     a.    Marisa Rodriguez decided to enroll her children in Montebello in furtherance of her children's religious education.

     b.    Rodriguez's children's attendance at Montebello is central to the free exercise of religion by Rodriguez and her children. It is important to Rodriguez that faith is built into the curriculum and daily activities of the school. Aside from morning prayer, weekly chapel, and daily Bible class, scripture is built into the broader academic curriculum.

     c.    In-person education is critical for Rodriguez's children's free exercise of religion and religious education. Rodriguez has spent some time volunteering in the school cafeteria, and has witnessed how in-person education and community reinforces religious lessons learned in class. In between classes, children sing songs learned in chapel, discuss religious lessons, and pray with one another. In-person education allows their children to experience a brotherhood and sisterhood in Christ.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

d.      Rodriguez wants her children to attend Montebello in person, and her children would attend Montebello in person but for the School Closure Order.

e.      The School Closure order harms Rodriguez and her children, deprives her of the right to direct her children's education, and deprives Rodriguez and her children of the free exercise of religion.

f.      The School Closure Order may also exacerbate the anxiety issues that Rodriguez's youngest child developed when in-person instruction ended during the spring of 2020.

26.     Plaintiff Ofelia Sandoval is a resident of Los Angeles County, California. Sandoval is a practicing Christian. She is suing in her individual capacity on behalf of herself and her minor children. She is the parent of three boys enrolled at Montebello. Sandoval's 7-year-old son is entering the second grade, her 10-year-old son is entering the fifth grade, and her 13-year-old son is entering the eighth grade.

a.      Sandoval decided to enter her children in Montebello in furtherance of her children's religious education. She desires for her children to have a faith-based education for their faith development and for reinforcement of their family's values.

b.      Sandoval's children's attendance at Montebello is central to the free exercise of Sandoval's and her children's religion. Sandoval and her children believe the Bible is the Word of God and that Jesus Christ is their savior. At Montebello, their faith is reinforced in the classroom setting. Teachers at Montebello trust God as their Lord and savior, pray regularly, and impart a spiritual discipline to their students.

c.      In-person education is critical for Sandoval's children's free exercise of religion and religious education. Sandoval and her children believe that there is a communal aspect to worship and prayer, and that spiritual development is stifled without the community. Sandoval's children are also very active

in the worship ministry at Montebello. Sandoval's 13-year-old son plays the drums and piano at chapel. They cannot participate in the worship ministry when the school is closed. Montebello has moved chapel to an online service, but Sandoval's children are not able to engage in worship over a screen in the same manner as they would in person. Furthermore, Sandoval and her children believe that being surrounded by teachers and students who share the same values strengthens and encourages spiritual development. Sandoval has sacrificed so that her children can have a lifelong experience in God's word based on an in-person Christian education.

d.      Sandoval wants her children to attend Montebello in person, and her children would attend Montebello in person but for the School Closure Order.

e.      The School Closure Order harms Sandoval and Sandoval's children because it deprives Sandoval of the right to the direct her children's education, and deprives Sandoval of the free exercise of religion. Sandoval desires for her children to grow up with the foundations of the Christian faith and faith in God's Word, which is best instilled when her children have an interconnection with other believers.

f.      The School Closure Order also causes additional harm to Sandoval and her children because of the emotional distress her children have experienced by being apart from their school classmates. Her 10-year-old son has developed anxiety, a condition from which he has never suffered before. He has started to chew his shirts so badly that they develop holes. He sometimes wears a chewing necklace. Sandoval's 13-year-old son has also developed anxiety issues that he has never previously experienced. He feels a tingling sensation in his arm and has suffered from at least one anxiety attack. Sandoval believes that these new anxiety symptoms are a result of the social isolation and separation from other Christian believers whom her sons ordinarily see and in school.

Their Christian school community provides an outlet to relieve stress with fellow believers.

27.     Plaintiffs Jerome and Veronica Toliver are residents of San Marcos, California. They are practicing Roman Catholics. Jerome and Veronica have three children: their eldest is an alumna of Saint Joseph; their daughter is entering the 10th grade at Saint Joseph; and their son is entering seventh grade at Saint Joseph.

a.     The Tolivers chose to send their children to Saint Joseph to instill a strong Catholic faith and learn from leaders in the Catholic education field. Jerome and Veronica make significant financial sacrifices to pay tuition so their children can attend Saint Joseph for the religious education and community. They pay for their children's education in the context of their faith.

b.     The Tolivers' children's attendance at Saint Joseph is central to the free exercise of the Tolivers' and their children's religion. In the Catholic faith, it is the father's sole purpose to ensure his children are granted eternal life. Because that is a heavy burden to shoulder, and one that Jerome Toliver felt he needed assistance with, the Tolivers decided to send their children to a school recognized by the Catholic leadership to instill strong Catholic values.

c.     In-person education is critical for the Tolivers and their children. In-person education is essential for their children to be able learn about practicing Roman Catholicism through observing and modeling the actions and values of teachers and peers.

d.     The Tolivers want their children to attend Saint Joseph in person, and their children would attend Saint Joseph in person but for the School Closure Order.

e.     The School Closure Order harms the Tolivers and their children, deprives the Tolivers of the right to direct their children's education, and deprives the Tolivers and their children of the free exercise of religion.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

28.     Plaintiff Alete Tsfira is a resident of Los Angeles, California. Tsfira is a practicing Modern Orthodox Jew. She is suing in her individual capacity on behalf of herself and her minor children. She is the parent of four children enrolled at Yavneh. Tsfira has children aged 5, 7, 9, and 11, who are entering grades pre-one, two, four, and six.

a.     Tsfira decided to enroll her children in Yavneh in furtherance of her children's religious education. Tsfira was not raised as an Orthodox Jew and does not speak Hebrew, so she relies on Yavneh to educate her children in Orthodox Jewish religious traditions and in the Hebrew language.

b.     Tsfira's children's attendance at Yavneh is central to the free exercise of Tsfira and her children's religion. Tsfira feels that only a structured, religious school environment like the one that Yavneh provides can give her children the comprehensive experience of Jewish culture that is fundamental to her religious belief.

c.     In-person education is critical for Tsfira's children's free exercise of religion and religious education. It is particularly important to Tsfira that her children receive rigorous, immersive instruction in the Hebrew language, which is impossible to achieve other than in person. Additionally, Tsfira believes, consistently with the tenets of Judaism, that prayer is inherently a communal activity, not an individual activity, and attending Yavneh in person is therefore essential to Tsfira's children's experience of and participation in Jewish prayer.

d.     Tsfira wants her children to attend Yavneh in person, and her children would attend Yavneh in person but for the School Closure Order.

e.     The School Closure Order harms Tsfira and her children, deprives Tsfira of the right to direct her children's education, and deprives Tsfira and her children of the free exercise of religion. Because they are unable to attend Yavneh in person, Tsfira's children have no other religious community in which

they can participate, and cannot join with their peers in the communal observance of Jewish Holy Days and other milestone celebrations.

  f. The School Closure Order also causes additional harm to Tsfira, including monetary damages in the form of tuition Tsfira continues to pay for services that Yavneh is forbidden to provide, and lost earnings and other difficulties with Tsfira's work as a result of the time she has to spend with her children providing religious education and other services that Yavneh ordinarily provides.

29. Plaintiff Vickie Zarazua is a resident of Montebello, California. She is a practicing Christian. Zarazua is suing in her individual capacity on behalf of herself and her minor child. She is the mother of a child enrolled at Montebello Christian School. Her child is entering grade seven.

  a. Zarazua decided to enroll her child in Montebello in furtherance of her child's religious education. Zarazua's child previously attended a non-religious school. Zarazua moved her child to Montebello specifically to aid her child's spiritual development.

  b. Zarazua's child's attendance at Montebello is central to the free exercise of religion by her and her child. Since her child first began attending Montebello, Zarazua has witnessed a growth in her child's spirituality and knowledge of theology. It is important to Zarazua that faith is built into the curriculum and daily activities of the school. Aside from weekly chapel and daily Bible class, scripture is built into the broader academic curriculum.

  c. In-person education is critical for Zarazua's child's free exercise of religion and religious education. Zarazua believes that there is frequently internal warfare in matters of spirituality, and it is important to have people physically present who can model Christ's teachings for her child. Zarazua believes that the spirit of God moves in the halls of Montebello, and she has witnessed the benefits of the in-person spiritual support provided by the school. Among

other things, a pastor would frequently have lunch with her child, and provided a form of "spiritual therapy." School staff also prayed for and comforted her child during times of trouble.

      d.    Zarazua works, and therefore cannot be physically present to aid in her child's education. The distance learning that took place in the spring of 2020 hindered her son's development.

      e.    Zarazua wants her child to attend Montebello in person, and her child would attend Montebello in person but for the School Closure Order.

      f.    The School Closure Order harms Zarazua and her child, deprives her of the right to direct her child's education, and deprives her and her child of the free exercise of religion.

## Teacher Plaintiffs

30.    Rabbi Moshe Amster is a resident of Los Angeles County, California. He is a practicing Orthodox Jew and an administrator and sixth and seventh grade Judaic Studies teacher at Yavneh, where he has taught for 45 years.

      a.    Rabbi Amster chose to teach at Yavneh because he felt a spiritual calling to serve as a teacher. Defendants' actions deprive Rabbi Amster of the right to the free exercise of religion.

      b.    In-person education is critical for Rabbi Amster's free exercise of religion because in his view, the most important part of Judaism is being able to apply the commandments of the Torah to one's daily life, which requires careful observation and emulation of the customs that are the hallmarks of the faith. Rabbi Amster believes that aspects of the school day cannot be replicated by virtual means, such as morning prayer, the serving of kosher foods and practices in the cafeteria (where meat and dairy is served at different tables), the blessing of snacks or lunch (there is always a Judaic teacher around for a proper blessing), and afternoon services.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

c.       Rabbi Amster wants to teach at Yavneh in person, and would do so but for the School Closure Order.

d.       The School Closure Order deprives Rabbi Amster of the right to the free exercise of religion. Rabbi Amster believes that Jewish teaching is carefully woven into the curriculum at Yavneh, and he lives out his religious calling by instructing his students in Orthodox Jewish practices and customs. Rabbi Amster believes that parents who were raised nonobservant, or do not like the role of becoming assistant teachers, have entrusted him to educate their children in the faith. Having dedicated his life to the personal instruction of the next Orthodox Jewish generation, Rabbi Amster believes that the School Closure Order jeopardizes his ability to carry out his religious calling by preventing him from teaching his students in person.

