ALEXIS MILLER BUESE (SBN: 259812)
alexis.buese@sidley.com
LOGAN P. BROWN (SBN: 308081)
lbrown@sidley.com
RYAN STASELL (SBN: 307431)
rstasell@sidley.com
SUMMER A. WALL (SBN: 331303)
summer.wall@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: +1 310 595–9668
Facsimile: +1 310 595–9501

MICHAEL H. PORRAZZO* (SBN: 121260)
mhporrazzo@porrazzolaw.com
THE PORRAZZO LAW FIRM
30212 Tomas, Suite 365
Rancho Santa Margarita, CA 92688
Telephone +1 949 348–7778
Facsimile: +1 949 209–3514

* Counsel for Plaintiff Montebello
  Christian School only

† Application for admission
  pro hac vice submitted

GORDON D. TODD †
gtodd@sidley.com
DAVID S. PETRON †
dpetron@sidley.com
ERIKA L. MALEY †
emaley@sidley.com
ELLEN CRISHAM PELLEGRINI †
epellegrini@sidley.com
DINO L. LAVERGHETTA †
dlaverghetta@sidley.com
LUCAS W.E. CROSLOW †
lcroslow@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736–8760
Facsimile: +1 202 736–8711

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SAMUEL A. FRYER YAVNEH ACADEMY *et al.*,<br><br>Plaintiffs,<br><br>*v.*<br><br>GAVIN NEWSOM *et al.*,<br><br>Defendants. | No. 2:20-cv-7408 (DPP) (PLAx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: Hon. Dean D. Pregerson<br><br>Hearing: September 21, 2020<br>Time: 10:00 a.m.<br>Room: 9th Floor, Courtroom 9C |

# **CONTENTS**

TABLE OF AUTHORITIES .............................................................................................ii

INTRODUCTION ......................................................................................................2

   I.   Defendants Have Banned In-Person Religious Education,
      While Allowing Similar Entities to Re-Open. ..............................................4

   II.  The School Closure Order Inhibits Plaintiffs' Free Exercise of Religion. ....5

   III. Defendants' Actions Are Contrary to Recommendations from the CDC,
       the AAP, and Other Experts, and are Not Scientifically Sound ....................8

LEGAL STANDARD ...............................................................................................11

ARGUMENT ............................................................................................................11

   I.   Plaintiffs Are Likely to Succeed on the Merits of Their Claims..................12

     A.  The Order Interferes with Plaintiffs' Free Exercise of Religion. ...............12

     B.  The School Closure Order Violates Plaintiff Parents' Right to Direct
        Plaintiff Students' Religious Education. ....................................................17

     C.  The School Closure Order Violates Procedural Due Process....................20

   II.  Plaintiffs Will Be Irreparably Harmed if An Injunction Is Not Granted.......23

   III. The Balance of the Equities and the Public Interest Weigh in Favor of
       Granting the Injunction. ..............................................................................24

CONCLUSION.........................................................................................................25

# **AUTHORITIES**

**Page(s)**

**Cases**

*Am. Family Ass'n, Inc. v. City & Cty. of San Francisco*,
   277 F.3d 1114 (9th Cir. 2002) .................................................................. 18

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
   750 F.2d 1470 (9th Cir. 1985) ................................................................. 24

*Ariz. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) ................................................................. 23

*Armstrong v. Manzo*,
   380 U.S. 545 (1965) ................................................................................. 20

*Bell v. Burson*,
   402 U.S. 535 (1971) ................................................................................. 21

*Berean Baptist Church v. Cooper*,
   No. 4:20-CV-81-D, 2020 WL 2514313 (E.D.N.C. May. 16, 2020) ...................... 15

*Blackhawk v. Pennsylvania*,
   381 F.3d 202 (3d Cir. 2004) .................................................................... 14

*Bullfrog Films, Inc. v. Wick*,
   847 F.2d 502 (9th Cir. 1988) ................................................................... 22

*Cent. Rabbinical Cong. of U.S. & Can. v. N.Y. City Dep't of Health &*
   *Mental Hygiene*,
   763 F.3d 183 (2d Cir. 2014) ...................................................... 12, 14, 15

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) .................................................................. 12, 16, 17

*Elrod v. Burns*,
   427 U.S. 347 (1976) ................................................................................. 23

*Emp't Div., Dep't of Human Res. v. Smith*,
   494 U.S. 872 (1990) .......................................................... 3, 12, 16, 19

*Fields v. Palmdale Sch. Dist.,*
    427 F.3d 1197 (9th Cir. 2005) ........................................................ 18, 20

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark,*
    170 F.3d 359 (3d Cir. 1999) .................................................................. 14

*Fuentes v. Shevin,*
    407 U.S. 67 (1972)................................................................................. 20

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006)......................................................................... 17, 23

*Goss v. Lopez,*
    419 U.S. 565 (1975). Here, the Order ..................................................... 21

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972)............................................................................... 23

*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004) (plurality opinion)................................................... 2

*Hernandez v. Sessions,*
    872 F.3d 976 (9th Cir. 2017) ................................................................. 11

*Holt v. Hobbs,*
    135 S. Ct. 853 (2015)............................................................................. 17

*Innovation Law Lab v. Wolf,*
    951 F.3d 1073 (9th Cir. 2020) ............................................................... 25

*Jacobson v. Massachusetts,*
    197 U.S. 11 (1905).............................................................................. 1, 15

*Maryville Baptist Church, Inc. v. Beshear,*
    957 F.3d 610 (6th Cir. 2020) ................................................................... 2

*Mathews v. Eldridge,*
    424 U.S. 319 (1979)......................................................................... 11, 21

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) ...................................................... 11, 23, 25

*Midrash Sephardi, Inc. v. Town of Surfside,*
   366 F.3d 1214 (11th Cir. 2004) .............................................................. 12

*Miller v. Reed,*
   176 F.3d 1202 (9th Cir. 1999) ......................................................... 18, 19

*Naoko Ohno v. Yuko Yasuma,*
   723 F.3d 984 (9th Cir. 2013) .................................................................. 18

*Nken v. Holder,*
   556 U.S. 418 (2009)................................................................................. 24

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft,*
   389 F.3d 973 (10th Cir. 2004), *aff'd sub nom. Gonzales v. O Centro*
   *Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418 (2006)................................ 23

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
   140 S. Ct. 2049 (2020)....................................................................... 3, 11

*Padilla v. ICE,*
   953 F.3d 1134 (9th Cir. 2020) ............................................................... 25

*Parents for Privacy v. Barr,*
   949 F.3d 1210 (9th Cir. 2020) .......................................................... 12, 18

*Pierce v. Soc'y of Sisters of the Most Holy Names of Jesus and Mary,*
   268 U.S. 510 (1925)............................................................................ 2, 19

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.,*
   944 F.2d 597 (9th Cir. 1991) .................................................................. 24

*Roberts v. Neace,*
   958 F.3d 409 (6th Cir. 2020) ........................................................ 12, 16, 25

*Rogin v. Bensalem Twp.,*
   616 F.2d 680 (3d Cir. 1980) ................................................................... 23

