1   XAVIER BECERRA
    Attorney General of California
2   JENNIFER M. KIM
    Supervising Deputy Attorney General
3   DARIN L. WESSEL, STATE BAR NO. 176220
    ASHANTE L. NORTON, STATE BAR NO. 203836
4   Deputy Attorneys General
      600 West Broadway, Suite 1800
5     San Diego, CA 92101
      P.O. Box 85266
6     San Diego, CA 92186-5266
      Telephone:  (619) 738-9125
7     Fax:  (619) 645-2012
      E-mail:  Darin.Wessel@doj.ca.gov
8   *Attorneys for Defendants*
    *Gavin Newsom, in his official capacity as the*
9   *Governor of California, Xavier Becerra in his*
    *official capacity as the Attorney General of*
10  *California, Sandra Shewry, in her official capacity*
    *as acting Director of the Department of Public*
11  *Health; Erica Pan, M.D., in her official capacity as*
    *acting Public Health Officer; and Tony Thurmond,*
12  *in his official capacity as State Superintendent of*
    *Public Instruction and Director of Education*

13

14              IN THE UNITED STATES DISTRICT COURT

15          FOR THE CENTRAL DISTRICT OF CALIFORNIA

16                      WESTERN DIVISION

17

| | |
|---|---|
| 18  **SAMUEL A. FRYER YAVNEH ACADEMY, et al.,** | 2:20-cv-07408-JAK-PLA |
| 19 | **MEMORANDUM OF POINTS AND AUTHORITIES IN** |
| 20                                    Plaintiffs, | **OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY** |
| 21        **v.** | **INJUNCTION** |
| 22  **GAVIN NEWSOM, in his official** | |
| 23  **capacity as the Governor of California; et al.,** | Judge:  Honorable John A. Kronstadt |
| 24                                    Defendants. | |

25

26

27

28

1

Memo. P&A in Opposition to Motion for Preliminary Injunction (2:20-cv-07408)

# TABLE OF CONTENTS

**Page**

Introduction ..................................................................................................... 6

Statement of Facts ........................................................................................... 8

Requirements for Issuance of a Preliminary Injunction .................................. 12

Argument ......................................................................................................... 13

I.      Plaintiffs Fail to Demonstrate a Likelihood of Success on the Merits of Their Claims ................................................................... 13

        A.    The Orders are a Constitutional Exercise of the State's Emergency Powers to Protect the Health and Safety of All Californians in Combating COVID-19 ..................................... 13

        B.    Even Under Traditional Constitutional Analysis, Plaintiffs' Free Exercise Claim Fails ........................................ 16

               1.    The Orders Are Neutral Laws of General Applicability that Apply to All California Schools and Survive Rational Basis Review ............................... 16

               2.    The Orders Survive Strict Scrutiny ................................ 21

        C.    The Orders Do Not Violate Parents' Liberty Interests to Direct the Religious Upbringing of Their Children ................. 24

        D.    Plaintiffs' Procedural Due Process Claims Lack Merit ............ 27

II.     The Balance of Equities Favor Denial of a Preliminary Injunction .......................................................................................... 27

Conclusion ....................................................................................................... 29

2

Memo. P&A in Opposition to Motion for Preliminary Injunction (2:20-cv-07408)

# TABLE OF AUTHORITIES

**Page**

CASES

*Alliance for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011) ............................................................... 13

*Best Supplement Guide, LLC v. Newsom, et al.*
    2020 WL 2615022 (E.D. Cal. May 22, 2020) ................................. 14, 27

*Blackhawk v. Pennsylvania*
    381 F.3d 202 (3d Cir. 2004) ................................................................. 20

*Braunfeld v. Brown*
    366 U.S. 599 (1961) ............................................................................. 25

*Calvary Chapel Dayton Valley v. Sisolak*
    2020 WL 4251360 ................................................................................ 25

*Central Rabbinical Congregation of the United States & Canada v.*
    *New York City Dep't of Health & Mental Hygiene*
    763 F.3d 183 (2d Cir. 2014) ................................................................. 20

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*
    508 U.S. 520 (1993) ............................................................................. 26

*Cross Culture Christian Ctr. v. Newsom*
    445 F. Supp. 3d 758 (E.D. Cal. May 5, 2020) ............................... 14, 18

*Drakes Bay Oyster Co. v. Jewell*
    747 F.3d 1073 (9th Cir. 2014) ......................................................... 27, 28

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*
    170 F.3d 359 (3d Cir. 1999) ................................................................. 20

*Garcia v. Google*
    786 F.3d 733 (9th Cir. 2015) ............................................................... 13

*Gish v. Newsom*
    2020 WL 1979970 (C.D. Cal. Apr. 23, 2020) ................................. *passim*

*Givens v. Newsom*
    2020 WL 2307224 (E.D. Cal. May 8, 2020) ......................................... 14

Memo. P&A in Opposition to Motion for Preliminary Injunction (2:20-cv-07408)

1

2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3

4

*Halverson v. Skagit Cty.*
   42 F.3d 1257 (9th Cir. 1994) ..................................................................27

5

6

*Hartman v. Acton*
   2020 WL 1932896 (S.D. Ohio Apr. 21, 2020)....................................27

7

8

*Jacobson v. Commonwealth of Massachusetts*
   197 U.S. 11 (1905) .........................................................................*passim*

9

*Kansas v. Hendricks*
   521 U.S. 346 (1997) ........................................................................13

10

11

*Marshall v. United States*
   414 U.S. 417 (1974) ........................................................................25

12

13

*Monica Six, et al. v. Newsom, et al.*
   2020 WL 2896543 (C.D. Cal. May 22, 2020)............................ 14, 23

14

15

*Pacific Gas & Electric Co. v. County of Stanislaus*
   16 Cal.4th 1143 (Cal. 1997) ..........................................................22

16

17

*Parents for Privacy v. Barr*
   949 F.3d 1210 (9th Cir. 2020)........................................................17

18

19

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*
   268 U.S. 510 (1925) .......................................................................24

20

21

*Reynolds v. United States*
   98 U.S. 145 (1878) .........................................................................25

22

*S. Bay United Pentecostal Church v. Newsom*
   591 U.S. __ (2020) ...................................................................*passim*

23

24

*Stormans v. Selecky*
   586 F.3d 1109 (9th Cir. 2009).......................................................18

25

26

*Stormans, Inc. v. Wiesman*
   794 F.3d 1064 (9th Cir. 2015)..................................................*passim*

27

28

*United States v. Lopez*
   514 U.S. 549 (1995) .......................................................................25

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*
 758 F.3d 1069 (9th Cir. 2014) ............................................................ 13

*Winter v. Natural Res. Def. Council, Inc.*
 555 U.S. 7 (2008) ................................................................ 12, 13, 27