31.       Plaintiff Lea Aust is a resident of Oceanside, California. She is a practicing Roman Catholic, and a fourth grade teacher at Saint Joseph.

a.       Aust chose to work at Saint Joseph after doing mission work in Haiti. At first, she thought she might stay a year or so. She has worked there for 11 years so far, and she attributes it to being part of God's plan.

b.       In-person education is critical for Aust's free exercise of religion. Students pray before every class, after lunch, and go to mass with the entire school at least once a week on Friday. Every lesson incorporates Catholic teachings and engagement with students. Even if families practice at home, Catholicism is reinforced at school through the environment, group prayer, and teachers who express their faith to the students. In-person instruction is particularly important for students who do not practice Catholicism at home. For such students, the only time that they are able to receive sacraments, such as confession, chapel time, and receiving the Eucharist, is while they are at school. Aust taught three students who were converting to the faith this past school year. Although

they would normally make their First Communion in May, they were prevented from doing so.

    c.    Some of Aust's students do not even have the requisite tools to adequately attend school on Zoom. Many of the families at the school are large, and some families do not have sufficient devices at home. Some families had seven children and just one computer. Because of these and other complications of distance learning, some children fell behind in Zoom, but would not have if they had attended in-person instruction.

    d.    Aust wants to teach at Saint Joseph Academy in person, and would do so but for the School Closure Order.

    e.    The School Closure Order deprives Aust of the right to the free exercise of religion.

    f.    Aust has witnessed and experienced other harms caused by the School Closure Order. For example, one of her former students' parents approached her in public and, without prompting, said that her 10-year-old son was borderline suicidal, and that he hated himself. In March, while in school, the child was doing well. Aust strongly believes that this student needs to be part of the Catholic community at Saint Joseph.

32.    Plaintiff Rabbi Moshe Brull is a resident of Los Angeles County, California. He is a practicing Orthodox Jew and has worked at Maimonides for one year as a Rabbi teaching sixth and seventh grade.

    a.    Rabbi Brull decided to move his family across the country so he could work at Maimonides because it was such a great opportunity to teach and change young students' lives. He has dedicated his life to his faith and becoming a Rabbi, spending over thirteen years in training (including a year and a half in Israel).

    b.    In-person education is critical for Rabbi Brull's free exercise of religion. The students at Maimonides participate in group prayer, singing, reading

from sacred scrolls and holy day celebrations, all of which are not possible through distance learning. Rabbi Brull feels that so much of his Jewish faith is built on learning and teaching by example. His ability to teach Judaism to his students is greatly strengthened by the bond he forms with students, by speaking to students individually after class, eating lunch with them in the cafeteria, and celebrating milestones in their religious development and education.

  c. Studying Judaism requires learning foreign languages and adapting an entirely new way of thinking, which all requires an incredible focus. When he is in the room with students, he can guide the students and help them to focus, but he cannot do that adequately through a computer screen. Rabbi Brull has had to lower academic expectations for all of his students because they simply cannot learn the principles of Judaism as effectively through remote learning.

  d. Rabbi Brull wants to teach at Maimonides in person, and would do so but for the School Closure Order.

  e. The School Closure Order deprives Rabbi Brull of the right to the free exercise of religion.

33. Plaintiff Holly Burgess is a resident of Los Angeles County, California. She is a practicing Christian and a teacher at Montebello.

  a. Burgess decided to teach at Montebello because she felt a religious calling to teach at a Christian school where she could teach from a biblical worldview.

  b. In-person education is critical for Burgess's free exercise of religion. Burgess believes there is power in people connecting and meeting in person. She cites the Bible verse, Matthew 18:20, "For where two or three gather in my name, there am I with them" as part of the basis for her belief that the Holy Spirit moves people more when they gather together. She thinks that gathering in Christ's name invites the Holy Spirit and is more likely to make a Christian

believer feel in tune with God's will for his or her life. She thinks this is especially important in the tentative years of elementary and middle school when students are still forming their beliefs and are highly influenced by people around them. According to Burgess, Christians edify each other and hold each other accountable, which cannot easily be done by remote means. At school, Burgess prays with her students and asks them whether they have any prayer requests or if they need a prayer outside of class. On Zoom, however, students are much less engaged and less likely to volunteer a prayer or prayer request.

      c.     Burgess wants to teach at Montebello in person, and would do so but for the School Closure Order.

      d.     The School Closure Order deprives Burgess of the right to the free exercise of religion.

34.     Plaintiff Robert A. Evans, Jr. is a resident of San Diego County, California. Evans is a practicing Roman Catholic. He has worked at Saint Joseph for eight years and is currently the lead high school teacher.

      a.     Evans came to work at Saint Joseph after retiring from his job as an Oceanographer and Hydrologist working for the federal government, because he wanted to live his faith in every aspect of his life including his job. He teaches physics, American history, and various math classes.

      b.     In-person education is critical for Evans's free exercise of religion. He leads a prayer before every class, and attends Mass with the entire school at least once per week. The sense of community and family that exists between Evans and his students is a key part of Evans's religious experience at Saint Joseph. He incorporates Catholic doctrine into every lesson he teaches: for example, understanding Catholic teachings helps his physics students to better comprehend the creation of the universe through the Big Bang, and to understand key ideas in the United States Constitution.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

c.     Even though Evans's students can read religious texts at home, their faith is greatly strengthened at school through the environment, group prayer, and experienced teachers who express their faith to students. Saint Joseph has teachers with advanced degrees in theology, which enriches the faith and knowledge of the students. Teachers and students simply cannot have the same kind of open dialogue on religious topics through a computer screen.

d.     Evans wants to teach at Saint Joseph in person, and would do so but for the School Closure Order.

e.     The School Closure Order deprives Evans of the right to the free exercise of religion.

f.     Evans has witnessed and experienced other harms caused by the School Closure Order. For example, students have reported experiencing headaches through looking at a screen all day for classes. Evans's students' learning is also greatly affected because they are much more distracted during virtual lessons at home and participate far less than during in-person classes.

35.     Plaintiff Allen Mann is a resident of Los Angeles, California. He is a practicing Orthodox Jew and a sixth- to eighth-grade math teacher at Toras Emes, where he has worked for approximately nine years.

a.     Mann chose to teach at Toras Emes because the values and philosophy of the school matched his own and he wanted to teach children from families that also shared his religious beliefs and levels of observance. Mann is also a graduate of Toras Emes, and has three children enrolled at the school. Defendants' actions deprive Mann of the right to the free exercise of religion.

b.     In-person education is critical for Mann's free exercise of religion. Mann weaves instruction about how to live as an Orthodox Jew into his daily interactions with his math students and other children at Toras Emes. He uses in-person interactions with students—whether in class or on the playground—to correct and teach children how to act in accordance with Jewish law and ethics.

Additionally, consistent with centuries-old Jewish traditions applicable to teachers and their students, Mann transmits the religion's values and ethical requirements by modeling to his students how to how to live as an Orthodox Jew. His in-person interactions with students allow him to develop close connections with students that are needed to foster the love of and respect for community that are central tenants of Orthodox Judaism.

c.     Mann wants to teach at Toras Emes in person, and would do so but for the School Closure Order.

d.     The School Closure Order deprives Mann of the right to the free exercise of religion. He cannot effectively establish the personal connection with students that is critical to the transmission of Jewish values. Not being in physical proximity to the students means that Mann is unable to model how to live as an observant Jew and that he cannot provide the experiential instruction about Jewish ethics that is core to the mission of the school.

36.     Plaintiff Rabbi Mordechai McKenney is a resident of Los Angeles, California. Rabbi McKenney is a practicing Orthodox Jew. He is a second grade Judaic Studies teacher entering his eighth year teaching at Yavneh.

a.     Rabbi McKenney chose to teach at Yavneh because he felt a religious calling to teach young children about Orthodox Judaism. He considers it a tremendous privilege and opportunity to pass along the Jewish faith to the next generation.

b.     Rabbi McKenney believes that religious education is absolutely vital to the Jewish faith. He considers education in Orthodox Judaism the link to the next generation to pass on Judaism's system of beliefs, and believes that world history is a testament to the significance of education in the survival of Judaism, as there is no other culture or religion that has passed their beliefs on so strongly for so many years (dating back about 3,500 years ago when the Torah was given to Moses). Through the ups and downs of every generation, the

Jewish faith has lived on through the education of the next generation. Rabbi McKenney refers to this phenomenon as *mesorah*, which is the Hebrew word for links in a chain. According to Rabbi McKenney, if one link is missing, then the chain is broken. Thus, he sees education as the lifeblood of Orthodox Judaism and has a personal passion in sharing his faith with the next generation of Orthodox Jews.

       c.     In-person education is critical for Rabbi McKenney's free exercise of religion. In addition to the significance of education to Judaism, and the traditional approach of in-person instruction that leaves a greater impact on students who serve as the link in the chain of a faith that is over 3,000 years old, Rabbi McKenney believes that the customs and way of life taught by the Torah are best understood when taught in person. In Orthodox Judaism, according to Rabbi McKenney, education is not just about digesting information, but is also building up the character of students to help them live out their values. In his experience, the in-person interaction that students have with other students and their teachers helps them to develop emotional skills and builds character, which strengthens them in the faith. Rabbi McKenney believes that even if students can regurgitate information for a test over a computer, he cannot impart the Orthodox Jewish way of living to his students if they are not in school in person. Students look to teachers for guidance in their thoughts and conduct, and it is impossible in a virtual environment for students to get a full picture of how to live out Orthodox Jewish values in day-to-day living. Moreover, Rabbi McKenney reads the Torah itself as prescribing in-person interaction with students and teachers as necessary for their religious education. The guidance Orthodox Jews have received from great rabbis for generations is that children need to be in school. There are other traditions that Rabbi McKenney celebrates in his classes that do not lend themselves to Zoom or other virtual means, such as the singing of prayers. He attempted to do this with his students but the

sound and synchronization of internet streaming does not permit for it. His students are less engaged and enjoy class far less without these components. There is an enthusiasm and connectedness when class is in person that is unattainable over the computer.

     d.    Rabbi McKenney regards distance learning as an inadequate substitute for the traditional teaching of Judaic Studies that has been done in person for 3,500 years. He has observed that it does not carry the same impact or make the next link as strong.

     e.    Rabbi McKenney wants to teach at Yavneh in person, and would do so but for the School Closure Order.

     f.    The School Closure Order deprives Rabbi McKenney of the right to the free exercise of religion.