*S. Bay United Pentecostal Church v. Newsom,*
   140 S. Ct. 1613 (2020)............................................................................ 14

*San Jose Christian Coll. v. City of Morgan Hill,*
   360 F.3d 1024 (9th Cir. 2004) .......................................................... 18, 19

iv

*Sessions v. Dimaya,*
 138 S. Ct. 1204 (2018) ............................................................................... 22

*Shinault v. Hawks,*
 782 F.3d 1053 (9th Cir. 2015) ...................................................... 20, 21, 22

*Stormans, Inc. v. Selecky,*
 586 F.3d 1109 (9th Cir. 2009) ................................................................. 12

*Stormans, Inc. v. Wiesman,*
 794 F.3d 1064 (9th Cir. 2015) ...................................................... 11, 16, 23

*Troxel v. Granville,*
 530 U.S. 57 (2000) ............................................................................. 18, 21

*United States v. Juvenile Male,*
 670 F.3d 999 (9th Cir. 2012) ................................................................... 18

*Ventura Cty. Christian High Sch. v. City of San Buenaventura,*
 233 F. Supp. 2d 1241 (C.D. Cal. 2002) .................................................. 19

*Washington v. Glucksberg,*
 521 U.S. 702 (1997) ................................................................................. 18

*Winter v. Nat. Res. Def. Council, Inc.,*
 555 U.S. 7 (2008) ..................................................................................... 10

*Wisconsin v. Yoder,*
 406 U.S. 205 (1972) ............................................................. 2, 11, 19, 20

**Other Authorities**

U.S. Const. amend. I .......................................................................... 15, 18, 19

U.S. Const. amend. XIV ................................................................................. 1, 3

1

## **INTRODUCTION**

2   Plaintiffs are Jewish, Protestant, and Catholic religious schools, parents, teach-

3   ers and students, who share as an article of faith the belief that in-person instruction in

4   a religious setting is essential to the promulgation and practice of their religion. De-

5   fendants have, by executive fiat, prohibited in-person instruction at nearly all religious

6   schools in California. At the same time, however, Defendants have allowed in-person

7   instruction to continue—and, indeed, to swell—at tens of thousands of tutoring and

8   enrichment centers, education and athletic camps, childcare facilities, and other extra-

9   curricular activity providers. In some cases, this in-person instruction involves the

10  very same students and the very same school buildings that have been closed to formal

11  school instruction. The First and Fourteenth Amendments to the United States Consti-

12  tution prohibit a state from disfavoring religious practices, and from interfering with

13  parents' ability to direct the religious upbringing of their children in the manner and

14  location of their choosing. So too, the Fourteenth Amendment prohibits Government

15  from seizing liberty interests, particularly core, constitutionally protected rights, with-

16  out pre- and post-deprivation process and protections. Here, Defendants have created

17  a framework where students may congregate and study academics and engage in

18  sports, so long as they do not do so under the auspices of organized school. Thus, the

19  practical effect of Defendants' mandate for private schooling is to prohibit in-person,

20  organized religious school. And, Defendants have done so without a scintilla of pro-

21  cess or protection. This cannot stand.

22  Defendants undoubtedly have the authority to take drastic actions to stem the

23  COVID-19 pandemic. Where the public health need is so dire that draconian measures

24  are called for, such measures must be "applicable equally to all in like condition." *Ja-*

25  *cobson v. Massachusetts*, 197 U.S. 11, 30–31 (1905). Where burdens are not levied

26  alike, however, they may not be imposed so as to burden core rights and disfavor the

27  free exercise of religion. In this breach, Courts must be particularly vigilant to protect

28  fundamental rights. "It is during our most challenging and uncertain moments" as a

1  country that the protection of fundamental constitutional rights is most crucial. *Hamdi*

2  *v. Rumsfeld*, 542 U.S. 507, 532 (2004) (plurality opinion). As the Sixth Circuit ob-

3  served, "[w]hile the law may take periodic naps during a pandemic, we will not let it

4  sleep through one." *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 615 (6th

5  Cir. 2020) (per curiam).

6      The ways and means Defendants have selected to address the pandemic fall

7  short of the high walls protecting religious freedom.

8      ***First***, Defendants' restrictions are not generally applicable but rather burden

9  only some educational congregate settings—most notably religious schools—while

10 leaving other functionally identical congregations unburdened. Secular activities rang-

11 ing from enrichment centers to math camps to childcare remain open for in-person in-

12 struction, subject to prudential safety measures. But, religious schools may not open

13 their doors to the study of the Torah or the Christian Bible, no matter how robust their

14 protections. Such a disparity may stand only if justified by a compelling government

15 interest.

16     To satisfy strict scrutiny, Defendants must prove that in-person religious educa-

17 tion poses a unique public health risk not present in *any* other permitted in-person in-

18 structional activity. Put differently, Defendants must prove that in-person tutoring, mu-

19 sic class, day care, camp, or karate school does *not* present a public-health risk—but

20 socially-distanced, hygienic in-person religious education somehow *does*. Defendants

21 cannot meet this burden. To the contrary, Defendants made no effort, and continue to

22 make no effort, to determine whether some schools can open safely.

23     ***Second***, Defendants' actions are unconstitutional for the separate reason that

24 they eviscerate parents' right to direct the religious education of their children in the

25 manner and location of their choosing. For nearly 100 years courts have recognized

26 that parents have authority to direct their children's education, particularly where that

27 education is religious in nature. *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972); *Pierce*

28 *v. Soc'y of the Sisters of the Most Holy Names of Jesus and Mary*, 268 U.S. 510, 535

2

(1925). Indeed, even under *Employment Division v. Smith*, the combination of a parental right to direct a child's educational upbringing and religious exercise requires more, not less, judicial scrutiny. *See Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 881–82 (1990). Because Defendants are ordering Plaintiffs to refrain from the in-person education of their children in the religious setting of their choice, as required by Plaintiff parents' faith, Defendants must satisfy strict scrutiny. Once again, they cannot.

***Third***, and entirely separately, the Order violates the Fourteenth Amendment Due Process Clause. At its essential minimum, due process requires notice and a hearing. Where fundamental rights are at issue, it often requires much more. Here, Defendants promulgated and enforced their mandate without notice, without a pre-deprivation hearing, without a post-deprivation hearing, and without articulating any procedural protections at all to safeguard these fundamental interests. Defendants have blinded themselves to the religious compulsion that motivates Plaintiffs. And, they have deafened themselves to the growing wealth of scientific teaching from the Centers for Disease Control (CDC), the American Academy of Pediatrics (AAP), and others, that closing schools to in-person instruction will cause worse injury to children and to society than COVID-19 ever could.

Defendants' unconstitutional acts cause incalculable and irreparable harm to Plaintiffs. Parents and students are being deprived of a communal religious education, including traditions and ceremonies that cannot be replicated through a Zoom call. Students are suffering worsening mental health due to their isolation from their school's religious community, as well as steep losses in learning. Schools and teachers are unable to carry out their central religious calling to pass their creeds and values to a new generation. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2064 (2020) ("Religious education is vital to many faiths practiced in the United States."). And some schools—particularly those serving predominantly low-

income and minority communities—may be forced to close permanently unless the Order is soon lifted. Plaintiffs' motion for a preliminary injunction should be granted.