*Wisconsin v. Yoder*
 406 U.S. 205 (1972) ....................................................... 24, 25, 26, 27

S<small>TATUTES</small>

Goverment Code
 § 8558, subd. (b) ............................................................... 14

Health & Safety Code
 § 101000 ............................................................................ 22
 § 120140 ............................................................................ 14

C<small>ONSTITUTIONAL</small> P<small>ROVISIONS</small>

United States Constitution
 First Amendment .................................................... 8, 15, 25

1

# INTRODUCTION

2       The State of California, like the rest of the world, is combatting a public health

3  emergency of a magnitude unseen for at least a century. SARS-COV-2, the novel

4  coronavirus causing the novel coronavirus disease-2019 (COVID-19) that is

5  spreading rapidly throughout the country, has infected more than 6 million

6  Americans and killed more than 190,000, and those numbers grow daily.  *See*

7  Declaration of James Watt, MD, MPH, ¶¶ 16, 89-90 (Watt Decl.).

8       In response to the rapid spread of COVID-19, Governor Newsom proclaimed

9  a state of emergency on March 4, 2020, and issued an executive order directing all

10  Californians to heed State public health directives on March 19, 2020.  Evidence in

11  Opposition (Evid.) Exs. A-B.  The State Public Health Officer likewise issued a

12  March 19, 2020, order directing Californians to stay at home.  *Id.* Ex. G.  At issue

13  in this case is the Public Health Officer's emergency order and related public health

14  directives regarding K-12 education (collectively, the Orders):

15  - the July 17, 2020 COVID-19 and Reopening In-Person Learning Framework

16    for K-12 Schools in California, 2020-2021 School Year (the July 17th Order)

17    that temporarily delays re-opening of schools to in-person instruction in

18    counties on the State's Monitoring List due to high rates of communitywide

19    COVID-19 transmission throughout the majority of California, *id.*, Ex. J;

20  - August 3, 2020 CDPH guidance authorizing waivers to permit full in-person

21    instruction for schools serving grades Transitional-Kindergarten through 6

22    (grades TK-6) in counties on the Monitoring List (Elementary Waiver), *id.*,

23    Ex. XX; and

24  - CDPH guidance establishing uniform conditions to maintain small group in

25    settings providing structured supervision of children and youth, issued on

26    August 25, 2020 and updated September 4, 2020 (Cohort Guidance), *id.*, Exs.

27    O and T.

28

Taken together, the Orders: (1) generally prohibit schools (secular and religious alike) from reopening for in-person instruction in counties with high rates of COVID-19 transmission; (2) authorize county public health officers to permit schools serving grades TK-6 to reopen when they would otherwise be prohibited from reopening under (1); and authorize all schools not permitted to reopen under (1) and (2) to provide in-person services and instruction to small groups of students in stable cohorts.

Plaintiffs, private religious schools, parents and teachers, ask this Court to exempt them from the July 17th Order.  Plaintiffs' Motion for Preliminary Injunction should be denied because they failed to demonstrate a likelihood of success on the merits, for multiple reasons.

First, the Orders are a constitutional exercise of the State's emergency powers to protect the public's health and safety during a global pandemic, as every federal court to consider similar challenges to the public health directives issued by California, including the United States Supreme Court, has concluded.

Second, even absent the deference afforded under *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), Plaintiffs have failed to articulate, let alone substantiate, a cognizable violation of their constitutional rights.  The July 17th Order applies statewide to *all schools*, not only religious schools.  Moreover, the operative orders governing other, dissimilar settings to which Plaintiffs attempt to compare schools—childcare, day camps, and youth sports—apply equally to religious and secular settings.  Accordingly, neither the July 17th Order nor other operative guidance support Plaintiffs' contention that the Orders treat religious activities less favorably than secular activities, making the Orders subject to intermediate scrutiny under traditional constitutional analysis. This neutral order is indisputably related to the compelling state interest of protecting community health and survives all levels of review.  Furthermore, the Cohort Guidance, which authorizes in-person supervision and instruction in small, stable groups at schools

1   not otherwise permitted to reopen, further undermines Plaintiffs' claims that the

2   Orders impermissibly burden their asserted First Amendment right to an in-person

3   religious education.  Additionally, the Cohort Guidance applies equally to the

4   dissimilar sectors of daycare, camps, etc., further undermining any contention that

5   these dissimilar sectors are receiving more favorable treatment than religious

6   schools (which, as noted above, ignores that religious schools are treated identically

7   to non-sectarian schools, public and private).  For similar reasons, Plaintiffs fail to

8   show likelihood of success on their hybrid Free Exercise-Due Process claim

9   grounded in the right of parents to direct the upbringing of their children. And,

10   binding precedent forecloses their procedural due process claim.

11   Because Plaintiffs have no likelihood of success on their claims and because

12   of the State's compelling interest in protecting the health of all Californians, and

13   because balancing of the harms favors protecting community health, this Court

14   should deny the preliminary injunction motion.

15   COVID-19 has imposed significant costs and burdens on Californians who are

16   all making sacrifices in the face of this monumental challenge.  Defendants do not

17   discount the challenges and burdens that school closures and distance learning bring

18   for students, families, and school employees. Everyone would prefer that the

19   country was not in the midst of an unprecedented pandemic. But we are, and given

20   current epidemiological trends, schools cannot operate as normal in many

21   communities without imperiling public health.

22                                    **STATEMENT OF FACTS**

23   COVID-19 knows no age boundaries.  Watt Decl. ¶22.  People of all ages,

24   including children, are susceptible to the disease.  *Id*. ¶¶ 22, 34. There is currently

25   no proven vaccine or widely effective treatment.  More importantly, a large

26   percentage of people infected with COVID-19 have no symptoms, but can still

27   unknowingly spread it.  *Id*. ¶¶ 24-25, 30-32.

28

COVID-19 is a highly contagious and deadly infectious disease, which can be readily transmitted when people gather in groups.  Watt Decl. ¶¶ 21-23, 25-31, 41-48.  Indoor settings substantially increase the risk of transmission.  *Id*. ¶¶ 48.  In the United States alone, COVID-19 has infected over six million people and caused the deaths of over 190,000 people nationwide, with 13,978 in California as of September 9, 2020.  *Id*. ¶¶ 89-90.

The novel coronavirus that causes this highly infectious and frequently fatal disease spreads through respiratory droplets that remain in the air or on surfaces, and may be transmitted unwittingly by individuals who exhibit no symptoms.  *S. Bay United Pentecostal Church v. Newsom*, 591 U.S. __, 140 S. Ct. 1613, 1613 (2020) (Roberts, CJ, concurring) (*South Bay III*); Watt Decl. ¶ 27.  There is also a growing indication that it may be spread by aerosolized particles.  Watt Decl. ¶ 28; Evid. Ex. VV.  With no cure and no vaccine, measures such as physical distancing that limit physical contact are the only widely recognized way to slow the spread.  *Gish v. Newsom*, No. EDCV20-755-JGB (KKx), 2020 WL 1979970, at *4 (C.D. Cal. Apr. 23, 2020); Watt Decl. ¶¶ 50-59.