37.    Plaintiff Liat Shamulian is a resident of Los Angeles County, California. Shamulian practices Orthodox Judaism. She is dean of students and teaches Judaic studies to seventh-grade girls at Yavneh. Additionally, Shamulian's 8- and 12-year-old sons are entering the third and seventh grades at Yavneh.

     a.    Shamulian chose to teach and serve as dean of students at Yavneh because she feels a spiritual calling to teach at an Orthodox Jewish school and to deepen her knowledge of Judaism in an Orthodox school community.

     b.    In-person education is critical for Shamulian's free exercise of religion because of its centrality to the historical and continuing practice of the Jewish faith. Much of the Jewish tradition that Shamulian teaches and desires for her sons to be taught consists of communal prayer, singing, and other religious practices that cannot be replicated using remote learning.

     c.    As an educator, Shamulian feels strongly that many of her students are disserved by remote learning, and that this jeopardizes Yavneh's mission—and her own personal religious vocation—to impart the Jewish faith and cul-

tural traditions to her students and to her sons. The study of conversational Hebrew, in particular, which requires a mastery of phonetic sounds unknown in English, is best taught by immersion, which cannot be replicated over a video call.

d.      Another core tenet of Shamulian's Orthodox Jewish faith is the cultivation of *middot*, or good character traits. Yavneh instills *middot* in its students, including Shamulian's sons, by encouraging them to emulate the good role models they find among the school's faculty and staff. Students at Yavneh also study the Torah's teachings on how to pray and dress, among other things, and simultaneously learn these things by observing their elders doing them.

e.      Shamulian wants to teach at Yavneh in person, and would do so but for the School Closure Order. Shamulian wants to send her children to Yavneh in person, and her children want to attend in person, and would do so but for the School Closure Order.

f.      The School Closure Order deprives Shamulian of the right to the free exercise of religion.

g.      The School Closure Order also causes additional harm to Shamulian by interfering with her ability to fulfil her professional obligations while also helping her children adapt to the new demands of remote learning.

**Faith-Community Interests**

38.    In preparing this Complaint, counsel for Plaintiffs have been contacted by numerous additional schools and families similarly interested in vindicating their constitutional rights and resuming safe and effective in-person education. Owing to the press of time and because this suit seeks state-wide injunctive relief, counsel have not added all these additional institutions and individuals as named plaintiffs. Counsel could do so in an Amended Complaint, if appropriate. A sampling of these additional schools includes: (1) YULA Boys, a Modern Orthodox high school that "strives to pro-

vide the religious context for a student-centered, integrated, college preparatory education in both Torah and General Studies"; (2) YULA Girls, "an Orthodox Yeshiva High School, dedicated to cultivating an unwavering commitment to Halacha, Torah values, outstanding academic achievement, and exemplary moral conduct"; (3) Valley Torah High School, whose mission is "to create an ambitious religious and educational experience where our students are inspired to live a life of commitment to Torah knowledge, continual spiritual growth and the pursuit of Judaic and Twenty-first Century learning"; and (4) Yeshiva Ohr Eliyahu, whose "primary goal is that the cumulative experiences of our students over the years result in enthusiastic and dedicated religious study and observance, refinement of character, and the prerequisite knowledge to be successful participants in the economic and social life of our society."

## Defendants

39.     Defendant Gavin Newsom ("Newsom") is made a party to this Action in his official capacity as the Governor of California. The California Constitution vests the "supreme executive power of the State" in the Governor, who "shall see that the law is faithfully executed." Cal. Const. art. V, § 1. Governor Newsom signed Executive Order N-60-20 on May 4, 2020.

40.     Defendant Xavier Becerra ("Becerra") is made a party to this Action in his official capacity as the Attorney General of California. Under California law, Becerra is the chief law enforcement officer in the State. Cal. Const. art. V, § 13.

41.     Defendant Tony Thurmond ("Thurmond") is made a party to this Action in his official capacity as State Superintendent of Public Instruction and Director of Education. Thurmond is responsible for enforcing education law and regulations in California.

42.     Defendant Sandra Shewry ("Shewry") is made a party to this Action in her official capacity as the Acting Director of the California Department of Public Health. Shewry is sued herein in her official capacity to the extent that she is responsi-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

ble for providing official government guidance to the various industries that are allowed to operate. Shewry was selected to replace Sonia Angell, the former State Public Health Officer and Department of Public Health Director, after Angell's abrupt resignation in August 2020.[1]

43.    Defendant Erica Pan, MD, MPH ("Dr. Pan") is made a party to this Action in her official capacity as the Acting State Public Health Officer. Pan is sued herein in her official capacity to the extent that she is responsible for providing official government guidance to the various industries that are allowed to operate. Pan was selected to replace Sonia Angell, the former State Public Health Officer and Department of Public Health Director, after Angell's abrupt resignation in August 2020.[2]

## FACTUAL ALLEGATIONS

**I.    Defendants Have Banned In-Person Education, Including Religious Education, While Allowing Similar Entities to Re-Open**

44.    On March 4, 2020, California Governor Gavin Newsom proclaimed a State of Emergency as part of California's response to the COVID-19 pandemic.[3]

45.    On March 19, 2020, Governor Newsom issued Executive Order N-33-20 in which he ordered "all residents … to immediately heed the current State public health directives."[4]

46.    On May 4, 2020, California Governor Newsom issued Executive Order N-60-20, which stated that "[a]ll residents are directed to continue to obey State public health directives, as made available at https://covid19.ca.gov/stay-home-except-for-essential needs/ and elsewhere as the State Public Health Officer may provide."[5]

---

[1] Kathleen Ronayne and Brian Melley, *Governor Gives Few Details on Top of California Official's Exit*, ASSOCIATED PRESS (Aug. 10, 2020), https://bit.ly/30XQbJC.
[2] *Id*.
[3] Exec. Dep't, State of Cal., *Proclamation of a State of Emergency* (Mar. 4, 2020), https://bit.ly/3lZDbTj.
[4] Cal. Exec. Order No. N-33-20 (Mar. 19, 2020), https://bit.ly/3arL6fM.
[5] Cal. Exec. Order No. N-60-20 (May 4, 2020), https://bit.ly/3h0MWHl.

47.     On July 17, 2020, Governor Newsom and the Department of Public Health Director announced a "framework for reopening" that, in effect, prohibits "in-person learning" in most of the state (the "School Closure Order").[6]

48.     Under the School Closure Order, schools and school districts are allowed to reopen for in-person instruction only "if they are located in a local health jurisdiction (LHJ) that has not been on the county monitoring list within the prior 14 days."[7] Otherwise, when a school "has been on the monitoring list within the last 14 days," the school may "conduct distance learning only."[8] Plaintiffs were not given any notice or opportunity for hearing prior to the issuance of the School Closure Order.

49.     Currently, there are 38 counties on the county monitoring list.[9] A county is put on the list if it exceeds any one of five benchmarks. These five benchmarks include: (1) more than 100 cases per 100,000 people over a two-week period; (2) more than 25 cases per 100,000 people with positive test rates of more than 8%; (3) an increase in the number of COVID-19 patients hospitalized of more than 10% over a three-day average; (4) ICU bed availability below 20%; and (5) ventilator availability below 25%. According to media reports, in order to get off the watch list, a county must not trigger any of the five thresholds for three consecutive days.[10]

---

[6] Cal. Dep't of Pub. Health, *COVID-19 and Reopening In-Person Learning Framework for K-12 Schools in California, 2020-2021 School Year* (July 17, 2020), https://bit.ly/2Y4fCaI [hereinafter *School Closure Order*].
[7] *Id.* (footnote omitted).
[8] *Id.* In addition to the framework, the Department of Public Health has also issued "industry guidance" on the reopening of schools. *See* Cal. Dep't of Pub. Health & Cal. Dep't of Indus. Relations, *COVID-19 Industry Guidance: Schools and School-Based Programs* (updated Aug. 3, 2020), https://bit.ly/30ZPTC4.
[9] Cal. Dep't of Pub. Health, *County Monitoring List*, https://perma.cc/E8J7-9SHK (last updated Aug. 15, 2020, 11:07 AM).
[10] Annie Vainshtein, *California's Watch List: What It Monitors, and Why It Matters for the Bay Area*, S.F. CHRON. (Aug. 4, 2020), https://bit.ly/2FtxXrf.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

50.     According to 2019–2020 public school enrollment data, there are approximately 6.1 million K-12 public school students in California.[11] Approximately 6 million of these students are in LHJs that are on the county monitoring list.[12] According to 2019-2020 private school affidavit information, there are approximately 470,000 K-12 private school students in California.[13] Approximately 465,000 of these students are in LHJs that are on the county monitoring list.[14]

51.     Public health officials and others have criticized the county monitoring list and the methodology for placing counties on the list. For example, one county health official has stated that the "arbitrary and constantly changing framework that the State has set up to put counties on the watch list and to determine closures (beyond the State 'floor') is fundamentally flawed."[15] That health official cited "data inconsistencies as well as state-imposed hospital transfers and testing restrictions as evidence the watch list criteria is unfair."[16]

52.     The State of California itself has acknowledged flaws in the county monitoring list. On August 5, 2020, it was reported that, due to a "technical problem with the state's coronavirus testing database," California stopped removing from and adding to the county monitoring list.[17] When the monitoring list is frozen, it is impossible for schools in LHJs on the county monitoring list to become eligible for in-person education.