## **BACKGROUND**

### I. Defendants Have Banned In-Person Religious Education, While Allowing Similar Entities to Re-Open.

On March 4, 2020, Governor Newsom proclaimed a State of Emergency in response to the COVID-19 pandemic. Buese Decl. Ex. 17. Governor Newsom has since directed "[a]ll residents … to obey State public health directives." *Id.* Ex. 18 at 2. These include a "framework for reopening" schools, issued July 17, 2020, that indefinitely prohibits "in-person learning" for nearly the entire state (the "School Closure Order" or "Order"). *Id.* Ex. 19. Prior to issuing the Order, Defendants did not provide notice or an opportunity for individual schools to be heard regarding re-opening plans. h

The Order allows schools to reopen for in-person instruction only "if they are located in a local health jurisdiction (LHJ) that has not been on the county monitoring list within the prior 14 days." *Id.* at 1. Outside such LHJs, schools may "conduct distance learning only." *Id.* The 36 counties currently on the monitoring list comprise approximately 80 percent of California's K–12 students enrolled in both public and private schools. Buese Decl. Exs. 20, 49x, 50x. A county is listed if it exceeds any of five benchmarks, and removed if it exceeds none for three days. *Id.* Ex. 21.

The Order provides that an elementary school may request a waiver from a local health officer, but state guidance also provides that no waivers should be considered if the LHJ's case levels are at twice the baseline for the monitoring list. *Id.* Ex. 19. Following this guidance, Los Angeles County has announced that it will not consider waiver requests at all. *Id.* Ex. 22. Plaintiff Saint Joseph Academy has applied for a waiver from San Diego County but received no response, while each of the other

Plaintiff Schools stands ready to apply for a waiver as soon as Los Angeles County explains how to do so—or even where to submit the application.[1]

California has not tied the in-person operation of childcare facilities or camps to the monitoring list. *Id.* Exs. 23, 24. There are currently 26,328 childcare facilities operating in the very same LHJs where no religious school is able to open. *Id.* Ex. 25. In fact, childcare and camps are being provided in the same school buildings that have been closed to education. *Id.* Ex. 26. "There is no public health rationale for treating K-12 schools differently from daycare facilities and day camps, many of which provide instruction." Flanigan Decl. ¶ 58. So too, the Order does not apply to extracurricular educational facilities, including academic enrichment, tutoring, music, art, and martial arts programs. The State has allowed the in-person operation of these facilities subject only to sound social distancing and hygiene practices. Buese Decl. Exs. 29, 63x, 64x. Indeed, some such facilities are now promoting monitored distance learning services—in which certified teachers gather together with students to help them with their schools' distance learning programs. In other words, schooling has been relocated to places such as karate dojos. *Id.* Ex. 27 at 1. And while California recently issued guidance allowing "limited instruction, targeted support services, and facilitation of distance learning" for cohorts of up to 14 children, *Id.* Ex. 33, the guidance does not "allow for in person instruction for all students," and emphasizes that "the number of students on a given school site should generally not exceed 25% of the school's enrollment size or available building capacity," *id.* Ex. 34.

## II.    The School Closure Order Inhibits Plaintiffs' Free Exercise of Religion.

Plaintiffs are religious schools located in California, teachers at those schools, and parents of students at those schools (suing in their own right and on behalf of their children). The Order inhibits all Plaintiffs' exercise of their religious convictions.

---

[1] San Diego County was recently removed from the Monitoring List and Saint Joseph plans to reopen soon. However, the threat remains that Saint Joseph could be forced to close again at Defendants' unchecked and plenary discretion.

The School Plaintiffs are religious organizations dedicated to teaching the Jewish, Catholic, and Evangelical Christian faiths. Teaching their religious traditions—not simply teaching secular subjects in a religious setting—is the central mission of each of the School Plaintiffs. Einhorn Decl. ¶ 6; Heintschel Decl. ¶ 2; Krause Decl. ¶ 5; Petz Decl. ¶ 2; Wilk Decl. ¶¶ 4–5, 10. The School Plaintiffs can only satisfy their religious mandate to inculcate faith in their students in person, Einhorn Decl. ¶¶ 8–9, such as by training their students in Christian discipleship, Petz Decl. ¶¶ 4–5, or forging a feeling of connection between their students and the Jewish people, Wilk Decl. ¶ 12. The School Plaintiffs each want to open for in-person education, and would do so but for the Order. Einhorn Decl. ¶ 11; Heintschel Decl. ¶ 6; Krause Decl. ¶ 13; Petz Decl. ¶ 6; Wilk Decl. ¶ 18. Similarly, Plaintiff Teachers are called religiously to teach, and consider in-person education to be a religious imperative. *See, e.g.*, Amster Decl. ¶ 4; Aust Decl. ¶ 4; Brull Decl. ¶ 4. For instance, Rabbi Mordechai McKenney describes Jewish education in terms of *mesorah*, the "links in a chain" that connect generations of Jewish teachers and pupils over an unbroken span of 3,500 years. McKenney Decl. ¶ 7. Distance learning severs that chain, by separating Rabbi McKenney from his students. *Id.* ¶ 8. Plaintiff Teachers would teach in person but for the Order. *See, e.g.*, Mann Decl. ¶¶ 6, 10; Shamulian Decl. ¶¶ 7, 22.

Plaintiff Schools and Teachers take different approaches to religious education, but none of them can be replicated through a video call. According to Yavneh Dean and Rav Shlomo Einhorn, "the ability of students to study the Torah in the physical presence of their teachers" has been a defining feature of "Judaism's survival throughout its tumultuous history." Einhorn Decl. ¶¶ 8–9. "At Yavneh, religious education is the very essence of what the Jewish people represent." *Id.* ¶ 8. Saint Joseph, likewise, makes "[p]rayer and devotion to the Catholic faith … central to every part of the school day." Heintschel Decl. ¶ 2. When Saint Joseph's students are "prevented from joining together as the Body of Christ, which is an essential aspect of the Catholic faith," "students [are] unable to live out the teachings of their faith, and teachers [are]

unable to cultivate the virtues of Catholicism in their students." *Id.* ¶ 5. At Montebello, "students and faculty believe that the Bible mandates that we must gather together with our fellow Christians in order to practice the faith," and "teach our students and model the transforming power of the Gospel." Petz Decl. ¶ 5. Moreover, Montebello—which has been teaching for nearly 50 years—may have to close permanently if the Order remains in place, due to plummeting enrollment attributable to many parents' inability to pay tuition *and* make other arrangements for childcare. *Id.* ¶ 10.