California responded early and decisively to combat and contain the COVID-19 threat.  In early December 2019, the State began planning for spread of COVID-19 and providing COVID-19 related guidance to hospitals, clinics, and other health providers.  Evid. Ex. A.1.

On March 4, 2020, the Governor proclaimed a State of Emergency in California, making additional resources available to combat the emergency and help the State prepare for the broader spread of the disease.  Evid. Ex. A.1.  On March 19, 2020, the Governor issued Executive Order N-33-20 and the State Public Health Officer issued a similar which required "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors."  Evid. Exs. C.1 and G.1 (collectively the "Stay-at-Home Order").

On April 28, 2020, the Governor announced a "Resilience Roadmap" to guide the gradual and safe reopening of the State.  Evid. Ex. D.  The Roadmap has four stages: (1) safety and preparation; (2) reopening of lower-risk workplaces and other spaces; (3) reopening of higher-risk workplaces and other spaces; and (4) an end to the Stay-at-Home Order.  *Id*. Ex. D.5.  To implement the Roadmap, on May 4, 2020, the Governor issued Executive Order N-60-20, providing that all California residents are to continue complying with the Stay-at-Home Order and other State public health directives, and that the State Public Health Officer shall establish criteria and procedures for qualifying local jurisdictions to move more quickly through Stage 2 of the Roadmap.  *Id*. Ex. E.2-3.  On May 7, 2020, based on review of current data, the State Public Health Officer issued an order moving the State into Stage Two.  *Id*. Ex. F.2.  Guidance governing the reopening of in-person instruction at schools, as part of Stage 2, was initially released on June 5, 2020.  *Id*. Ex. D.8.

In response to the summer surge in COVID-19 positive rates, the State Public Health Officer issued an order on July 13, 2020, closing, statewide, certain activities that had been permitted to reopen under the Roadmap, and closing additional indoor activities in counties on the State's Monitoring List.  Evid. Ex. H.1-2.  The Public Health Officer noted that, particularly in counties on the County Monitoring List, "the risks and impacts of disease transmission are even greater. The science suggests that for indoor operations the odds of an infected person transmitting the virus are dramatically higher compared to an open-air environment. Thus, for those counties on the list, it is necessary to close indoor operations for additional sectors which promote closed-space mixing of populations beyond households and/or make adherence to physical distancing with face coverings

difficult." *Id*. Ex. H.2; *see also* Ex. I.3-4 ("Guidance on Closure of Sectors in Response to COVID-19").[1]

On July 17, 2020, the July 17th Order, which updated its previously issued guidelines to specify that **"[s]chools and school districts may reopen for in-person instruction at any time if they are located in a local health jurisdiction (LHJ) that has <u>not</u> been on the county monitoring list within the prior 14 days.**" *Id*. Exh. J.1 [emphasis in original].

On August 3, 2020, CDPH provided further guidance to schools, including an FAQ about the July 17th Order and additional documents to assist elementary schools in Monitoring List counties that may seek a waiver to allow in-person instruction. Evid. Exhs. K, L and VV. The materials additionally explain that, "[b]ased on the current best available scientific evidence, COVID-related risks in schools serving elementary-age students (grades TK-6) are lower than and different from the risks to staff and to students in schools serving older students. In particular, there appears to be lower risk of child-to-child or child-to-adult transmission in children under age 12." *Id*. Exh. L.4.[2]

On August 25, 2020, CDPH issued the Cohort Guidance applicable to "groups of children and youth in controlled, supervised, and indoor environments operated by local educational agencies, non- profits, or other authorized providers, including but not limited to, public and private schools; licensed and license-exempt child care settings; organized and supervised care environments . . .; recreation programs;

---

[1] At the time, CDPH used six indicators – the number of new infections per 100,000 residents, the test positivity rate, and the change in hospitalization rate, among others. A county that did not meet the State's benchmarks went on the County Monitoring List. *See* Evid. Ex. I.3-4.

[2] Plaintiffs' comparison to daycare and day camps is misplaced as will be discussed in further detail below. Mot. Prelim. Inj. 5:3-21, 13:3-17, ECF No. 29-1. The Stay-at-Home Order and other guidance generally do not allow in-person instruction under similar circumstances. *See* Evid. Exs. C.10 and NN. Nor do the State's orders and guidance allow for what Plaintiffs generically describe as "extracurricular educational facilities" because gatherings of individuals from different families not expressly authorized by applicable guidelines violate the Stay-at-Home Order. *See id*. Exs. G.1, P.2-3.

1    before and after school programs; youth groups and day camps." Evid. Ex. O.1.

2    The Cohort Guidance allows limited in-person services and instruction for small

3    cohorts of children and youth, and applies to schools that would not otherwise be

4    allowed to re-open for in-person education because they are in counties on the

5    State's monitoring list and have not received a waiver to operate grades TK-6. *See*

6    *id*. Ex. MM.1 (cohort guidance FAQs, as updated Sept. 4, 2020).

7         On August 28, 2020, the State also adjusted and reformulated its framework

8    for reopening. Evid. Exs. P and Q. Commonly referred to as the Blueprint for a

9    Safer Economy, or more formally, "California's Plan for Reducing COVID-19 and

10   Adjusting Permitted Sector Activities to Keep Californians Healthy and Safe," the

11   reformulated reopening plan utilizes more specific "tiers" based on the levels of

12   communitywide COVID-19 transmission and related criteria. *Id.*, at Exs. P.2 and

13   Q.1-2. It is intended to "permit a broader range of reopening guided by risk-based

14   criteria pertinent to each sector." *Id*., Ex. P.2 (¶ 1).

15        Indeed, as of September 1, 2020, schools in San Diego County, like Plaintiff

16   Saint Joseph Academy, have been allowed to re-open to full in-person instruction

17   under the July 17th Order. Mot. Prelim. Inj. 5:27-28, ECF No. 29-1; Evid. Ex.

18   R.14. It is also noteworthy that Plaintiff Saint Joseph Academy's waiver

19   application was granted on August 26, 2020, allowing it to re-open for K-6 in-

20   person instruction before schools could reopen countywide. Evid. Ex. U.13.

21        All schools in Los Angeles County remain subject to the Tier 1 restrictions on

22   in-person learning because of widespread COVID-19 transmission. Evid. Ex. S.1.

23   Nevertheless, "Local school and health officials may decide to open elementary

24   schools and school officials may decide to conduct in-person instruction for a

25   limited set of students in small cohorts." *Id*. Ex. S.13.