---

[11] Data Reporting Office, Cal. Dep't of Educ., *2019-20 Enrollment by Grade*, https://perma.cc/85SD-9CDP (last updated Aug. 15, 2020).
[12] *Id.*; *see also County Monitoring List*, *supra* note 9.
[13] Educ. Data Mgmt. Div., Cal. Dep't of Educ., *2019-20 Private School Affidavit Data - Schools with Enrollment of Six or More Students* (July 7, 2020), https://perma.cc/ZLL6-PRYN.
[14] *Id.*; *see also County Monitoring List*, *supra* note 9.
[15] Eric Ting, *San Mateo County Health Officer Assails 'Fundamentally Flawed' State Watch List*, SFGATE (Aug. 6, 2020), https://bit.ly/2PSsLiu.
[16] *Id.*
[17] Amy Taxin, *California's Growing Virus Data Collection Headache*, ASSOCIATED PRESS (Aug. 5, 2020), https://bit.ly/2CAMeRW.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

53.     Sonia Angell, the former State Public Health Officer and Department of Public Health Director, abruptly resigned on August 9, 2020. Media reports indicate that Governor Newsom has "hinted that the abrupt departure ... of his state public health officer was related to" California's coronavirus testing data problems.[18]

54.     In an article about the flaws in California's testing data, one public health official was quoted saying "I would say now we're back to feeling blind. We don't know how the epidemic is trending."[19]

55.     The School Closure Order provides that a local health officer may grant a waiver of the reopening restrictions, but only for elementary schools.[20] A school's superintendent—or the equivalent for a charter or private school—may request a waiver "in consultation with labor, parent and community organizations."[21]

56.     The Department of Public Health provided limited guidance on these waivers on August 3, 2020.[22] The guidance does not provide an objective standard for evaluating waiver requests, and does not provide for an oral presentation, a reasoned decision, or an appeal process. The guidance recommends that schools not be considered for a waiver in jurisdictions where the 14-day case rate was more than double the threshold for inclusion on the county monitoring list. In light of this recommendation, Los Angeles County has preemptively stated that it will not entertain waiver requests until "the case rate falls to the levels recommended by the State."[23]

---

[18] Kevin Yamamura & Victoria Colliver, *Newsom Indicates California Health Officer's Abrupt Departure Related to Data Blunder*, POLITICO (Aug. 11, 2020), https://politi.co/2DWiHCL.
[19] Taxin, *supra* note 17.
[20] *School Closure Order*, *supra* note 6.
[21] *Id.*
[22] Cal. Dep't of Pub. Health, *COVID-19 and Reopening In-Person Learning Elementary Education Waiver Process* (Aug. 3, 2020), https://bit.ly/31YpqUz.
[23] News Release, L.A. Cty. Dep't of Pub. Health, *Los Angeles County Will Not Consider School Re-opening Waivers, Per State Guidance* (Aug. 4, 2020), https://bit.ly/3iFbmGg.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

57.     California has not tied the in-person operation of similarly situated entities—such as childcare facilities and camps—to the county monitoring list. Such entities are allowed to conduct in-person operations regardless of whether those entities are located in an LHJ that has been on the county monitoring list within the prior 14 days.

58.     On July 17, 2020, California issued a guidance document for childcare facilities. Recognizing that many childcare facilities remained available to essential workers throughout the pandemic, the childcare guidance provides instruction "[a]s programs begin to reopen and other programs transition from emergency child care for essential workers to enhanced regular operations."[24] The guidelines suggest measures for both children and adults to reduce the risk of COVID-19 transmission, including wearing masks and gloves, standards for cleaning and disinfecting surfaces, hygiene protocols, and physical distancing requirements. However, there is no prohibition on childcare facilities conducting in-person operations, regardless of whether a childcare facility is located in an LHJ on the county monitoring list.

59.     On July 29, 2020, California also issued guidelines for reopening day camps. As with childcare facilities, the guidelines provide safety and hygiene measures for both children and adults for reducing the risk of COVID-19 transmission. These include wearing masks, washing hands, cleaning surfaces, and ensuring sufficient ventilation. However, the State of California has not mandated that camps are only allowed to operate in LHJs not on the county monitoring list.

60.     In sum, Governor Newsom's scheme subjects schools to greater restrictions than camps and childcare facilities. A camp or daycare in an LHJ on the county monitoring list can conduct in-person business, but the parochial school across

---

[24] Cal. Dep't of Pub. Health, Cal. Dep't of Soc. Servs. & Cal. Dep't of Indus. Relations, *COVID-19 Update Guidance: Child Care Programs and Providers* 2 (July 17, 2020), https://bit.ly/2Q2uSAd.

the street cannot. There is no legally-appropriate basis for this discriminatory treatment.

61.    Camps and childcare facilities have been conducting in-person business. In fact, childcare is being provided in the very same school buildings that have been closed to educational instruction.[25]

62.    As of August 11, 2020, there were 8,633 Child Care centers and 24,942 licensed Family Child Care Homes open in California, for a total of 33,575 open facilities.[26] According to California's data, 32,543 of these facilities are located in LHJs that appear on the county monitoring list.[27] Nevertheless, under California's arbitrary framework, zero schools are allowed to conduct in-person education in these very same jurisdictions, even if they implement the same preventative measures (e.g., the use of masks and gloves, hygiene protocols, and physical distancing).

63.    These prohibitions on in-person education apply county-wide without any effort to ascertain local conditions or any particular school's circumstances. Nor do these prohibitions make any accommodation for religious schools, religious instruction, or religious worship offered as part of or in conjunction with an educational curriculum.

64.    In other words, children may gather in a school building to play games, take field-trips, design tie-dye tee shirts, and engage in other fun camp activities. Those same children, however, cannot attend regular school in that same setting to study math, history, or religious studies, or engage in worship.

65.    The discriminatory treatment against schools cannot survive scrutiny. There is no reason to believe that schools implementing the same preventative measures and sometimes operating in the very same buildings present any greater risk

---

[25] Amy Taxin, *California Using Virus-Closed Classrooms for Child Care*, ASSOCIATED PRESS (July 22, 2020), https://bit.ly/3h0NnB9.
[26] Cal. Dep't of Soc. Servs., *Coronavirus (COVID-19) Cases in Child Care Facilities* (Aug. 13, 2020), https://perma.cc/TW2E-NM7C.
[27] *Id.*; *see also County Monitoring List*, *supra* note 9.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

of transmission than childcare facilities or camps. Defendants have offered no explanation for why it is fine for children to share a room to play, but it is prohibited for those very same children in that very same room to learn and pray.

## II.   Defendants' Actions Are Not Supported by Science and Defy Recommendations from the CDC and the AAP to Allow In-Person Instruction

66.     The CDC, AAP, and numerous other organizations and experts have recommended resuming in-person education. Defendants have ignored those recommendations to the detriment of California's children.

67.     Continued school closures in California will have long-term detrimental consequences for the education, safety, and health of school-aged children. Evidence-based research has shown that distance learning is less effective than in-person schooling. Implementation of distance learning since school closures in the spring of 2020 has already had disastrous results in educational growth and development. Children's social development, physical safety, and health are jeopardized by school closures. These costs are too high a burden for California's children to bear, particularly when overwhelming scientific data shows the minimal public health risk that school-aged children pose in contracting or transmitting COVID-19.

### a.   Evidence-based Research Shows Distance Learning to be Substantially Less Effective than In-person Schooling

68.     The concept of distance learning is not new in America. The expansion of virtual or online education since the late 1990s has drawn attention of policymakers and researchers alike, with 501 full-time virtual schools enrolling 297,712 students nationwide in the 2017-2018 academic year.[28] Empirical studies consistently show that students in virtual schools underperform when compared to their counterparts in live educational settings. This performance gap exists for virtual schools established with

---

[28] Alex Molnar, Nat'l Educ. Pol'y Ctr., *Virtual Schools in the U.S. 2019* 4 (May 2019), https://bit.ly/33YNJ7I.

the express purpose of effectively implementing distance learning for students who have chosen to enroll in this method of instruction. This fall, California students who have known only in-person education will be forced to virtually attend schools that are not designed or intended for distance learning—an *ad hoc* experiment in distance learning that will likely widen the existing performance gap.

69.    In a 2019 report by the National Education Policy Center, only 48.5% of virtual schools received acceptable performance ratings, with an average graduation rate of 50.1%, "far short of the national average of 84%."[29]

70.    In a 2015 study, the Center for Research on Education Outcomes at Stanford University ("CREDO") compared online charter school students in 17 states and the District of Columbia to demographically identical students attending in-person schools. Compared to traditional public school students, full-time virtual charter school students showed substantially weaker academic growth. Overall, full-time virtual charter school students experience 180 fewer days of learning in math and 72 fewer days of learning in reading in comparison to traditional public school students.[30] Academic growth was weaker than traditional public schools in a substantial majority of states with online charter schools (including California) and across all subgroups of students (white, black, Hispanic, Asian/Pacific Islander, Native American, multi-racial, those in poverty, English-language learners, and special education students).[31]

71.    For younger students, a distance-learning model presents particular obstacles to their academic growth and development. For example, "[i]n grades K-3, children are still developing the skills to regulate their own behavior, emotions, and

---

[29] *Id.* at 9 (summarizing data for states with available school performance ratings).
[30] James L. Woodworth et al., Ctr. for Research on Educ. Outcomes, *Online Charter School Study* 23 (2015), https://stanford.io/34gu2sj.
[31] *Id.* at 25-34.

attention, and therefore struggle with distance learning."[32] To help these younger students, distance-learning models tend to rely heavily on increased levels of parental involvement to increase student participation and the effectiveness of instruction. *See, e.g.*, 2015 Mathematica Policy Research Report (showing that 78 percent of online charter elementary schools "expect parents to actively participate in the student's instruction").[33] This puts single-parent and two-working-parent families in a systemically disadvantaged position, where parents will have significant difficulty providing the level of participation needed to replace a full-time in-person teacher. The increased reliance on parental participation will also disproportionately hurt lower socio-economic families, where parents' jobs "are more likely to be deemed essential and to be employed in lower-paid service sector positions in transportation, food production, delivery or grocery."[34] These parents are therefore more likely to be unavailable in the home during the school day to participate in the instruction program.

72.    In addition, distance learning relies heavily on screened electronic devices to convey instruction, even as the scientific literature has long and consistently discouraged screen time for young children. Early data from a landmark National Institutes of Health study that began in 2018 indicates that "children who spent more than two hours a day on screen-time activities scored lower on language and thinking tests," and if children spent more than seven hours a day on a screen, they "experienced thinning of the brain's cortex, the area of the brain related to critical thinking and reasoning."[35] This may be because "screens could inhibit certain aspects of a

---

[32] News Release, Nat'l Acads. of Scis., Eng'g, & Med., *Schools Should Prioritize Reopening in Fall 2020, Especially for Grades K-5, While Weighing Risks and Benefits* (July 15, 2020), https://bit.ly/2E4rbr9.

[33] Brian Gill et al., Mathematica Pol'y Research, *Inside Online Charter Schools* 22-23 (Oct. 2015), https://bit.ly/2Y52F0p.

[34] Christina Ramirez, Commentary, *Fall School Closure = Long-Term Health, Learning Costs for Kids*, REALCLEAR POL. (Aug. 6, 2020), https://bit.ly/3av7J2N.