Parent Plaintiffs choose religious instruction precisely because of the centrality of Plaintiff Schools' religious commitments. *See, e.g.*, Fleischmann Decl. ¶ 4; Peretz Decl. ¶ 4; Rodriguez Decl. ¶ 4. Parent Plaintiffs seek a return to in-person instruction because remote learning compromises their children's religious education. *See, e.g.*, H. Graves Decl. ¶ 15; Katz Decl. ¶ 7; Sandoval Decl. ¶ 15. With their schools shut down, these families are suffering. Many of the Jewish Parent Plaintiffs are especially concerned for their children to learn Jewish customs and ethics by observing adult role models practicing the faith—a key part of Orthodox Jewish education that is entirely missing online. *See* Peretz Decl. ¶ 5; Mann Decl. ¶ 7. Catholic Parent Plaintiffs emphasize the importance of their children attending weekly school Mass, which is not possible over Zoom. *See* C. Ambuul Decl. ¶¶ 5–7; R. Graves Decl. ¶¶ 6–7. One family has had to postpone their son's first Holy Communion because his struggles with remote learning led to him being held back a grade year. *See* C. Ambuul Decl. ¶ 11.

Indeed, many Plaintiff Students have struggled greatly with remote schooling, especially younger students and those with special needs. They are less able to focus or to understand information conveyed through a computer screen. *Id.* ¶ 10; H. Graves Decl. ¶ 11. Their ability to learn and grow through social interaction with their peers and teachers has also been greatly harmed. C. Ambuul Decl. ¶ 10; H. Graves Decl. ¶ 11. Other Plaintiff Students have developed serious mental health issues, including anxiety and depression, due to being isolated from their school. Sandoval Decl. ¶¶ 10–13; M. Ambuul Decl. ¶ 9.

7

Most damaging for the Plaintiff Parents, Teachers, and Students is the destruction of the enveloping religious communities they have built at the Plaintiff Schools. *See* Gaines Decl. ¶¶ 9, 48–51. Plaintiffs believe that in-person education is a religious mandate, and distance learning does not simply make it harder for Plaintiffs to fulfil this mandate—it makes it impossible. According to Jewish law, certain prayers can only be recited within a *minyan*, a quorum of 10 males aged 13 or over. *See* Peretz Decl. ¶ 9. Parent Plaintiffs' children therefore are not able to learn, practice, or recite entire sections of the daily prayer service remotely. *Id.* Similarly, Catholic Parents' children are deprived of access through school to the sacrament of confession and participation in Holy Mass, which are possible only in the physical presence of a priest. *See* C. Ambuul Decl. ¶ 6.

## III.   Defendants' Actions Are Contrary to Recommendations from the CDC, the AAP, and Other Experts, and Are Not Scientifically Sound.

Defendants contend that these severe harms are necessary in order to protect the public health during the COVID-19 pandemic. However, the scientific evidence shows that schools can safely re-open upon taking reasonable precautions.

Numerous experts have recommended resuming in-person education, including the CDC, the AAP, the World Health Organization (WHO), the Royal College of Paediatrics and Child Health, and the National Academies of Sciences, Engineering, and Medicine. Buese Decl. Exs. 3–16x. *See* Flanigan Decl. ¶¶ 33–34, 46–47. As the Director of the National Institute of Allergy and Infectious Diseases, Dr. Anthony S. Fauci, says, the "default position should be to try, as best as you possibly can, to open up the schools for in-person learning." *Id.* Ex. 6. Dr. Timothy P. Flanigan, M.D., an infectious disease specialist at Brown University whose group has treated over 1,000 COVID-19 patients, agrees with these recommendations: "it is my opinion that schools can safely reopen for in-person instruction provided appropriate safeguards—namely, those outlined in the CDC and AAP guidance, including social distancing, face coverings, and

hand hygiene—are followed." Flanigan Decl. ¶ 61. The School Plaintiffs have committed to following all applicable public health guidance, including these recommendations from the CDC and AAP. Einhorn Decl. ¶¶ 14–22; Heintschel Decl. ¶ 6; Krause Decl. ¶ 14; Petz Decl. ¶ 6; Wilk Decl. ¶ 19.

Experts' recommendations to reopen schools reflect a growing body of high-quality, increasingly peer-reviewed scientific literature. *See* Flanigan Decl. ¶ 52 ("The California Order is contrary to the public health consensus."). The scientific literature shows that COVID's risks to school-age children are categorically lower than the risks to adults. Indeed, Defendants have conceded that there is a "'lower risk of child-to-child or child-to-adult transmission in children under age 12,' and a lower risk of infection and serious illness in younger children." Memorandum of Points and Authorities in Opposition to Application for Temporary Restraining Order at 7, *Brach v. Newsom*, No. 2:20-cv-6472 (SVW) (C.D. Cal. Aug. 9, 2020), ECF No. 35. And Defendants' own figures show that of 538,416 COVID cases and 10,000 COVID deaths in California, only a single child has died and none younger than 12. *Id.* at 2, 4. Persons younger than 18 are hospitalized at a rate of 8.0 per 100,000, compared with 164.5 for adults. Buese Decl. Ex. 10 at 1081–82. California reports that children between 5 and 17 years old account for 7.6 percent of cases despite being 16.7 percent of the population, while people ages 18–34 represent approximately 35 percent of infections in California, but only account for 24 percent of the state population. *Id.* Ex. 11.

In addition to having low infection rates, school-age children also rarely transmit infections to others. *Id.* Ex. 12 at 12–15. Data from around the world demonstrate that "children have not played a substantive role in the intra-household transmission of SARS-CoV-2," *id.* Ex. 13 at 6, or in school environments, *id.* Ex. 14 at 3. This is consistent with the outcome of a natural experiment resulting from Finland's decision initially to close schools, while Sweden never closed its schools. The result was "no measurable direct impact on the number of laboratory confirmed cases" in children in either country, and no increased risk for teachers as compared to higher risks present

9

in other professional environments. *Id.* Ex. 16 at 7. And a study of county infection rates of COVID-19 across the United States from March 1, 2020 to April 27, 2020, found "no evidence that school closures influenced the growth rate" in COVID infections. *Id.* Ex. 15 at 1242.

The CDC recognizes that although the risks of COVID-19 to school-aged children are low, "the harms attributed to closed schools on the social, emotional, and behavioral health, economic well-being, and academic achievement of children, in both the short- and long-term, are well-known and significant." *Id.* Ex. 3 at 1. These harms are particularly acute for children, who experience higher levels of depression, thoughts about suicide, social anxiety, and sexual activity, as well as lower levels of self-esteem, when they are separated from teachers and other adults at school who care about their well-being. *Id.* Ex. 8. Educational staff make more than one-fifth of all child abuse reports—more than any other category of reporter. *Id.* Ex. 9 at 8. Perhaps as a consequence, since the pandemic began "there has been a sharp decline in reports of suspected maltreatment," but an increase in hospitalizations of children suffering from abuse. *Id.* Ex. 3 at 3.

In addition to the host of physical, mental, emotional, spiritual, and social costs it imposes, distance learning simply does not work. Social interaction among school-aged children cannot be replicated remotely, and is "particularly important for the development of language, communication, social, emotional, and interpersonal skills." *Id.* One study found that, because of school closures this past spring, students likely would achieve only "63–68% of the learning gains in reading relative to a typical school year," and only "37–50% of the learning gains in math." *Id.* Ex. 1 at 23. Another study concluded that students receiving online learning of average quality for the upcoming fall will lose "three to four months of learning" by the start of 2021, as compared to peers receiving in-person education. *Id.* Ex. 2 at 3. These losses are magnified when combined with the particular needs of religious school instruction.