26        **REQUIREMENTS FOR ISSUANCE OF A PRELIMINARY INJUNCTION**

27        A preliminary injunction is "an extraordinary remedy that may only be

28   awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v.*

1   *Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008).  Plaintiffs must establish:

2   "(1) a likelihood of success on the merits, (2) that the plaintiff[s] will likely suffer

3   irreparable harm in the absence of preliminary relief, (3) that the balance of equities

4   tips in [their] favor, and (4) that the public interest favors an injunction."  *Wells*

5   *Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014),

6   as amended (Mar. 11, 2014) (citing *Winter*, 555 U.S. at 20).  A preliminary

7   injunction may also issue under the "serious questions" test.  *Alliance for the Wild*

8   *Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011) (affirming the viability of

9   this doctrine post-*Winter*).  Under this test, plaintiffs must demonstrate "that serious

10  questions going to the merits were raised and the balance of hardships tips sharply

11  in the plaintiff's favor," in addition to the other *Winter* elements.  *Id.* at 1134–35

12  (citation omitted).  Because they seek a mandatory injunction to disrupt already-

13  implemented COVID-19-related directives, Plaintiffs must meet the "doubly

14  demanding" burden of "establish[ing] that the law and facts *clearly favor* [their]

15  position."  *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

**ARGUMENT**

16  **I.    PLAINTIFFS FAIL TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE
17         MERITS OF THEIR CLAIMS**

18         **A.    The Orders are a Constitutional Exercise of the State's
19                Emergency Powers to Protect the Health and Safety of All
20                Californians in Combating COVID-19**

21         In an extraordinary public-health crisis such as the COVID-19 pandemic, the

22  State has broad emergency powers that it may exercise to protect public health, and

23  courts should afford deference to temporary actions taken to curb the spread of a

24  dangerous disease and mitigate its effects.

25         As the Supreme Court has long recognized, "a community has the right to

26  protect itself against an epidemic of disease which threatens the safety of its

27  members."  *Jacobson*, 197 U.S. at 27 (internal quotation marks omitted); see also

28  *Kansas v. Hendricks*, 521 U.S. 346, 356-57 (1997) (recognizing the continued

13

vitality of *Jacobson*).  Moreover, it is not a court's role "to determine which one of two modes [is] likely to be the most effective for the protection of the public against disease." *Jacobson,* 197 U.S. at 30.  To the contrary, "[o]ur Constitution principally entrusts 'the safety and the health of the people' to the politically accountable officials of the States," and such officials' public health judgments "should not be subject to second guessing" in court where—as here—they "act in areas fraught with medical and scientific uncertainties." *S. Bay*, 140 S. Ct. at 1614 (Roberts, C.J., concurring) (quoting, inter alia, *Jacobson*, 197 U.S. at 38).

Here, every federal court to consider California's executive orders and public health directives in response to COVID-19 has concluded the deferential *Jacobson* standard applies and upheld the challenged orders and directives under that standard.[3]  Consistent with the authorities discussed above, this Court should do the same.

Plaintiffs do not challenge the Governor's power to declare emergencies within the scope of the Emergency Services Act, including those based on "epidemic" or "disease."  Cal. Gov. Code § 8558, subd. (b).  Similarly, they do not challenge CDPH and the State Public Health Officer's powers under California's Communicable Disease Prevention and Control Act to "take measures as are necessary to ascertain the nature of the [communicable] disease and prevent its spread."  Cal. Health & Safety Code § 120140.  Indeed, Plaintiffs concede that the

---

[3] *See, e.g.*, *S. Bay,* 140 S. Ct. 1613 at 1614 (Roberts, C.J., concurring) (declining to enjoin enforcement of the orders' ban on in-person religious services); *Best Supplement Guide, LLC v. Newsom, et al.*, No. 2:20-cv-00965-JAM-CKD, 2020 WL 2615022, at *3–7 (E.D. Cal. May 22, 2020) (concluding that the State's orders are a "constitutional response to an unprecedented pandemic"); *Givens v. Newsom*, __ F. Supp. 3d __ No. 2:20-cv-00852-JAM-CKD, 2020 WL 2307224, at *3–5 (E.D. Cal. May 8, 2020) (applying *Jacobson* to conclude that the plaintiffs were unlikely to succeed on their challenge to the stay-at-home orders); *Monica Six, et al. v. Newsom, et al.*, __ F. Supp. 3d __, No. 8:20-cv-00877-JLS-DFM, 2020 WL 2896543 at *1–7 (C.D. Cal. May 22, 2020) (same); *Cross Culture Christian Ctr. v. Newsom*, 445 F. Supp. 3d 758, 767 (E.D. Cal. May 5, 2020) (the State's orders "bear a real and substantial relation to public health"); *Gish*, 2020 WL 1979970 at *4–5 (C.D. Cal. Apr. 23, 2020), *appeal docketed*, No. 20-55445 (9th Cir. Apr. 28, 2020) (performing a similar analysis).

14

State has "the authority to take drastic actions to stem the COVID-19 pandemic." Mot. Prelim. Inj. 1:22-23, ECF No. 29-1.  Plaintiffs also concede that the State has a compelling state interest in containing the pandemic.  *Id*. at 17:6-7.

Instead, Plaintiffs try to distinguish *Jacobson* and the cases applying it to California's orders on two grounds. Both are meritless.

Plaintiffs first maintain that Supreme Court and Ninth Circuit decisions applying *Jacobson* to First Amendment challenges to public health directives filed by churches are not controlling because the procedural posture involved a motion for extraordinary relief pending appeal. Mot. Prelim. Inj. at 14:21-28 (n. 2), ECF No. 29-1.  This is true as far as it goes, but it ignores that those orders turned on the legal question of *Jacobson*'s applicability in the context of First Amendment challenges.  It also ignores the countless district court decisions applying *Jacobson* to California's public health directives, including the underlying denial of injunctive relief that precipitated the appeal that led to Supreme Court and Ninth Circuit orders they attempt to distinguish.

Plaintiffs next argue those cases (and *Jacobson*) are inapposite because the challenged orders there only treated more leniently dissimilar activities, while the challenged order here treats similarly situated groups differently.  *Id.* at 14:21-28, 15:5-16:14, ECF No. 29-1.  As explained in more detail in Section I.B.1, *infra*, this is actually a much easier case on the merits of the free exercise claims than *South Bay* because the Orders apply to schools (secular and religious alike) equally, as a uniform sector, and apply equally to secular and religious providers in the other (dissimilar) sectors to which Plaintiffs seek to compare themselves.  In contrast, the challenged orders in *South Bay* facially imposed restrictions on "places of worship" and the question was whether that facial restriction was more burdensome than those imposed on similar, secular activities.  But more to the point about *Jacobson*'s applicability, the distinctions drawn by the Orders and other operative public health directives, and upon which Plaintiffs' Free Exercise claims rest

15

entirely, are precisely the sort of public health judgments by "the politically accountable officials of the States" that the Chief Justice, relying on *Jacobson*, admonished "should not be subject to second guessing" in court where—as here—they "act in areas fraught with medical and scientific uncertainties" applies with equal force to the Orders and the distinctions drawn by other public health directives. *S. Bay*, 140 S. Ct. at 1614 (Roberts, C.J., concurring).