[35] Jennifer F. Cross, *What Does Too Much Screen Time Do to Children's Brains?*, HEALTH MATTERS (2020), https://bit.ly/2Y6HQSl.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

child's development by narrowing their focus of interest and limiting their other means of exploration and learning."[36]

73.     These shortcomings are magnified when applied to instruction that ordinarily takes place in a religious setting. As described above, many Plaintiffs send their children to, teach in, or attend a religious school because religious instruction is infused throughout the school day including during non-instructional time. Faculty model appropriate behavior between classes, in the lunchroom, and on the playground and playing fields. Students congregate together in a religious manner and appropriate conduct is steadily encouraged and reinforced. Religious study, together, is itself often a form of worship, and religious services are included congregationally as part of the school day. These things cannot be pushed online; they are simply and irreparably lost.

### b. Distance Learning During the COVID-19 Pandemic to Date Shows Negative Results that Are Unlikely to Improve in the Fall

74.     Data regarding distance learning implemented following school closures in the spring of 2020 show troubling trends that are projected to continue into the fall.

75.     A survey of 477 school districts by the University of Washington's Center on Reinventing Public Education found a "sobering story": "[J]ust one in three districts expect teachers to provide instruction, track student engagement, or monitor academic progress for all students…. Far too many districts are leaving learning to chance during the coronavirus closures."[37]

76.     In addition to inadequate engagement by schools, evidence in California also shows student participation rates in pandemic distance learning programs are troublingly low. Shortly after the Los Angeles School District shut down in March 2020, the district reported that "[a]bout 15,000 ... high school students are absent online and have failed to do any schoolwork," while "more than 40,000 have not been

---

[36] *Id.*

[37] Betheny Gross & Alice Opalka, Ctr. on Reinventing Pub. Educ., *Too Many Schools Leave Learning to Chance During the Pandemic* 1 (June 2020), https://bit.ly/2Y62WzV.

in daily contact with their teachers."[38] A study from the Los Angeles Unified School District found that, on an average day between mid-March and late-May 2020, "only about 36% of middle and high school students participated online," about 25% only "logged on or viewed work," and "about 40% were absent."[39]

77.     One study found that, because of school closures this past spring, students likely would achieve only "63–68% of the learning gains in reading relative to a typical school year," and only "37–50% of the learning gains in math."[40]

78.     Another study concluded that even those students receiving online learning of average quality for the upcoming fall will lose "three to four months of learning" by the start of 2021, as compared to their peers receiving in-person education.[41]

79.     Many parents send their children to religious schools because the schools teach things that the parents cannot. While such parents will make every effort to encourage their children, there is no reason to believe that similar losses would not manifest in religious education.

### c. *School Closures Put Children's Social Development, Physical Safety, and Mental Health at Risk*

80.     Trusted institutions and individuals throughout the scientific and medical community overwhelmingly support re-opening schools this fall, including the

---

[38] Howard Blume, *15,000 L.A. High School Students Are AWOL Online, 40,000 Fail to Check in Daily Amid Coronavirus Closures*, L.A. TIMES (Mar. 30, 2020), https://lat.ms/3iIZdjD.

[39] Paloma Esquivel, *L.A. Latino, Black Students Suffered Deep Disparities in Online Learning, Records Show*, L.A. TIMES (July 16, 2020), https://lat.ms/3g7D25i.

[40] Megan Kuhfeld et al., *Projecting the Potential Impacts of COVID-19 School Closures on Academic Achievement* 2 (Brown Univ. Annenberg Inst., Paper No. 20-226, May 2020), https://bit.ly/3lYY7dl.

[41] Emma Dorn et al., McKinsey & Company, *COVID-19 and Student Learning in the United States: The Hurt Could Last a Lifetime* 3 (June 2020), https://mck.co/3kKUnV0.

CDC;[42] the AAP;[43] the World Health Organization ("WHO");[44] Royal College of Paediatrics and Child Health;[45] The National Academies of Sciences, Engineering and Medicine;[46] the former Commissioner of the Food and Drug Administration, Dr. Scott Gottlieb;[47] and the Director of the National Institute of Allergy and Infectious Diseases, Dr. Anthony S. Fauci.[48] These experts have warned of the detrimental effects that continued school closures will have on the social development, safety and mental health of children.

81.     Dr. Anthony S. Fauci stated recently that the "default position should be to try, as best as you possibly can, to open up the schools for in-person learning … because of the psychological benefit and in some places, even for the nutrition of children[.]"[49]

82.     The CDC explained that "[s]chools play a critical role in supporting the whole child, not just their academic achievement," including the "development of social and emotional skills," "creat[ing] a safe environment for learning; address[ing] nutritional needs; and facilitat[ing] physical activity."[50]

83.     Social interaction among school-aged children is "particularly important for the development of language, communication, social, emotional, and interpersonal

---

[42] Ctrs. for Disease Control & Prevention, *The Importance of Reopening America's Schools This Fall*, https://bit.ly/31WJc2N (last updated July 23, 2020).
[43] *COVID-19 Planning Considerations: Guidance for School Re-entry*, Am. Acad. of Pediatrics, https://bit.ly/3fXIZBv.
[44] World Health Org., *Considerations for School-Related Public Health Measures in the Context of COVID-19* (May 10, 2020), https://bit.ly/3h1Ixn5.
[45] Royal College of Paediatrics and Child Health, *Open Letter from UK Paediatricians About the Return of Children to Schools* (June 17, 2020), https://bit.ly/3221jom.
[46] *Schools Should Prioritize Reopening in Fall 2020*, *supra* note 32.
[47] Scott Gottlieb, Opinion, *Schools Can Open Safely This Fall*, WALL ST. J. (July 12, 2020), https://on.wsj.com/2YlP45l.
[48] Mark Pazniokas, *In Connecticut Briefing, Fauci Urges a Return to Classroom*, CT MIRROR (Aug. 3, 2020), https://bit.ly/30Xa7MP0.
[49] *Id.*
[50] *The Importance of Reopening America's Schools This Fall*, *supra* note 42.

skills."[51] Especially for younger children (ages 2–5), interactive play with other children is essential both for building foundational skills and for avoiding "anxiety and depression" and "an array of sensory, motor and cognitive issues" later in life.[52]

84.    School closures also cut off access to support systems that children need to help them recognize and manage emotions, appreciate others' perspectives, and make responsible decisions. School connectedness, or a student's belief that teachers and other adults at school care about them and their well-being, is associated with lower levels of depression, thoughts about suicide, social anxiety, and sexual activity, as well as higher levels of self-esteem.[53] This connection in a school environment is especially important for children in unstable or unsupportive home environments.[54]

85.    As mandatory reporters, teachers who have daily contact with children are in the best position to notice and report suspected child abuse. As a report from RAINN (Rape, Abuse, & Incest National Network) explains:

> Many minors are now quarantined at home with their abuser. Meanwhile, these kids are cut off from their safety net—the teachers, coaches, and friends' parents who are most likely to notice and report suspected abuse." ... "As a result, abuse reports to many state authorities have declined—not because there is less abuse taking place, but because children have less contact with adults outside the home who could potentially spot and report abuse. Sadly, it is likely that the risk of children being sexually abused will increase as shelter-in-place orders continue—one

---

[51] *Id.*

[52] Christine K. VanDeVelde, Opinion, *School Closures Damage the Youngest Children*, WALL ST. J. (Aug. 7, 2020), https://on.wsj.com/2Y44cnj.

[53] Cynthia Ewell Foster et al., *Connectedness to Family, School, Peers, and Community in Socially Vulnerable Adolescents*, 81 CHILD. & YOUTH SERVS. REV. 321 (2017).

[54] *See* Alexandra Loukas et al., *School Connectedness Buffers the Effects of Negative Family Relations and Poor Effortful Control on Early Adolescent Conduct Problems*, 20 J. RES. ON ADOLESCENCE 13 (2010), https://bit.ly/3iIhBJA (a longitudinal study of 478 adolescents over 3 years finding "high levels of school connectedness protected adolescents from the deleterious effects of negative family relations").

more tragic consequence of the public health crisis the country currently faces.[55]

86.    A 2018 U.S. Department of Health and Human Services study found that teachers and other educational staff were responsible for making more than one-fifth of all reports of child abuse—more than any other category of reporter.[56] During school closures since the pandemic began "there has been a sharp decline in reports of suspected maltreatment," and hospitals have seen an increase in hospitalizations of children suffering from abuse.[57] Calls to the hotline of the Los Angeles County Department of Children and Family Services "have plummeted since schools were closed due to the pandemic" by 50%.[58] The pandemic has caused school-aged children to be "isolated at home with parents, who may be under increased stress with the added responsibilities of educating their kids … working from home or the economic stress of recent job loss" which are "well known risk factors for abuse."[59]

87.    As the foregoing paragraphs indicate, resumption of in-person education will have manifold psychological benefits for children. This is particularly true for religious schools, which are often tight-knit communities of families with shared values and experiences. Children attending such schools congregate with their peers in school, at religious worship, and elsewhere, and such schools are at the core of these communities. Shutting down these schools shuts down substantially more than just school.