10

1

**LEGAL STANDARD**

2

"A plaintiff seeking a preliminary injunction must establish that he is likely to

3

succeed on the merits, that he is likely to suffer irreparable harm in the absence of pre-

4

liminary relief, that the balance of equities tips in his favor, and that an injunction is in

5

the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The

6

Ninth Circuit's "sliding scale" approach balances these elements, "so that a stronger

7

showing of one element may offset a weaker showing of another." *Hernandez v. Ses-*

8

*sions*, 872 F.3d 976, 990 (9th Cir. 2017).

9

**ARGUMENT**

10

As the Supreme Court recently affirmed, religious education is central to both

11

the free exercise of religion and parents' right to direct the upbringing of children. *See*

12

*Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2064. "Religious education is vital to many

13

faiths practiced in the United States," including, among others, Christian and Judaic

14

faiths. *Id.* "The religious education and formation of students is the very reason for the

15

existence of most private religious schools …." *Id.* at 2055. Laws infringing on such

16

liberties may do so only when neutral and generally applicable. *See Stormans, Inc. v.*

17

*Wiesman*, 794 F.3d 1064, 1082 (9th Cir. 2015). The Order is not. Laws burdening par-

18

ents' right to direct the religious education of their children may stand only when nar-

19

rowly tailored to advance the most exacting of government interests. *Yoder*, 406 U.S.

20

at 233–34. The Order is not. And such laws may stand only when accompanied by the

21

procedural protections appropriate to safeguard such important rights. *Mathews v. El-*

22

*dridge*, 424 U.S. 319, 334–35 (1979). The Order was not. Plaintiffs are likely to suc-

23

ceed on the merits of their claims.

24

In cases implicating fundamental constitutional rights, likelihood of success on

25

the merits is reason enough to grant injunctive relief. *See, e.g.*, *Melendres v. Arpaio*,

26

695 F.3d 990, 1002 (9th Cir. 2012) (deprivation of constitutional rights "unquestiona-

27

bly constitutes irreparable injury" and it is "always in the public interest to prevent the

28

violation of a party's constitutional rights"). But if more were needed, the three remaining factors also skew heavily in Plaintiffs' favor: Plaintiffs are being irreparably harmed by the Order, and the balance of equities and public interest strongly favor issuance of the injunction. The Court should therefore enjoin enforcement of the Order.

## I.      Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

### A.      The Order Interferes with Plaintiffs' Free Exercise of Religion.

The Free Exercise Clause prohibits government from disfavoring religious practice. To be sure, the Free Exercise Clause ordinarily does not prohibit application of generally applicable laws to religious institutions and practices. *Smith*, 494 U.S. at 881–82. However, where a rule is not generally applicable, particularly where it is riddled with exceptions, the most exacting scrutiny does apply. *Id.* at 884; *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 543 (1993); *see also id.* at 567–68 (Souter, J., concurring in part and concurring in the judgment).

As the Ninth Circuit has repeatedly explained, "[a] law is not generally applicable if its prohibitions substantially underinclude non-religiously motivated conduct that might endanger the same governmental interest that the law is designed to protect." *Parents for Privacy v. Barr*, 949 F.3d 1210, 1235 (9th Cir. 2020) (alteration in original) (quoting *Stormans*, 794 F.3d at 1079); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1134 (9th Cir. 2009) (laws are not "general applicable" when they are "substantially underinclusive"). *See also Roberts v. Neace*, 958 F.3d 409, 414–15 (6th Cir. 2020) (per curiam) ("[R]estrictions inexplicably applied to one group and exempted from another do little to further [public health] goals and do much to burden religious freedom."). This rule is also well established in other Circuits. *See Cent. Rabbinical Cong. of U.S. & Can. v. N.Y. City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014) ("A law is therefore not generally applicable if it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly

justifying it."); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1234–35 (11th Cir. 2004) (similar).

The Order violates this rule. Plaintiff Schools cannot open to teach math, creative writing, science, history, creative arts, or religion, or even to host physical education or recess. Yet in strip malls, office buildings, gyms, libraries, book stores, and indeed, in public and private school buildings across the state, students may congregate to study math, creative writing, science, history, and art, and engage in sports, recreation, and other mental and physical activities as part of enrichment programs, tutoring, or educational and sports camps, with appropriate safeguards. Buese Decl. Exs. 23–24. In fact, as desperate parents seek options, entities from YMCAs to karate dojos are now hosting "shadow school," where they monitor students' "distance learning" and then supply some additional extracurricular education. *Id.* Exs. 27, 30. Children of all ages—including difficult-to-socially-distance toddlers and pre-Ks—gather in child-care and daycare facilities. *Id.* Ex. 23. And when shadow school is done for the day, children of all ages can head to an indoor sports practice, bowling alley, arcade, movie theater, or other entertainment venue, which are also permitted open in person with appropriate precautions. *Id.* Exs. 28–29.

Thus, the Order does not prevent children from congregating and engaging in educational and physical activities, or even from doing so in a school building. Rather, it merely prohibits them from doing so in a formally organized school format. In so doing, the Order deprives Plaintiff Schools of the very thing that distinguishes them and the reason Plaintiff Parents, Teachers, and Students associate with them—religious education in a pervasively religious setting. As the attached declarations make clear, Parents do not enroll their children in such schools merely so they can learn Hebrew, read the Bible, or memorize prayers—but so they can be immersed in the practice of their faith by teachers who speak and pray in fluent Hebrew, who read and study and venerate the Bible, and who cultivate their own devotional and spiritual

lives.[2] And for each of the Plaintiffs that immersive religious experience includes participation in ritual and worship that is only possible in person according to the tenets of Plaintiffs' faiths. *See* Declarations *passim.*

Defendants will doubtless argue that the Order raises no concern because it treats formal religious schools and formal nonreligious schools equally. But the question is not whether a rule also disadvantages some nonreligious conduct, but rather whether it treats free exercise less favorably than some nonreligious conduct. Thus in *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999), the Third Circuit ruled that as long as a police department allowed officers to wear a beard for any reason, they had to allow Muslim officers to do so, regardless of the fact that most other officers were prohibited from wearing facial hair. *Id.*; *see also Blackhawk v. Pennsylvania*, 381 F.3d 202, 211–12 (3d Cir. 2004) (similar). "A law fails the general applicability requirement if it burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated." *Blackhawk*, 381 F.3d at 209. And in *Central Rabbinical Congregation*, the Second Circuit held that New York City could not forbid a method of religious circumcision to control the spread of disease, when fewer than 10 percent of infections appeared

---

[2] This case is not controlled by the Supreme Court's and Ninth Circuit's decisions in *South Bay United Pentecostal Church*, where plaintiffs sought extraordinary injunctive relief subject to a standard far more exacting than applicable here. *See S. Bay United Pentecostal Church v Newsom*, 140 S. Ct. 1613, 1613 (2020) (mem.) (Roberts, C.J., concurring in denial of application for injunctive relief) (injunction pending appeal is granted "sparingly and only in the most critical and exigent circumstances" (quoting Stephen M. Shapiro et al., *Supreme Court Practice* § 17.4 (11th ed. 2019))). Moreover, plaintiffs there sought an increase in the number of persons who could attend in-person worship services, without identifying any congruent permitted activities. *Id.* ("[T]he Order exempts or treats more leniently only dissimilar activities …."). Here, California permits the same activities, by the same children, in the same buildings.

linked to the practice and the city had made no attempt to address the causes of the other 90 percent of cases. 763 F.3d at 187, 197. "[T]he record is almost entirely devoid of explanation," the court observed, "much less evidence in support of explanation, for such selectivity." *Id.* So too here.