Accordingly, *Jacobson* applies, and under that deferential standard, this Court should decline Plaintiffs' invitation to set aside the Orders, like every court to consider similar challenges has done.

**B.   Even Under Traditional Constitutional Analysis, Plaintiffs' Free Exercise Claim Fails**

**1.   The Orders Are Neutral Laws of General Applicability that Apply to All California Schools and Survive Rational Basis Review**

Plaintiffs' Motion should be denied because the Orders are neutral laws that apply to all schools statewide, both public and private. Evid. Ex. J. Plaintiffs do not contend otherwise. Plaintiffs also do not dispute the validity of the Stay-at-Home Orders that establish the default rule that all Californians are to remain at home, with limited exceptions. *Id*. Exs. B.1, G.1. Instead, they assert that the Orders impermissibly burden their free exercise rights because other activities, which they maintain are identical to school, are permitted. Mot. Prelim. Inj. 13:3-14:3, ECF No. 29-1. This contention misapprehends the applicable legal standard.

"The right to exercise one's religion freely . . . 'does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that [one's] religion prescribes (or proscribes).'" *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1075 (9th Cir. 2015) (quoting *Emp't Div. v. Smith*, 494 U.S. 872, 879 (1990)). "[A] neutral law of general application need not be supported by a compelling government interest even when 'the law has the incidental effect of burdening a particular

religious practice.'" *Id.* (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993) (*Lukumi*)). Instead, "[s]uch laws need only survive rational basis review." *Id.* at 1076.

The Orders easily meet these requirements because they are neutral toward religion on their face and because they do not in operation treat religious or faith-based activitites differently from analogous secular gatherings. *See Parents for Privacy v. Barr*, 949 F.3d 1210, 1234 (9th Cir. 2020) (courts look to both the text and the actual operation of a law to determine whether it is neutral and generally applicable). As noted, Plaintiffs do not (and cannot) argue that the Orders facially single out religious expression or activities. The July 17th Order applies to all schools, secular and religious, public and private. The Elementary Waiver similarly applies to all schools serving grades TK-6 without regard to whether they are religious or secular. Likewise, the Cohort Guidance applies equally to all settings involving structured supervision of children and youth, including schools not permitted to reopen, and other settings such as childcare, day camps, and youth groups that may equally have secular or religious affiliations. Finally, no other health directive governing the settings to which Plaintiffs point (Mot. Prelim. Inj. 13:3-17) applies differently based on the religious or secular nature of the activity.

Nor do the Orders impose "restrictions against religion in disguise." *Gish*, 2020 WL 1979970, at *6. Rather, the broad-based restrictions on school reopening are based on the unique impact they would have on disease transmission: With approximately 6.5 million school-age children in California, widely reopening schools for in-person instruction in counties with high rates of COVID-19 would result in a significant amount of new movement throughout the community of students, parents, and school employees as they travel to and from school, and a mixing of individuals from various households, with students and teachers together in groups indoors for extended periods of time, creating substantial new risks of transmission of COVID-19 in the community. Watt Decl. ¶¶93-95. Plaintiffs have

Mem. of P.&A. in Opposition to Motion for Preliminary Injunction (2:20-cv-07408)

1    presented no contrary evidence establishing that the Orders, "in a selective manner,

2    impose[] burdens only on conduct motivated by religious belief," nor do they

3    "substantially underinclude" analogous secular conduct.  *Wiesman*, 794 F.3d at

4    1079 (quoting *Lukumi*, 508 U.S. at 543).  Rather, "both secular and religious

5    conduct are prohibited equally," *Gish*, 2020 WL 1979970, at *6, in each of the

6    relevant sectors, whether schools, childcare, day camps, youth sports, or under the

7    Cohort Guidance, which is generally applicable to all settings involving structured

8    supervision of children and youth, including schools not permitted to reopen for in-

9    person instruction.  *See* Evid. Exs. O, T and NN.  In short, Plaintiffs' schools are

10   subject to the same rules applicable to *all* schools, public and private, religious and

11   secular.  And like all schools, Plaintiff-Schools are free to offer in-person services

12   to small, stable cohorts of students consistent with the Cohort Guidance, in the

13   same manner as day camps, child care centers and other settings involving child

14   supervision.

15        Thus, Plaintiffs cannot show that the Orders "suppress, target, or single out the

16   practice of any religion because of religious content."  *Stormans v. Selecky*, 586

17   F.3d 1109, 1131 (9th Cir. 2009) (reversing district court's preliminary injunction).

18   In this regard, this case is far easier than the various challenges to California's

19   health directives that explicitly apply to "places of worship" (which courts have

20   universally rejected) because there is no need here to adduce whether the

21   challenged orders treat those settings similarly or less favorably than comparable

22   secular settings.  *See S. Bay,* 140 S. Ct. at 1614 (Roberts, C.J., concurring); *Cross*

23   *Culture Christian Ctr.*, 445 F. Supp. 3d at 769-70; *Gish*, 2020 WL 1979970, at *5-

24   6.  The Orders, on their face, apply equally to religious and secular activities within

25   each setting.

26        Plaintiffs nonetheless maintain that the Orders single out religious education

27   for unfavorable treatment.  The thrust of their argument is that schools must close,

28   but other activities involving children are permitted, including childcare, day

camps, youth sports, educational enrichment, and extracurricular activities operating what they call "shadow schools."  Mot. Prelim. Inj. 13:3-17, ECF No. 29-1.  As discussed above, this argument is logically flawed because these activities are not inherently secular, as plaintiffs assert.  Childcare operators may be religiously affiliated, just as may day camp operators (*i.e.*, vacation Bible school).  Youth groups are expressly covered by the Cohort Guidance (Evid. Ex. T.1, NN) and may be religious or secular.  Accordingly, there is no differential treatment of secular versus religious activities; rather, there were, at most, distinctions between settings that include both secular and religious activity.  But, under the Cohort Guidance, schools are treated at least as well as all other settings that involve structured supervision of children and youth, which must follow the same rules for small group supervision that apply to schools that are not permitted to reopen.  Because Plaintiffs seek only prospective injunctive relief, they cannot demonstrate a likelihood of success because the schools that cannot yet reopen are treated *identically* on a going forward basis to the other settings to which they point as comparators.[4]