---

[55] *For the First Time Ever, Minors Make Up Half of Visitors to National Sexual Assault Hotline*, RAINN (Apr. 16, 2020), https://bit.ly/3fXLliP.
[56] U.S. Dep't of Health & Human Servs., *Child Maltreatment 2018*, at 8 (2018), https://bit.ly/3h48gLC.
[57] *The Importance of Reopening America's Schools this Fall*, *supra* note 42.
[58] Kelly Callahan & ChrisAnna Mink, *Child Abuse Hotline Calls Are Down During COVID-19, But Abuse Fears Are Up*, CTR. FOR HEALTH JOURNALISM (May 7, 2020), https://bit.ly/3lQ9Z0Q.
[59] *Id.*

### d. *Current Scientific Data Shows that Opening Schools Presents Minimal Risk to Public Health*

88.     The latest CDC guidance shows the relatively low infection risk in children: people younger than 18 years old are hospitalized at a rate of 8.0 per 100,000 population, compared to 164.5 for adults.[60] The breakdown of hospitalization rates shows that children younger than two years old were hospitalized at much higher rates (24.8 per 100,000 population) compared to children aged 2–4 years (4.2) and 5–17 years (6.4).[61]

89.     As of August 13, 2020, the California Department of Public Health reports children under the age of 5 account for 2.1 percent of the cases in the state; children between 5 and 17 years old account for 7.46 percent of cases.[62] For both age groups, the percentage of infection is less than half of their respective percentage of the California population (5.8% and 16.7%, respectively; compared to people ages 18–34, which represent 35.3% of infections in California, but only account for 24.3% of the state population).[63] A recent study shows that the lower rates of infection in young children may be due to lower levels of a receptor enzyme gene in their airways, which COVID-19 uses "for host entry."[64] California reports only a single death of a child, from the 5- to 17-years-old age group.[65]

---

[60] Lindsay Kim et al., *Hospitalization Rates and Characteristics of Children Aged <18 Years Hospitalized with Laboratory-Confirmed COVID-19 — COVID-NET, 14 States, March 1–July 25, 2020*, 69 MORBIDITY & MORTALITY WKLY. REP. 1081 (2020), https://bit.ly/310asyn.
[61] *Id.*
[62] Cal. Dep't of Pub. Health, *Cases and Deaths Associated with COVID-19 by Age Group in California* (Aug. 13, 2020), https://perma.cc/6SZ4-SPV5.
[63] *Cases and Deaths Associated with COVID-19 by Age Group in California*, *supra* note 62.
[64] Supinda Bunyavanich, Alfin Vicencio, *Nasal Gene Expression of Angiotensin-Converting Enzyme 2 in Children and Adults*, JAMA (2020) 323(23); 2427-2429.
[65] *Id.*

90.     When school-age children are infected, studies show that they tend to have mild[66] or asymptomatic infections.[67]

91.     Early in the global outbreak, the Australian Research Council released a study that looked at countries experiencing the pandemic earlier than Western countries: China, Singapore, South Korea, Japan, and Iran. The study concluded that while "SARS-CoV-2 can cause mild disease in children, the data available to date suggests that children have not played a substantive role in the intra-household transmission of SARS-CoV-2."[68]

92.     In April, the Ministry of Health for British Columbia found that "COVID-19 virus has a very low infection rate in children estimated at 1–5% worldwide."[69]

93.     A large-scale analysis of school transmission studies, reviewing data from December 2019 to the end of May 2020, showed that the children were not drivers of transmission in school environments.[70] Similarly, a study of county infection rates of COVID-19 across the United States from March 1, 2020, to April 27, 2020, found "no evidence that school closures influenced the growth rate" in COVID infections.[71]

---

[66] Nisha S. Mehta et al., *SARS-CoV-2 (COVID-19): What Do We Know About Children? A Systematic Review*, CLINICAL INFECTIOUS DISEASES (May 11, 2020), https://bit.ly/2PYnWV2.

[67] Petra Zimmermann & Nigel Curtis, *Coronavirus Infections in Children Including COVID-19*, 39 PEDIATRIC INFECTIOUS DISEASE J. 355 (2020), https://bit.ly/2DOBYpT.

[68] Yanshan Zhu et al., *Children Are Unlikely to Have Been the Primary Source of Household SARS-CoV-2 Infections*, MEDRXIV (Mar. 30, 2020), https://bit.ly/3I1190Q (preprint).

[69] Sarah Silverberg & Laura Sauvé, BC Centre for Disease Control, *Caring for Children with COVID-19* (Apr. 3, 2020), https://bit.ly/3avBbpm.

[70] Luis Rajmil, *Role of Children in the Transmission of the COVID-19 Pandemic: A Rapid Scoping Review,* BMJ PAEDIATRICS OPEN (2020), https://bit.ly/2E8RYm4

[71] Charles Courtemanch et al., *Strong Social Distancing Measures in the United States Reduced the COVID-19 Growth Rate*, 39 HEALTH AFF. 1237, 1242 (2020), https://bit.ly/3asqlAF.

94.     Finland and Sweden conducted a comparative joint study of transmission rates in Finnish schools (which reopened in mid-May 2020) compared to Swedish schools (which never closed), then compared them to the rate of infection in other professions in both countries. The report observed that there was "no measurable direct impact on the number of laboratory confirmed cases" in children in either country, but also that there was no increased risk for teachers as compared to higher risks present in other professional environments.[72]

95.     An Australian study observed COVID-19 transmission among children and adults in 25 educational settings (early childhood education and care settings, in addition to primary and secondary schools) for a period of three months.[73] The study concluded that the "spread of COVID-19 within NSW (New South Wales) schools has been very limited."[74] This study also found that, unlike other respiratory viruses, children are not the primary drivers of the spread of COVID-19.[75]

96.     Since the reopening of schools in 22 member states in the European Union, there has been no significant increase in infections of COVID-19 among students, teachers, and parents.[76]

97.     An Irish study observing six confirmed cases in children found that no secondary cases were reported as arising from the original pediatric infections.[77]

---

[72] Pub. Health Agency of Swed., *Covid-19 in Schoolchildren – A Comparison Between Finland and Sweden* 7 (2020), https://bit.ly/2FwFsxL.

[73] National Centre for Immunisation Research and Surveillance, *Covid-19 in Schools: The Experience in NSW* 1 (Apr. 26, 2020) , https://bit.ly/2FuEAcT. *See also* Kristine Macartney et al., *Transmission of SARS-CoV-2 in Australian Educational Settings: A Prospective Cohort Study*, THE LANCET (Aug. 3, 2020), https://bit.ly/3g0cH97 (re-presenting findings of the same study).

[74] *Covid-19 in Schools*, *supra* note 73, at 1.

[75] *Id.*

[76] Carly Ortiz-Lytle, *More Than 20 EU Member States Have Not Seen a Spike in Coronavirus Cases in Schools After Reopening*, WASH. EXAMINER (May 21, 2020), https://washex.am/2E4lo4U.

[77] Laura Heavey et al., *No Evidence of Secondary Transmission of COVID-19 from Children Attending School in Ireland, 2020*, 25 EUROSURVEILLANCE, May 28, 2020, at 2, https://bit.ly/34gxkMb.

98.     On June 29, 2020, a French study released a report on 1,340 people linked to primary schools in France and concluded that infected children did not spread the virus to other children, teachers, or school staff.[78]

99.     On July 8, 2020, Prevent Epidemics published a report by the former Head of the CDC, titled "Reopening America's Schools: A Public Health Approach." The report found that the evidence "suggests that children may play a smaller role in transmission of COVID-19 than adults."[79]

100.    A study of German school children published in July 2020 concluded that schools and young people do not play a significant role in the transmission of the coronavirus.[80] This study found that schools in Germany did not become hotspots after they were reopened.[81]

101.    The National Academies of Sciences, Engineering, and Medicine published a report in July 2020 that weighed the health risks of reopening K-12 schools against the educational risks of providing no in-person instruction. According to the report, "the science has suggested that children are at lower risk of severe illness relative to adults, and many infections in children are either asymptomatic or are very mild."[82] The report concluded that:

---

[78] Arnaud Fontanet et al., *SARS-CoV-2 Infection in Primary Schools in Northern France: A Retrospective Cohort Study in an Area of High Transmission*, MEDRXIV (June 29, 2020), https://bit.ly/2YlSrcb (preprint).
[79] Prevent Epidemics, *Reopening America's Schools: A Public Health Approach* 6 (July 2020), https://bit.ly/3atSpDG.
[80] Jakob Peter Armann et al., *Hospital Admission in Children and Adolescents with COVID-19*, 117 DEUTSCHES ÄRZTEBLATT INT'L 373 (2020), https://bit.ly/3g5hxlf.
[81] *Id.*
[82] *Reopening K-12 Schools During the COVID-19 Pandemic: Prioritizing Health, Equity, and Communities* 14 (Enriqueta Bond et al. eds., Nat'l Acads. Press 2020), https://bit.ly/2CuWYRE (preprint).

> Districts should weigh the relative health risks of reopening against the educational risks of providing no in-person instruction in Fall 2020. Given the importance of in-person interaction for learning and development, districts should prioritize reopening with an emphasis on providing full-time, in-person instruction in grades K-5 and for students with special needs who would be best served by in-person instruction.[83]

102.    A leading U.K. epidemiologist reported to the media in July 2020 that there has been no reported cases of a teacher catching coronavirus from pupils.[84]

103.    Israel reported that even in the case of a large high school outbreak, in which 13.2% of students tested positive for COVID-19, no hospitalizations were required, and no secondary infections were documented, indicating the outbreak was both mild and limited to the school.[85]

104.    On July 23, 2020, the CDC updated its report titled "The Importance of Reopening America's Schools This Fall."[86] This report found:

> Death rates among school-aged children are much lower than among adults. At the same time, the harms attributed to closed schools on the social, emotional, and behavioral health, economic well-being, and academic achievement of children, in both the short- and long-term, are well-known and significant.

105.    There is no reason to think that these statistics would be any different for religious schools. To the contrary, schools that teach personal propriety including hygiene not only as a matter of good practice but as an article of faith are more likely to be effective in implementing disease-containing protocols.

---

[83] *Id.* at 5, 75.
[84] Mark McLaughlin et al., *No Known Case of Teacher Catching Coronavirus from Pupils, Says Scientist*, TIMES (London) (July 21, 2020), https://bit.ly/346I8fw.
[85] Chen Stein-Zamir et al., *A Large COVID-19 Outbreak in a High School 10 Days After Schools' Reopening, Israel, May 2020*, 25 EUROSURVEILLANCE, July 23, 2020, at 2, https://bit.ly/2DNmUZC.
[86] *The Importance of Reopening America's Schools This Fall*, *supra* note 42.

### III.  The Defendants' Actions Irreparably Harm Plaintiffs and Deprive Them of the Free Exercise of Religion

106.   In addition to subjecting Parent Plaintiffs' children to the emotional, psychological, physical, and academic harms discussed above, the School Closure Order deprives Plaintiffs of the free exercise of religion.

107.   As the Supreme Court recently affirmed, religious education is central to the free exercise of religion. *See Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2064. "Religious education is vital to many faiths practiced in the United States," including, among others, Christian, Islamic, and Judaic faiths. *Id.* "The religious education and formation of students is the very reason for the existence of most private religious schools …." *Id.* at 2055.

108.   There is a "close connection that religious institutions draw between their central purpose and educating the young in the faith." *Id.* at 2066.

109.   "Religious education is a matter of central importance in Judaism." *Id.* at 2065. "The term 'rabbi' means teacher," *id.* at 2067, and "the Torah is understood to require Jewish parents to ensure that their children are instructed in the faith," *id.* at 2065.