Defendants will also doubtless assert that pursuant to *Jacobson*, they have near-plenary authority to respond to a pandemic. 197 U.S. at 30–31. *Jacobson*, however, proves Plaintiffs' case. There, the Court recognized that in order to respond to a pandemic, government may need to impose draconian restrictions on the population generally, or at least restrictions that are "applicable equally to all in like condition" and do not result in "a plain, palpable invasion of rights secured by the fundamental law." *Id.* Under such dire circumstances, the necessary and appropriate public health response can brook no exemptions lest it be neutralized. Where, however, public officials have already determined that a restriction need not apply equally "to all in like condition," or when the public health response tramples on constitutional rights, "it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Id.* "There is no pandemic exception to the Constitution of the United States or the Free Exercise Clause of the First Amendment." *Berean Baptist Church v. Cooper*, No. 4:20-cv-81-D, 2020 WL 2514313, at *1 (E.D.N.C. May. 16, 2020).

Because Defendants have determined that extracurricular education, camps, daycares, and such may continue with appropriate safeguards and social distancing, *Jacobson* does not support shuttering religious schools that are willing and able to implement the same public health safeguards. These carve-outs doom any claim that the Order is "generally applicable." The Order "inexplicably applie[s]" to religious schools, while "exempt[ing]" childcares, day camps, and favored profit-making industries. *See Neace*, 958 F.3d at 414–15. As such, it is subject to strict scrutiny.[3]

---

[3] The Order is separately unconstitutional because it gives local health officials unbridled discretion to waive the requirements of the Order for individual schools. *See*

Because the Order trenches on fundamental religious liberties, it must be invalidated unless it is "justified by a compelling interest and is narrowly tailored to advance that interest." *Lukumi Babalu Aye*, 508 U.S. at 533. Here, the Order is not narrowly tailored for two reasons. First, there are other, less restrictive means that the Defendants could have employed to combat COVID-19 without closing down private religious schools. *See, e.g.*, *Neace*, 958 F.3d at 415 ("There are plenty of less restrictive ways to address these public-health issues. Why not insist that the congregants adhere to social-distancing and other health requirements and leave it at that—just as the Governor has done for comparable secular activities?"). Defendants could have prescribed measures such as smaller class sizes, social distancing, facial coverings, and frequently disinfecting shared surfaces, in other words, the same standards applied in camps, daycares, and supervised remote-learning centers. Plaintiff schools are willing and prepared to implement such measures. *See supra* Background Part III; Flanigan Decl. ¶ 32.

Second, the Order is not narrowly tailored because it prohibits school openings based on county-wide health data and metrics, rather than allowing school-specific determinations. Thus, even if a particular school can safely reopen—as Plaintiff Schools here have prepared to do, at great cost—it may not unless health officials determine that all *other schools* in the county can as well. The Order took no account of critical differences between schools, including size, facility capacity, ability to hold classes

---

*Smith*, 494 U.S. at 884; *Stormans*, 794 F.3d at 1082. Neither the Order nor any other authority articulates any objective standards governing waiver requests. *See Smith*, 494 U.S. at 884. Accordingly, the order bestows exactly the type of "unfettered discretion" that "would permit discriminatory treatment of religion or religiously motivated conduct." *Stormans*, 794 F.3d at 1082. Moreover, "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Smith*, 494 U.S. at 884. The waiver process together with the new "cohorting guidance" shows that the School Closure Order is not generally applicable, but rather applicable only to those left out by the growing list of arbitrary exemptions. Buese Decl. Exs. 65–66.

MEMORANDUM OF POINTS AND AUTHORITIES          No. 2:20-cv-7408

outdoors, and willingness to adopt appropriate social-distance, hygiene, and cleaning standards. *See* Flanigan Decl. ¶ 52. "That public schools are unable to reopen on a districtwide basis is no reason to prevent individual private schools to demonstrate their ability to safely offer in-person education." *Id*. ¶ 53. At a minimum, narrow tailoring demands individualized determinations for reopening different schools.

The Order also does not further a compelling state interest. Of course California has a compelling interest in containing a pandemic, but "a law cannot be regarded as protecting an interest 'of the highest order,'" as strict scrutiny requires, "when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547; *see Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006) (under the compelling interest test, courts must "scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants," as when *Yoder* required the state "to show with more particularity how its admittedly strong interest … would be adversely affected by granting an exemption *to the Amish*" (omission in original) (quoting *Yoder*, 406 U.S. at 236)); *Holt v. Hobbs*, 135 S. Ct. 853, 863 (2015) (state had a "compelling interest in prison safety and security," "but the argument that this interest would be seriously compromised by allowing an inmate to grow a ½-inch beard," as required by the inmate's religion, "is hard to take seriously"). The State cannot open daycares, camps, and student enrichment centers while shuttering religious schools, and claim it is doing so in service of a compelling interest. The State's interest in public health encompasses all aspects of public health, including not only citizens' physical health but also their emotional, psychological, and mental wellbeing. Remote education undermines all aspects of public health, particularly for low-income and special needs students.

**B.     The School Closure Order Violates Plaintiff Parents' Right to Direct Plaintiff Students' Religious Education.**

The Order separately violates the First Amendment by trenching on Plaintiff Parents' right to direct the religious education of their children. Plaintiffs believe that

in-person education is essential to the religious-formation mission of these schools. The Supreme Court has long recognized parents' right to direct their children's religious education, including the place that education is delivered. And a rule inhibiting that right is subject to strict scrutiny.

The Due Process Clause of the Fourteenth Amendment "specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (citations omitted). State action that infringes on a fundamental right is "subject to strict scrutiny and is invalid[] unless it is 'narrowly tailored to serve a compelling state interest.'" *United States v. Juvenile Male*, 670 F.3d 999, 1012 (9th Cir. 2012) (quoting *Reno v. Flores*, 507 U.S. 292, 301–02 (1993)).

Courts have long recognized parents' right to choose the mode and locus of children's education. *See Pierce*, 268 U.S. at 534–35; *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion) ("The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court.").[4] Parents must be "free from state interference with their choice of the educational forum itself." *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1207 (9th Cir. 2005).

This right reaches its zenith with respect to religious education. In *Pierce*, the Supreme Court recognized "the liberty of parents and guardians to direct the upbringing and education of children under their control." 268 U.S. at 534–35. In *Yoder*, the

---

[4] *See also Parents for Privacy*, 949 F.3d at 1229 ("[T]he state cannot prevent parents from choosing … religious instruction at a private school …." (quoting *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1205 (9th Cir. 2005))). Notwithstanding dicta in *Parents for Privacy*, the "hybrid rights" doctrine is well established by Circuit precedent. *See, e.g.*, *Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 1012 (9th Cir. 2013); *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004); *Am. Family Ass'n, Inc. v. City & Cty. of San Francisco*, 277 F.3d 1114, 1124 (9th Cir. 2002); *Miller*, 176 F.3d at 1207–08.