---

[4] Plaintiffs' assertion that the different sectors are identical is nonetheless mistaken.  Schools are not equivalent to daycares and camps in significant respects.  The number of children participating in day camps during the summer months is smaller than the volume of students in K-12 schools in California during the school year, and day camps are generally structured with smaller group sizes and in a manner that allows more distancing and outdoor activities than traditional school.  Watt Decl. ¶ 99.  Childcare settings also differ significantly from K-12 settings.  They primarily serve children who are younger than school age, and thus present a relatively lower risk of spread for the same reason that elementary schools present a lower risk than middle and high schools. They also are regulated in a way that schools are not, most notably through hard caps on adult-to-child ratios, *see, e.g.*, 22 C.C.R. § 101216.3 (no more than a 15-to-1 ratio in childcare center settings); 5 C.C.R. § 18290 no more than 15-to-1 ratio for state preschool). There are no comparable requirements for schools, and the *average* teacher-to-student ratio for public schools in California is 21-to-1, see https://www.ed-data.org/state/CA (Staff, Demographics, Per Pupil Ratio: Teachers).  As a result, there is a greater likelihood of safely maintaining small group sizes and stable cohorts to reduce the risk of transmission in childcare settings than schools.

Plaintiffs' reference to "shadow schools" undercuts their position because that term reinforces that they are not actually permitted under operative guidance.  Plaintiffs have notably pointed to nothing in the directives that permit such activities, instead citing examples from news articles that such activities are

Plaintiffs also rely on three out-of-circuit cases that are readily distinguished. In *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999), a police department generally required all officers to be clean-shaven, but denied an exemption to officers whose religion did not permit them to shave despite having granted multiple exemptions for secular, medical considerations.  Similarly, in *Blackhawk v. Pennsylvania*, 381 F.3d 202, 211–12 (3d Cir. 2004), Pennsylvania law authorized a fee exemption for several secular reasons but not on religious grounds.  And the third case involved an ordinance that "purposefully singles out religious conduct performed by a subset of Orthodox Jews" while ignoring altogether a host of other non-religious activities that contribute more to the disease the ordinance was purportedly adopted to combat. *Central Rabbinical Congregation of the United States & Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 194 (2d Cir. 2014).  In all three cases, the challenged action singled out religious practices, either by denying exemptions when comparable secular ones were available or by targeting only religious activities. As discussed above, the Orders apply uniformly to all schools and do not otherwise treat secular activities more favorably than religious activities.[5]

_____

occurring.  As described, it appears some activities may also violate the state's licensing regime for childcare settings.  Even assuming such evidence is admissible, it does not establish that the Orders authorize such conduct.

[5] Plaintiffs also argue that the Elementary Waiver triggers strict scrutiny because the delegation of authority to local public health departments, without objective criteria, permits discrimination against religion in its application. Mot. Prelim. Inj., 15-16, n. 3, ECF No. 29-1.  First, this misstates the law.  As the Ninth Circuit explained, "[t]he mere existence of an exemption that affords some minimal governmental discretion does not destroy a law's general applicability." *Stormans*, 794 F.3d at 1082.  Rather, exemptions may trigger strict scrutiny when they reveal discriminatory animus toward religion, such as where (as in *Fraternal Order of Police* and *Blackhawk*) an exemption exists "for secular reasons but not . . . for religious reasons,'" *Stormans*, 794 F.3d at 1082 (quoting *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 276 (3d Cir.2007)), or where "'the facts support an argument that the challenged rule is applied in a discriminatory fashion that disadvantages religious groups or organizations,'" *id.* (quoting *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 651 (10th Cir. 2006)). Plaintiffs have made *no* showing that the waiver process reflects

1    Because the Orders are both neutral and generally applicable, they are subject

2    to rational basis review, *see Stormans v. Wiesman*, 794 F.3d at 1084, which they

3    easily satisfy.  California's interest in stopping the spread of COVID-19 and

4    protecting the health of its citizens is not only legitimate, it is compelling. And the

5    temporary restriction on in-person learning under the Orders are rationally related

6    to that purpose. Thus, Plaintiffs have not shown a likelihood of success on their

7    Free Exercise Clause claim even under traditional constitutional analysis.

8                    **2.    The Orders Survive Strict Scrutiny**

9         Even assuming strict scrutiny applies (which it does not), the Orders satisfy

10   that standard. *Gish,* 2020 WL 1979970 at *5-6.  Plaintiffs concede that the State has

11   a compelling interest in controlling the spread of COVID-19.  Mot. Prelim. Inj.

12   17:6-7, ECF No. 29-1.

13        They argue, however, that the Orders are not narrowly tailored, first

14   maintaining that they should be allowed to operate in-person with restrictions,

15   rather than close completely.  Under the Cohort Guidance, however, Plaintiffs may

16   now do precisely that, or they may operate under the guidelines applicable to places

17   of worship while providing the remainder of their educational services following

18   the July 17th Order (*see* Evid. Ex. TT.3), or both.  Accordingly, the Orders provide

19   precisely the sort of narrow tailoring that Plaintiffs suggest.

20        Plaintiffs next assert that they the Orders are not narrowly tailored because

21   they apply countywide metrics rather that allowing school-specific reopening

22   determinations.  However, a county-level approach is unquestionably necessary to

23   advance the compelling state interests here. The State consists of 58 counties, all of

24   _____

25   discriminatory animus: it does not distinguish between religious and secular
     schools, and there is no evidence Defendants (or local jurisdictions) are applying it

26   discriminatorily.  Indeed, Plaintiff Saint Joseph Academy received such a waiver.
     Evid. Ex. U.13.  Moreover, the waiver process expressly incorporates objective

27   criteria, such as adoption of a school reopening plan that addresses specific topics
     and local public health data, including the extent to which and number of metrics

28   for which the county exceeds the thresholds to be on the Monitoring List.  *Id.* Ex.
     XX.2.

which are political subdivisions of the State, subject to its control.  *Cf. Pacific Gas & Electric Co. v. County of Stanislaus,* 16 Cal.4th 1143, 1149-50 (Cal. 1997). There is no other recognized, subdivided infrastructure under State control. Moreover, virtually every county has a public health department, which can coordinate efforts with the Department, a state-level entity, and is empowered under the relevant statutory regime to issue its own public health orders to combat the pandemic.  *See* Cal. Health & Saf. Code § 101000 (requiring every county to have a public-health officer).  The overwhelming majority of cities do not have public health departments, and some school districts even straddle more than one city. This argument also presumes that public health officials could plausibly review each school plan prior to approval.  There are more than 10,000 public schools in California alone,[6] and state and county health officials are also managing all other aspects of public health response.  It is neither possible nor practical to operate a statewide pandemic abatement program broken down geographically to a more granular level.