110.   Religious education is also crucial to Christians. For example, "[i]n the Catholic tradition, religious education is 'intimately bound up with the whole of the Church's life.' Under canon law, local bishops must satisfy themselves that 'those who are designated teachers of religious instruction in schools … are outstanding in correct doctrine, the witness of a Christian life, and teaching skill.'" *Id.* (omission in original) (internal citations omitted). Canon law also provides that "Catholic parents … have the duty and right of choosing those means and institutions through which they can provide more suitably for the Catholic education of their children," and "are to entrust their children to those schools which provide a Catholic education." *Codex Iuris Canonici* c.793 § 1, c.798 (1983).

111.    Similarly, Protestant churches have long "viewed education as a religious obligation." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2065.

112.    As detailed in the Plaintiff descriptions above, Defendants' actions deprive Plaintiffs of their ability to exercise this key element of their faith.

113.    The School Plaintiffs are religious schools devoted to Orthodox Jewish, Christian, and Catholic education.

114.    Each of the Parent Plaintiffs have enrolled their children with a School Plaintiff in order to direct the religious education of their minor children.

115.    Each of the Teacher Plaintiffs chose to teach at a School Plaintiff because of the religious mission of the school.

116.    Teaching religion, developing the faith of students, and ministering to students are central to the mission and curriculum of each of the School Plaintiffs. Religious education, ceremony, and prayer are incorporated throughout the schools' curricula and schooldays. The education provided by the Plaintiff Schools is essential to the free exercise of religion by the Plaintiff Schools, the Plaintiff Parents and their children, and the Plaintiff Teachers.

a.    The primary goal of Jewish education is the study of Torah. The study of Torah is itself a form of religious worship: "For as the Talmud sees it, the study of Torah, a study often centered on picayune particulars of halakhah, is one of the most pristine forms of divine worship." Chaim Saiman, Halakhah: The Rabbinic Idea of Law 6 (2018). Through study of Torah, Jewish education hopes to socialize students into an Orthodox Jewish way of life. For Jewish students, the education provided by School Plaintiffs is necessary to fulfill one's religious responsibility to pray, study foundational Jewish texts and ethics, and live an ethical life. The schools' curricula provide children instruction in the Hebrew language, Jewish history, the text and historical commentary on the Torah, and the rituals that are foundational to the tenets of their religion.

b.      For Christian students, prayer, chapel, and bible study are vital ele-ments of schooldays, and scripture is incorporated throughout the students' aca-demic education. For Catholic students, the school schedule also includes regu-lar Mass in which the entire school community participates.

117.   In-person education is critical to the free exercise of religion by each of the School Plaintiffs, Parent Plaintiffs, and Teacher Plaintiffs.

a.      Community and gathering together are essential elements of the Catholic, Christian, and Jewish faiths.

b.      The communal aspect of the Jewish religious experience is the core of Judaism. Judaic study is an inherently communal experience that historically requires partnered dialogue, communal prayer, and a tangible, sensory experi-ence of holidays and celebrations, particularly for young children. The Torah it-self is read as prescribing in-person interaction between students and teachers as necessary for the religious education of children. Study of Torah is not simply about the accumulation of knowledge or development of skill: "even if one has retained nothing, the experience itself—live contact with the epiphanous divine will manifested through Torah, and encounter with the divine presence, which hovers over its student—is immeasurably important." Aharon Lichtenstein, "Study" in Twentieth Century Jewish Religious Thought 931, 934 (A. Cohen & P. Mendes-Flohr eds. 2009). "Torah study, regarded as an encounter with the Sekhinah (the divine presence), is enhanced by an experiential dimension. Hence the importance that the rabbis assigned to the confluence of prayers and study: They urged that one should preferably engage in both at the same place …." *Id.*

c.      Similarly, in Christianity, the Bible requires that in order to prac-tice the Christian faith, and in order to learn how to be a disciple of Christ, you need to gather together with your fellow Christians. For example, Matthew 18:20 states: "For where two or three gather in my name, there am I with them."

In-person education allows children to be moved by the Holy Spirit and experience what it means to be a part of the brotherhood and sisterhood in Christ.

      d.    The Catholic Church, in particular, has repeatedly reaffirmed the centrality of physical presence in the practice of Christianity. As a 2002 Vatican document explained, "the virtual reality of cyberspace cannot substitute for real interpersonal community, the incarnational reality of the sacraments and the liturgy, or the immediate and direct proclamation of the gospel." Pontifical Council for Social Communications, *The Church and the Internet*, I.5 (2002).

118.    Defendants' actions deprive the School Plaintiffs, the Parent Plaintiffs and their children, and the Teacher Plaintiffs of the free exercise of religion, and deprive the Parent Plaintiffs of the right to direct the religious education of their minor children. Distance learning does not allow for the School Plaintiffs to provide the religious instruction that their faiths require.

      a.    Because Jewish education does not merely aim to impact skills and knowledge, but socialize students into a religious community and inculcate religious values, online platforms are uniquely inadequate for Jewish education. Socializing young children cannot be done without in-person community. Distance learning does not allow for the traditional communal celebration of religious milestones, such as the *upsherin* (an Orthodox Jewish boy's first haircut), and observances, such as *siyum* (a celebratory meal to mark a student's completion of a section of central Jewish religious texts such as the Talmud or the Mishnah). Children are not able to learn, practice, or recite entire sections of the daily prayer service remotely because according to Jewish law, those prayers can only be recited within a *minyan*, a quorum of 10 males aged 13 or over. Students are deprived of the opportunity to understand important aspects of the rituals and Holy Days that are critical to the practice of their religion. Distance learning also does not allow for immersive Hebrew instruction which is central to religious practice and often cannot be provided at home. Distance learning

also does not allow teachers to model for the students how to manifest Judaism's values and ethics and apply the teachings of Judaism to life's everyday challenges.

b.     In Christian schools, distance learning does not allow students to join together as the Body of Christ, effectively participate in communal prayer, or participate in corporate worship. Without in-person education, students are deprived of the daily spiritual support provided by clergy and staff, and they are robbed of the opportunity to witness educators who have been charged with modeling Christ's teachings.

c.     In Catholic schools in particular, the life of the school revolves around the celebration of Mass and the reception of the sacraments, especially the Eucharist and confession. None of these is possible except in the physical presence of a priest or Eucharistic minister.

119.   Each of the School Plaintiffs desires to open for in-person instruction, and would do so but for the School Closure Order. Each of the Parent Plaintiffs want their children to attend school in-person, and those children would do so but for the School Closure Order. Each of the Teacher Plaintiffs desires to resume in-person instruction, and would do so but for the School Closure Order.

120.   Each school's situation is different. Plaintiff Schools plan on opening, but if their circumstances changed, may make a different choice. Many other religious schools similarly will wrestle with the decision whether to open. Laws disparately burdening religion should be tailored to minimize the imposition on this fundamental right. Laws trenching on fundamental rights should be adopted and reviewed with protective procedures. California did none of this. As the saying goes, when all you have is a hammer, the whole world looks like a nail. Defendants have made nails of all religious schools.

# CLAIMS FOR RELIEF

## FIRST CLAIM
### 42 U.S.C. § 1983
### Violation of Free Exercise Clause – Lack of General Applicability

121.    Plaintiffs repeat and incorporate the preceding paragraphs as if fully stated herein.

122.    The First Amendment, made applicable to the States through the Fourteenth Amendment, prohibits any law abridging the free exercise of religion.

123.    A state action that discriminates on the basis of religion is subject to strict scrutiny, and must be invalidated unless it is "justified by a compelling interest and is narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).

124.    A law that provides for individualized exceptions is not generally applicable and therefore discriminates on the basis of religion.

125.    In-person religious education is central to the faith of and free exercise of religion by each of the Plaintiffs.

126.    The School Closure Order infringes on the right of School Plaintiffs and Teacher Plaintiffs to provide religious instruction to their students, the right of Parent Plaintiffs to choose religious education for their children, and the right of Parent Plaintiffs' students to receive religious instruction.

127.    The School Closure Order is not generally applicable because it does not apply to equivalent operations such as childcare facilities and camps. It also permits local health officials discretion to grant waivers for elementary schools to open for in-person instruction. The School Closure Order does not offer any objective standard for local health officials to employ when evaluating the merits of waiver requests.

128.    While the State unquestionably has a compelling interest in safeguarding public health, the School Closure Order is not narrowly tailored to that interest. The CDC, the AAP, and other public health organizations have endorsed in-person instruction for the 2020–21 school year, and have outlined measures that would ensure public

safety while also providing students with the educational developmental benefit of in-person education. The state itself has crafted social distancing guidelines and other preventative measures that allow childcare facilities and camps to safely conduct in-person operations. Those measures, among others, are more narrowly tailored than the blanket closure order imposed here.

129.   Moreover, mandatory distance learning for all grade levels and all ability groups does not advance the state's interest in protecting public health at all. Distance learning increases educational inequities, particularly for low-income, minority, and special-needs students; deprives families of childcare, meals, and other supports; decreases mental health; and increases the risk of child abuse. By contrast, children are at the lowest risk of contracting or spreading COVID-19, and are at the lowest risk of developing serious complications in the improbable event that they contract COVID-19.

130.   Therefore, the Court should enter judgment in favor of Plaintiffs and declare that the School Closure Order violates the Free Exercise Clause of the First Amendment.

## SECOND CLAIM
### 42 U.S.C. § 1983
### Violation of Substantive Due Process – Right to an Education

131.   Plaintiffs repeat and incorporate the preceding paragraphs as if fully stated herein.

132.   The Due Process Clause of the Fourteenth Amendment "specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (citations omitted).

133.   State action that infringes on a fundamental right is "subject to strict scrutiny and is invalid[] unless it is 'narrowly tailored to serve a compelling state interest.'" *United States v. Juvenile Male*, 670 F.3d 999, 1012 (9th Cir. 2012) (quoting *Reno v. Flores*, 507 U.S. 292, 301–02 (1993)); *see also Serrano v. Priest*, 5 Cal. 3d 584, 597 (1971) (noting that, where strict scrutiny applies, "the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose").

134.   The right of parents to "direct the upbringing and education of children under their control" is a fundamental constitutional right. *Pierce v. Soc'y of Sisters of the holy Names of Jesus and Mary*, 268 U.S. 510, 534–35 (1925).

135.   California courts have long recognized that education is a fundamental interest in California. *Serrano*, 5 Cal. 3d at 608–09. Article IX of the California Constitution affirms that "[a] general diffusion of knowledge and intelligence [is] essential to the preservation of the rights and liberties of the people." Cal. Const. art. IX, § 1. Recognizing the importance of education, courts apply strict scrutiny when evaluating executive actions that infringe upon this interest. *Serrano*, 5 Cal. 3d at 597.