18

Supreme Court reaffirmed this fundamental right, holding that the First and Fourteenth Amendments prevented the state from compelling Amish parents to send their children to formal high school in violation of their religious beliefs. *See* 406 U.S. at 233–34. "[W]hen the interests of parenthood are combined with a free exercise claim," the Court concluded, "more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's" actions. *Id.* at 233. And in *Smith* the Court again affirmed that strict scrutiny applies to "hybrid situation[s]" involving "the Free Exercise Clause in conjunction with other constitutional protections, such as … the right of parents, acknowledged in *Pierce v. Society of Sisters*, to direct the education of their children." 494 U.S. at 881–82 (citation omitted) (citing *Yoder*, 406 U.S. 205). *See also Miller v. Reed*, 176 F.3d 1202, 1208 (9th Cir. 1999) (hybrid-rights claims are "entitled to strict scrutiny analysis"); *Ventura Cty. Christian High Sch. v. City of San Buenaventura*, 233 F. Supp. 2d 1241, 1251 (C.D. Cal. 2002) (same). Thus the First Amendment may bar the application of even a neutral and generally applicable law that nonetheless burdens the right of parents to direct the religious education of their children. In the Ninth Circuit, strict scrutiny applies to such a claim when a plaintiff demonstrates "a colorable claim that a companion right has been violated—that is, a fair probability or a likelihood, but not a certitude, of success on the merits." *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1032 (9th Cir. 2004) (quoting *Miller*, 176 F.3d at 1207).

Plaintiffs here have a more than colorable claim that the Order violates a "companion right" under the Due Process Clause. *See Pierce*, 268 U.S. at 534–35; *Miller*, 176 F.3d at 1207. The Order vetoes parents' decisions to send their children to in-person, private religious education. Depriving parents of the ability "to direct the religious upbringing of their children," *Yoder*, 406 U.S. at 233, by choosing "the educational forum itself," *Fields*, 427 F.3d at 1207, plainly violates parents' fundamental rights. The Supreme Court has already held in *Pierce* and *Yoder* that parents have a fundamental right to choose religious education for their children, and in *Smith* that

19

burdens on that fundamental right are subject to strict scrutiny. Plaintiff Parents believe that in-person instruction in a religious setting is essential to meet the spiritual, educational, developmental, and emotional needs of their children, *see* Compl. ¶¶ 7–36, much as the Amish parents in *Yoder* believed those same needs made it essential to end their children's formal education after the eighth grade. The State may not veto these determinations absent a compelling reason and a narrowly tailored approach. For the same reasons discussed above, Defendants cannot make that showing.

## C. The School Closure Order Violates Procedural Due Process.

The Order is also unconstitutional as it was enacted without due process of law. Even if Defendants could demonstrate that the Order advances a compelling state interest, it must nonetheless be undone because it lacks any pre- or post-deprivation procedural safeguards, or indeed any discernible procedure at all.

The Constitution is clear that "[p]arties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (quoting *Baldwin v. Hale*, 68 U.S. (1 Wall.) 223, 233 (1864)). This "'opportunity to be heard' … must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). Defendants' actions have robbed Plaintiffs of cherished freedoms without the notice, hearings, or other processes required by law.

### 1. The *Mathews* Factors Require a Pre-Deprivation Hearing.

Courts "apply the three-part balancing test established in *Mathews v. Eldridge* to determine 'whether a pre-deprivation hearing is required and what specific procedures must be employed at that hearing given the particularities of the deprivation.'" *Shinault v. Hawks*, 782 F.3d 1053, 1057 (9th Cir. 2015) (citing *Mathews*, 424 U.S. at 335). The *Mathews* factors require examination of (1) "the private interest affected," (2) "the risk of erroneous deprivation through the procedures used, and the value of additional safeguards," and (3) "the government's interest, including the burdens of additional procedural requirements." *Shinault*, 782 F.3d at 1057 (citing *Mathews*, 424

1   U.S. at 335). Each factor shows that California was required to hold a pre-deprivation

2   hearing before imposing the Order.

3     First, the private interests affected by the Order are constitutional rights of the

4   highest magnitude, including religious freedom and "perhaps the oldest of the funda-

5   mental liberty interests," Plaintiff Parents' fundamental right "to direct the upbringing

6   and education of [their] children." *Troxel*, 530 U.S. at 65 (plurality opinion). The Su-

7   preme Court has held that even a 10-day deprivation of the right to an education was

8   substantial and required pre-deprivation process. *Goss v. Lopez*, 419 U.S. 565, 577

9   (1975). Here, the Order quashes these rights indefinitely. *Mathews*, 424 U.S. at 341

10  (duration is an "important factor").

11    Second, the Order presents a substantial risk of erroneous deprivation, because

12  Defendants made no effort to ascertain whether in-person instruction is essential or

13  whether an individualized approach was feasible or less restrictive than the Order. Ra-

14  ther than considering "the safety profile of the individual school," or the "difference

15  between large public school districts and individual private schools," Defendants

16  treated broad geographical swaths collectively. Flanigan Decl. ¶ 52. A pre-deprivation

17  hearing would have allowed School Plaintiffs to present scientific data along with

18  their reopening plans, which are at least as protective as those prescribed by the CDC

19  and other public health agencies. By disregarding these distinctions, Defendants guar-

20  anteed that Plaintiffs would be deprived of their constitutionally protected interests.

21    Third, Defendants' interest in dispensing with a pre-deprivation hearing was

22  minimal. Unfortunately, the COVID-19 pandemic has now become a long-term prob-

23  lem. It is no longer the type of "emergency situation[]" that can justify eliminating

24  pre-deprivation process. *See Bell v. Burson*, 402 U.S. 535, 542 (1971). Indeed, the Or-

25  der was issued nearly two months before the start of the school year in California, and

26  more than four months after Governor Newsom proclaimed a State of Emergency. De-

27  fendants clearly could have permitted meaningful pre-deprivation process in those six

28

MEMORANDUM OF POINTS AND AUTHORITIES    No. 2:20-cv-7408

months, and "where the State feasibly can provide a predeprivation hearing … it gen-
erally must do so regardless of the adequacy of a postdeprivation … remedy."
*Shinault*, 782 F.3d at 1058 (quoting *Zinermon v. Burch*, 494 U.S. 113, 132 (1990)). Due
Process therefore required the state to provide Plaintiffs notice and a hearing before
entering an Order prohibiting schools from opening.

The challenges presented by COVID-19 do not justify discarding due process of
law. Because Defendants imposed it without the pre-deprivation procedural safeguards
required by the Fourteenth Amendment, the Order is unconstitutional.