Plaintiffs seem to argue that narrow tailoring requires that the State defer to individual school leaders about whether they can operate safely.  School leaders, however, are not public health professionals.  Plaintiffs cite to research which they argue shows that there are low safety risks in reopening schools for in-person instruction, irrespective of high COVID-19 levels in the community.  Mot. Prelim. Inj. 8:17-9:27, ECF No. 29-1.  However, the federal Center for Disease Control and Prevention recently issued updated guidance, which analyzed many of the same studies to which Plaintiffs cite and concluded that schools may be safely reopened in communities *where community spread is low*, not where it is high, as in Los Angeles County.  Evid. Ex. UU.1, and see Exs. KK.1-3.  Not only does this underscore Chief Justice Robert's admonition that courts should not second guess public health determinations "in areas fraught with medical and scientific

---

[6] https://www.cde.ca.gov/ds/sd/cb/ceffingertipfacts.asp

Mem. of P.&A. in Opposition to Motion for Preliminary Injunction (2:20-cv-07408)

1    uncertainties," *S. Bay*, 140 S. Ct. at 1614 (Roberts, C.J., concurring), but the

2    relevant guidance is actually also consistent with the approach taken in the Orders:

3    schools are able to open for in person instruction when community spread is low,

4    *i.e.,* when the county has moved into at least Tier 2.  Unfortunately, that is not the

5    case for most counties in California, which remain in Tier 1 based on objective

6    criteria.  Watt Decl. ¶¶ 73-74, 82-86; Evid. Exs. Q and S.

7        Moreover, there is growing consensus that: children are susceptible to

8    infection by COVID-19 and transmission; the current positive rate data may not

9    accurately reflect the actual rate of infection of children and the transmission

10   between children and adults because testing of children is sparse and children may

11   have less severe symptoms or be asymptomatic; and opening schools for in-person

12   instruction increases the risk of COVID-19 transmission within the school and the

13   broader community, especially since some evidence exists that older children are

14   able to spread the virus throughout the community in the same manner as adults.

15   Watt Decl. ¶¶ 34-37; *and see* Evid. Exs. W-Z, HH-JJ.  Reopening schools for in-

16   person instruction in communities with high COVID-19 rates is risky, especially for

17   middle and high schools.  Watt Decl. ¶¶ 36; Evid. Exs. BB-GG.  This has been

18   demonstrated in some other countries with high COVID-19 rates, and in recent in-

19   person school openings in other states.  Evid. Exs. BB-GG.  Such evidence supports

20   California's health officials' constitutional discretion to enact public-health policy

21   temporarily limiting in-person classes during a widespread and ever-worsening

22   health emergency.  *Jacobson*, 197 U.S. at 27.

23       Finally, even if Plaintiffs are correct that the public-health situation is better

24   than the State originally anticipated, they "fail to account for the possibility" that

25   this may be true precisely "because of" the public-health orders that they are

26   seeking to invalidate.  *Monica Six*, 2020 WL 2896543 at *8.  It is for this reason

27   that courts have held that it is "the duty of the constituted authorities primarily to

28   keep in view the welfare, comfort, and safety of the many, and not permit the

interests of the many to be subordinated to the wishes or convenience of the few."
*Jacobson*, 197 U.S. at 29.

### C.   The Orders Do Not Violate Parents' Liberty Interests to Direct the Religious Upbringing of Their Children

On their face, the Orders do not in any way interfere with the Parent-Plaintiffs' choice to have their children receive religious education from Yavneh Academy, Montebello Christian School, Maimonides Academy, Saint Joseph Academy, Toras Emes Academy, or any other private religious school.  Thus, Plaintiffs' reliance on *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510 (1925) (Mot. Prelim. Inj. 23:25-26:7, ECF No. 29-1), is misplaced.  *Pierce* involved compelled attendance at public schools, thus presenting a direct preclusion from parental choice of a private religious school education.  *See* 268 U.S. at 534-35.  Similarly, *Yoder* involved a compulsory attendance law applicable to high school students that precluded Amish parents' free exercise of religious beliefs by providing informal vocational education instead of formal school-based education.  *See* 406 U.S. at 219.  In fact, the Court held that evidence demonstrated the compulsory attendance law would "gravely endanger if not destroy the free exercise of respondents' religious beliefs." *Id*.  Unlike the parents in *Pierce* and *Yoder*, Parent-Plaintiffs remain free to choose to enroll their children in religious schools to receive religious education.

What remains is whether a hybrid Free Exercise-Due Process Clause claim supports application of strict scrutiny to the Orders' temporary limitations on the ability of schools to provide in-person instruction.  Plaintiffs maintain it does, that *any* burden on their free exercise rights triggers strict scrutiny, regardless of whether the restriction is neutral and broadly applicable.  *Yoder* itself undercuts Plaintiffs' position, recognizing that courts "must not ignore the danger that an exception from a general obligation of citizenship on religious grounds may run afoul of the Establishment Clause" and recognizing the need for "a sensible and

1  realistic application of the Religion Clauses." 406 U.S. at 205. Plaintiffs' proposed

2  mechanistic application of strict scrutiny is hardly that. Indeed, there would never

3  be a need to establish less favorable treatment toward religion under a free-standing

4  Free Exercise claim if the Due Process Clause supports strict scrutiny based on a

5  mere showing of burden.

6      *Yoder* also recognized that "that activities of individuals, even when

7  religiously based, are often subject to regulation by the States in the exercise of

8  their undoubted power to promote the health, safety, and general welfare, or the

9  Federal Government in the exercise of its delegated powers." *Yoder*, 406 U.S. at

10  220, citing *Gillette v. United States*, 401 U.S. 437 (1971), *Braunfeld v. Brown*,

11  366 U.S. 599 (1961), *Prince*, 321 U.S. 158, and *Reynolds v. United States*, 98 U.S.

12  145 (1878). Furthermore, the Supreme Court has repeatedly recognized state

13  sovereignty in the areas of education and public-health policy. *See United States v.*

14  *Lopez*, 514 U.S. 549, 564 (1995); *Marshall v. United States*, 414 U.S. 417, 427

15  (1974); *Jacobson*, 197 U.S. at 23-29.[7]

16      Significantly, the Orders do not preclude the Parent-Plaintiffs' children from

17  receiving religious instruction through distance learning, prevent the schools from

18  operating in-person under the broadly applicable Cohort Guidance, or otherwise

19  delivering prayers and messages. For example, the Toras Emes' June Newsletter

20  shows that a fifth grade teacher was able to conduct a religious lesson via distance

21  learning. Evid. Ex. QQ.3. Montebello was able to deliver back-to-school prayers

22  in its August newsletter. *Id*. at Ex. OO.1. It also appears that Yavneh Academy

23  was already prepared to offer a distance learning-only option for its students in the

24

25

26      [7] Justice Kavanaugh recently underscored this point. *See Calvary Chapel Dayton Valley v. Sisolak*, 591 U.S. __, 2020 WL 4251360 (Kavanaugh, J, dissenting). Although Justice Kavanaugh argued in his dissent that *Jacobson* should

27  not govern First Amendment challenges, he accepted that *Jacobson* provides the appropriate, deferential standard for reviewing numerous "COVID-19 matters,"

28  including "school closures." *Id*. at *11.