136.   In-person instruction is a critical component of Plaintiff Schools' educational mission.

137.   Parents have chosen to enroll their children at Plaintiff schools specifically to provide their children with an in-person, religious education.

138.   Parents of students with special needs, in particular, have chosen to enroll their children at Plaintiff Schools to provide the educational and therapeutic services of their choice, options that they determined were not available in their local public schools.

139.   Plaintiff Schools cannot provide the same level of instruction—to all students generally and to special needs students specifically—through remote learning.

140.   The School Closure Order infringes on the rights of the Parent Plaintiffs by preventing them from directing the religious education of their children.

141.    The School Closure Order infringes on the rights of the Parent Plaintiffs by categorically prohibiting parents from choosing a specific educational program and by compelling private schools to follow the same path of education as public schools.

142.    The School Closure Order infringes on the rights of the Plaintiff Parents' minor children by basing the in-person instruction ban on the geographic locations of schools rather than each school's ability to implement appropriate safety measures. *See Butt v. State*, 4 Cal. 4th 668, 692 (1992) (noting that California's Constitution forbids State actors from denying "basic educational equality on the basis of district residence").

143.    The School Closure Order is contrary to the expert judgment of the CDC, the AAP, and other public health organizations that have determined that the risks of COVID-19 to children and teachers is outweighed by the educational, psychological, and developmental harm of mandatory distance-learning.

144.    Even as the Defendants force the closure of School Plaintiffs, the state and local governments are permitting other forms of indoor gatherings that create equal or greater risk of COVID-19 transmission. Among other things, Defendants have allowed childcare facilities and camps to conduct in-person operations, so long as social distancing and other preventative measures are followed.

145.    The School Closure Order is not narrowly tailored to the state's interest in combatting the spread of COVID-19. As demonstrated by the less restrictive regulations imposed on childcare facilities, camps, and other more-favored gatherings, the Defendants could prevent the transmission of COVID-19 through other means that do not infringe on individuals' fundamental constitutional rights.

146.    Therefore, the Court should enter judgment in favor of Plaintiffs and declare that the School Closure Order violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article IX of the California Constitution.

## THIRD CLAIM
### 42 U.S.C. § 1983
### Violation of Free Exercise Clause – Parental Rights

147.    Plaintiffs repeat and incorporate the preceding paragraphs as if fully stated herein. The Free Exercise Clause of the First Amendment, in combination with the Due Process Clause of the Fourteenth Amendment, enshrines a right of the highest constitutional order. *See Yoder*, 406 U.S. at 233 ("However read, the Court's holding in *Pierce* stands as a charter of the rights of parents to direct the religious upbringing of their children. And, when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment."); *Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 881 (1990) (recognizing that the First Amendment may bar the application of a neutral, generally applicable law when the law implicates both the Free Exercise Clause and the right of parents to direct the education of their children); *see also Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020) ("Drawing on 'enduring American tradition,' we have long recognized the rights of parents to direct 'the religious upbringing' of their children." (citing *Yoder*, 406 U.S. at 213–14, 232)).

148.    The state may not interfere with parents' rights to direct the religious upbringing and education of their children except where the interference is narrowly tailored to a compelling state interest.

149.    In-person instruction is a critical component of School Plaintiffs' religious mission.

150.    Parents have chosen to enroll their children at School Plaintiffs specifically to provide their children with an in-person, devotional education.

151.    The School Closure Order infringes on the ability of Parent Plaintiffs to direct the religious upbringing of their children.

152.    By forcing the closure of religious schools, while permitting childcare facilities and camps to conduct in-person operations, the Defendants have unlawfully abridged the ability of Plaintiff Parents and their children to freely exercise their religion.

153.    The School Closure Order is not narrowly tailored to the state's interest in combatting the spread of COVID-19. As demonstrated by the less restrictive regulations imposed on childcare facilities, camps, and other more-favored gatherings, the Defendants could prevent the transmission of COVID-19 through other means that do not infringe on individuals' religious liberty.

154.    Therefore, the Court should enter judgment in favor of Plaintiffs and declare that the School Closure Order violates the Free Exercise Clause of the First Amendment.

**FOURTH CLAIM**
**42 U.S.C. § 1983**
**Violation of Procedural Due Process**

155.    Plaintiffs repeat and incorporate the preceding paragraphs as if fully stated herein.

156.    The Fourteenth Amendment to the U.S. Constitution and article I, section 7 and article I, section 15 of the California Constitution prohibit state actors from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1; *see* Cal. Const. art. I, §§ 7, 15.

157.    "For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (quoting *Baldwin v. Hale*, 68 U.S. (1 Wall.) 223, 233 (1864)). This "'opportunity to be heard' … must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

158.    Generally, "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Shinault v. Hawks*, 782 F.3d 1053, 1058

(9th Cir. 2015) (quoting *Zinermon v. Burch*, 494 U.S. 113, 127 (1990)). "[I]n situations where the State feasibly can provide a predeprivation hearing … it generally must do so regardless of the adequacy of a postdeprivation … remedy." *Id.* (quoting *Zinermon*, 494 U.S. at 132); *see Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569–70 (1972) ("When protected interests are implicated, the right to some kind of prior hearing is paramount.").

159.    The process that is constitutionally required is determined by weighing (1) "the private interest affected"; (2) "the risk of erroneous deprivation through the procedures used, and the value of additional safeguards"; and (3) "the government's interest, including the burdens of additional procedural requirements." *Shinault*, 782 F.3d at 1057 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

160.    Here, the state's failure to provide any pre-deprivation hearing violated Plaintiffs' procedural due process rights.

161.    First, the School Closure Order deprives Plaintiffs of fundamental liberty interests, including their rights "to acquire useful knowledge …, establish a home and bring up children, to worship God according to the dictates of [their] own conscience, and generally to enjoy those privileges long recognized … as essential to the orderly pursuit of happiness by free men." *Roth*, 408 U.S. at 572 (second omission in original) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)).

162.    The School Closure Order deprives Plaintiffs of these rights for an indefinite period of time, which could potentially last for months or even longer. *See Goss v. Lopez*, 419 U.S. 565, 577 (1975) (deprivation of right to education lasting 10 days was substantial and required pre-deprivation process). The indefinite deprivation of these interests comes at a great cost: the educational, emotional, and spiritual well-being of children. Distance learning increases educational inequities, decreases mental health, and increases the risk of child abuse.

163.   Second, the School Closure Order presents a substantial risk of erroneous deprivation, which could be avoided through additional procedural safeguards. For example, a pre-deprivation hearing would allow School Plaintiffs to present plans and evidence that they are prepared to open safely (including by implementing CDC and AAP guidance), rather than being subjected to a blanket closure order based only on their location.

164.   Third, the state's interests in dispensing with any pre-deprivation hearing is minimal. This is not the type of "emergency situation[]" that can justify eliminating pre-deprivation process. *See Bell v. Burson*, 402 U.S. 535, 542 (1971). Although the COVID-19 pandemic has created many challenges, it is now a long-term problem. The School Closure Order was issued more than four months after California proclaimed a State of Emergency, and nearly two months before the traditional start of the school year in California. Given the lengthy period of time available, the State clearly could have permitted some pre-deprivation process, such as allowing schools that wish to conduct in-person instruction to present evidence regarding how school re-openings can be conducted safely, and to submit written plans and protocols for their proposed reopening.

165.   Therefore, the state violated Due Process by failing to provide Plaintiffs notice and a hearing before prohibiting schools from opening.

166.   The School Closure Order also violates Due Process because it fails to provide a sufficient post-deprivation hearing. While the Order allows local health officers to grant a waiver, the waiver process is unconstitutionally restrictive and vague.

167.   First, waivers are available only to elementary schools. For middle and high schools, the Order provides for no pre-deprivation or post-deprivation process whatsoever. Schools in locations—including Los Angeles County—where the 14-day case rate is more than double the threshold for inclusion on the county monitoring list, may also be ineligible for waivers, and thus likewise are provided no pre-deprivation or post-deprivation process.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

168.    The Order also provides no meaningful criteria or objective standard by which the local health officer should examine and evaluate the waiver request. It therefore "impermissibly delegates basic policy matters" to local officials "for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (plurality opinion) (The void-for-vagueness doctrine "guards against arbitrary or discriminatory law enforcement" by local officials.).

169.    The waiver process also fails to provide several "elements of due process," including an opportunity to make an oral presentation, a decision based on the record with a statement of reasons for the result, or an opportunity to appeal. *See Rogin v. Bensalem Twp.*, 616 F.2d 680, 694 (3d Cir. 1980) (citing *Mathews*, 424 U.S. at 335).

170.    Therefore, the Court should enter judgment in favor of Plaintiffs and declare that the School Closure Order violates the Due Process Clause of the Fourteenth Amendment, and Article I of the California Constitution.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs request that the Court:

a.    Declare that the First and Fourteenth Amendments to the United States Constitution and Articles I and IX of the California Constitution require Defendants to cease enforcing the School Closure Order against Plaintiffs and similarly-situated individuals and entities;

b.    Enjoin Defendants from enforcing the School Closure Order against Plaintiffs and similarly situated individuals and entities in violation of their constitutional rights, including the rights to the free exercise of religion and due process;

c.    Award nominal damages to Plaintiffs;

d.    Award actual damages to Plaintiffs;

1        e.     Award Plaintiffs the costs of this action and reasonable attorney's fees;

2  and

3        f.     Award such other and further relief as the Court deems equitable and just.

4                                **<u>JURY TRIAL DEMANDED</u>**

5        Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

6  Civil Procedure, of all issues so triable.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Dated: August 17, 2020

Respectfully Submitted,

By: /s/ Alexis Miller Buese
Alexis Miller Buese
Logan P. Brown
Ryan Stasell
Summer A. Wall
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: +1 310 595-9668
Facsimile: +1 310 595-9501

Gordon D. Todd*
David S. Petron*
Erika L. Maley*
Ellen Crisham Pellegrini*
Dino L. LaVerghetta*
Lucas W.E. Croslow*
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736-8760
Facsimile: +1 202 736-8711

Michael H. Porrazzo†
THE PORRAZZO LAW FIRM
30212 Tomas, Suite 365
Rancho Santa Margarita, CA 92688
Telephone +1 949 348-7778
Facsimile: +1 949 209-3514

*Attorneys for Plaintiffs*

\* *Application for admission pro hac vice to be submitted*
† *Counsel for Plaintiff Montebello Christian School only*