### 2. The "Waiver" Process Does Not Provide an Adequate Post-Deprivation Hearing.

The Order's post-deprivation "waiver" process is constitutionally inadequate.
First, even if some post-deprivation process could suffice, *but see supra* Part I.C.1, the
waiver process is not currently available to many schools, including at least four of the
five Plaintiff Schools. It is limited to elementary schools. It is also unavailable in
many geographic areas including Los Angeles County, where four of the Plaintiff
Schools are located. Buese Decl. Ex. 22. Thus, Plaintiff Schools are being subjected to
an indefinite deprivation of their constitutional rights with no available pre-depriva-
tion or post-deprivation process at all. Indeed, while all Plaintiff Schools stand ready
to apply for a waiver, Los Angeles has not promulgated any rules to govern the waiver
process, or even specified where schools should send waiver applications.

Second, the Order's waiver process fails to provide any intelligible standards or
objective criteria for deciding whether to grant waiver requests. "This kind of unfet-
tered discretion is patently offensive to the notion of due process." *Bullfrog Films, Inc.
v. Wick*, 847 F.2d 502, 514 (9th Cir. 1988); *see Sessions v. Dimaya*, 138 S. Ct. 1204, 1212
(2018) (plurality opinion) (the void-for-vagueness doctrine "guards against arbitrary or
discriminatory law enforcement" by local officials). The waiver process also lacks
several "elements of due process," including a neutral arbiter, a means of presenting

evidence or arguing, a decision based on record with a statement of reasons for the result, or an opportunity to appeal. *Rogin v. Bensalem Twp.*, 616 F.2d 680, 694 (3d Cir. 1980) (citing *Mathews*, 424 U.S. at 335). This is a recipe for "arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *see Stormans*, 794 F.3d at 1082 ("a regime of unfettered discretion" untethered from "objective criteria," "permit[s] discriminatory treatment of religion").

As one county health official put it, the "arbitrary and constantly changing framework that the State has set up to put counties on the watch list and to determine closures (beyond the state 'floor') is fundamentally flawed." Buese Decl. Ex. 31 at 4. The lack of objective criteria gives unelected local health officers total discretion to grant or deny waivers and fails to satisfy the requirements of procedural due process.

## II.   Plaintiffs Will Be Irreparably Harmed if An Injunction Is Not Granted.

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres*, 695 F.3d at 1002; *accord Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1008 (10th Cir. 2004) (Seymour, J., concurring in relevant part) ("[T]he violation of one's right to the free exercise of religion necessarily constitutes irreparable harm."), *aff'd sub nom. Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418 (2006). Because the Order deprives plaintiffs of their right to free exercise of religion and their right to educate their children as they see fit, their injury is, per se, irreparable. *See Melendres*, 695 F.3d at 1002.

Moreover, Plaintiffs cannot be made whole by damages. *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Plaintiff Students face severe non-economic, intangible injuries, including losing the religious experiences that are central to their faith and suffering serious declines in mental health and a steep loss in

learning. *See supra* Background Part III. All of Plaintiff Parents have observed educa-
tional, developmental, or religious losses in their children. *See* Compl. ¶¶ 20–29. In-
tangible harms like these will persist if the Order remains in effect, and they are more
than enough to satisfy the irreparable injury requirement. *See Rent-A-Ctr., Inc. v.
Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

Additionally, Plaintiff Schools stand to lose enrollments, and some of them, like
Montebello, will likely be forced to close if current circumstances hold. *See* Compl.
¶ 16. "The threat of being driven out of business is sufficient to establish irreparable
harm," *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th
Cir. 1985), and so is the loss of enrollments, *see Rent-A-Ctr., Inc.*, 944 F.2d at 603.

## III.   The Balance of the Equities and the Public Interest
        Weigh in Favor of Granting the Injunction.

The balance of the equities and the public interest, which merge when the gov-
ernment is the defendant, *Nken v. Holder*, 556 U.S. 418, 435 (2009), also support the
entry of a preliminary injunction. As explained above, students at the Plaintiff Schools
face an imminent and irreparable harm to their educational, social, emotional, and
spiritual development. The learning loss attributable to the "COVID slide" compounds
each month students are out of school, meaning students may spend *years* catching up
(if they ever catch up at all). Buese Decl. Ex. 32. Moreover, Plaintiff Schools have a
comprehensive religious curriculum, often tied to important age-defined milestones
such as bar mitzvahs and first Holy Communion, designed to give their students a
complete religious education. And the greatest harms may be harder to measure, as
students barred from attending school will develop mental, social, and behavioral
health problems at the same time they have lost a critical safety net, and will be at
greater risk of abuse, and other forms of violence, as well as a loss of their religious
community.

California's generalized interest in public health cannot outweigh the "depriva-
tion of a fundamental constitutional right and its attendant harms" including "physical,

emotional, and psychological damages," *Padilla v. ICE*, 953 F.3d 1134, 1147 (9th Cir. 2020), for two reasons. First, the government's interest is undermined by the fact that the Order is inconsistent with Plaintiffs' constitutional rights. *See Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1093–94 (9th Cir. 2020). The public has a substantial interest in ensuring that constitutional rights are "not imperiled by executive fiat." *Id.* at 1094 (quoting *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018)). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002.

Second, Plaintiffs do not seek liberty to reopen their schools in disregard of the pandemic or the public health risks it presents; rather, Plaintiffs have developed responsible safety plans consistent with expert safety guidance. These measures ensure that the risk of student-to-student, student-to-staff, and student-to-family transmission will remain low—just as they do in other settings. *See Neace*, 958 F.3d at 416 ("[A]n injunction appropriately permits religious services with the same risk-minimizing precautions as similar secular activities, and permits the Governor to enforce social-distancing rules in both settings."). The measures that Plaintiff Schools have implemented are more rigorous than the requirements the state has imposed on daycare facilities, day camps, and other similarly situated settings that have been allowed to reopen. All Plaintiffs seek is to be allowed to exercise their fundamental rights to freedom of religion and education on an equal basis as these other entities—which is exactly what the law, the equities, and the public interest command. *See id.* ("As for the public interest, treatment of similarly situated entities in comparable ways serves public health interests at the same time it preserves bedrock free-exercise guarantees.").

## **CONCLUSION**

For the foregoing reasons, Plaintiffs request that the Court enter a preliminary and permanent injunction prohibiting the enforcement of the Order against Plaintiffs or any other similarly situated individual or entity.

25

Dated: August 27, 2020

Respectfully submitted,

By:   /s/ Alexis Miller Buese_____
      Alexis Miller Buese

Gordon D. Todd*
David S. Petron*
Erika L. Maley*
Ellen Crisham Pellegrini*
Dino L. LaVerghetta*
Lucas W.E. Croslow*
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736–8760
Facsimile: +1 202 736–8711

Michael H. Porrazzo†
THE PORRAZZO LAW FIRM
30212 Tomas, Suite 365
Rancho Santa Margarita, CA 92688
Telephone +1 949 348–7778
Facsimile: +1 949 209–3514

Logan P. Brown
Ryan Stasell
Summer A. Wall
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: +1 310 595–9668
Facsimile: +1 310 595–9501

*Attorneys for Plaintiffs*

* *Application for admission pro hac vice submitted*
† *Counsel for Plaintiff Montebello Christian School only*

MEMORANDUM OF POINTS AND AUTHORITIES          No. 2:20-cv-7408