1  2020-2021 school year, thus demonstrating that religious based education can still

2  be provided, even with restrictions on in-person learning. *Id.* at Ex. RR.3.

3        Nor do the Orders prevent the School-Plaintiffs from providing religious

4  services to their students on an in-person basis. The School-Plaintiffs can provide

5  in-person prayers and religious ceremonies by following the COVID-19 Industry

6  Guidance: Places of Worship and Providers of Religious Services and Cultural

7  Ceremonies (July 29, 2020), as long as they conduct the remainder of their

8  educational activities consistent with the July 17th Order. Evid. at Ex. TT.3. This

9  is demonstrated by the fact that Toras Emes provided a drive-through Siddur party.

10 *Id.*, Ex. QQ.1 and QQ.4.

11       On the above basis alone, the Orders' temporary restrictions on in-person

12 instruction do not violate parental choice related to religious instruction of their

13 children under *Yoder*. As discussed in Section I.B.1 *supra*, these orders are

14 prototypical neutral and generally applicable laws that incidentally burden "a

15 particular religious practice," *Lukumi*, 508 U.S. at 543. Although Plaintiffs

16 understandably prefer to provide in-person religious education, they have not

17 presented evidence that the temporary restrictions on in-person education risks

18 "gravely endanger[ing] if not destroy[ing]" their free exercise of religion sufficient

19 to trigger strict scrutiny. *Yoder*, 406 U.S. at 220.

20       Even if the Court presumed an absolute right to receive *in-person* religious

21 instruction, the Orders still pass constitutional muster. Contrary to Plaintiffs'

22 assertions (Mot. Prelim. Inj. 11:16-21, ECF No. 29-1), the Cohort Guidance allows

23 each of the Plaintiff-Schools to provide "necessary" in-person education using the

24 small cohort model, even in counties where schools are not otherwise authorized to

25 re-open for in-person instruction. Evid. Exs. O.1, T.1. This effectively balances

26 the ability of schools to provide in-person instruction and related services (which

27 could include prayer and other rites that Plaintiffs identify) with the State's interest

28 in minimizing the potential spread of COVID-19 to a small cohort, in the event a

child, teacher or staff member test positive.  *Id*.  Yavneh Academy already appears prepared to employ this model for in-person instruction since its 2020-2021 school plan envisioned learning "pods" as a means of in-person instruction and to allow for social distancing and to minimize mixing of students.  *Id*., at Ex. RR.2.

Finally, for the reason noted in Section I.B.2, *supra*, the Orders advance a compelling state interest and are narrowly tailored.  They survive even strict scrutiny.

### D.   Plaintiffs' Procedural Due Process Claims Lack Merit

Binding precedent squarely forecloses Plaintiffs' procedural due process argument.  "[G]overnmental decisions which affect large areas and are not directed at one or a few individuals do not give rise to the constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient."  *Halverson v. Skagit Cty.*, 42 F.3d 1257, 1261 (9th Cir. 1994).  Here, the issuance of the Orders provided all the notice that was needed under the Due Process Clause.  *See Best Supplement*, 2020 WL 2615022, at *5; *accord Hartman v. Acton,* No. 2:20-CV-1952, 2020 WL 1932896, at *8 (S.D. Ohio Apr. 21, 2020) (holding that an Ohio emergency order issued to combat COVID-19 "did not violate Plaintiff's due process rights because the [] Order was a generally applicable order affecting thousands of businesses, and not a decision targeting an individual or single business").  Thus, Plaintiffs are not likely to succeed on their procedural due process claim.

## II.   THE BALANCE OF EQUITIES FAVOR DENIAL OF A PRELIMINARY INJUNCTION

Besides failing to demonstrate a likelihood of success on the merits, Plaintiffs also fail to show that they will suffer irreparable harm, that the balance of equities weighs in their favor, or that a preliminary injunction is in the public interest.  *Winter*, 555 U.S. at 20; *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th

Cir. 2014) ("Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge.").

Here, the balancing of the harms is properly assessed by comparing the harm to the public as compared to the temporary imposition on Plaintiffs. Plaintiffs' asserted harm of starting school with distance learning while COVID-19 infection rates are high is temporary; the restriction only remains in place while community spread is categorized in the purple tier. By comparison, the potential harm to the public of allowing schools to fully open with in-person instruction is great.

The health orders serve to protect the health of *all* residents in California, particularly those who are at highest risk for deadly consequences of contracting COVID-19. Recent school openings and COVID-19 related outbreaks show that in-person instruction represents a real risk of increasing communitywide spread of COVID-19 at a time when rates are already high. Evid. Exs. BB-GG. Recent reports confirm significant COVID-19 spread among school-aged children. Evid. Exs. Y.4 [an increase of 90% in child cases over four weeks from July 9, 2020 to August 6, 2020], and Z.1. Even early studies show that transmission rates between children and adult family members are significant. Evid., Ex. W.2. This means that children infected by adult family members may unknowingly spread the disease to other students or teachers, and students who become infected at school can spread the disease to family members. *Id.*; Decl. Watt, ¶¶ 34-37, 89-103.

Granting Plaintiffs' Motion would substantially undermine the ability of State officials to craft public health and safety orders necessary to prevent the spread of communicable disease on a community-wide basis in general, and on a specific basis in relation to K-12 schools.

There is also minimal harm to these Plaintiffs because, as previously explained, the State orders and guidance allow Plaintiffs multiple ways to provide in-person religious services and education to their students.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the reasons set forth above and as may be raised during oral argument, the Court should deny Plaintiffs' Motion for a Preliminary Injunction.

Dated:  September 11, 2020                    Respectfully submitted,

XAVIER BECERRA
Attorney General of California
JENNIFER M. KIM
Supervising Deputy Attorney General


/s/  Darin L. Wessel

DARIN L. WESSEL
ASHANTE M. NORTON
Deputy Attorneys General
*Attorneys for Defendants*

LA202060222
82514311.docx

Mem. of P.&A. in Opposition to Motion for Preliminary Injunction (2:20-cv-07408)

# CERTIFICATE OF SERVICE

Case Name:   **Samuel A. Fryer Yavneh**          No.   **2:20-cv-07408-DDP-PLA**
             **Academy, et al. v. Newsom. G.,**
             **as Governor of California, et al.**
                                              _____

I hereby certify that on <u>September 11, 2020</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>September 11, 2020</u>, at San Diego, California.

_____          _____
          E. Blanco-Wilkins                               Signature
               Declarant