ALEXIS MILLER BUESE (SBN: 259812)
alexis.buese@sidley.com
LOGAN P. BROWN (SBN: 308081)
lbrown@sidley.com
RYAN STASELL (SBN: 307431)
rstasell@sidley.com
SUMMER A. WALL (SBN: 331303)
summer.wall@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: +1 310 595–9668
Facsimile: +1 310 595–9501

MICHAEL H. PORRAZZO* (SBN: 121260)
mhporrazzo@porrazzolaw.com
THE PORRAZZO LAW FIRM
30212 Tomas, Suite 365
Rancho Santa Margarita, CA 92688
Telephone +1 949 348–7778
Facsimile: +1 949 209–3514

* *Counsel for Plaintiff Montebello Christian School only*

† *Admitted pro hac vice*

GORDON D. TODD†
gtodd@sidley.com
DAVID S. PETRON†
dpetron@sidley.com
ERIKA L. MALEY†
emaley@sidley.com
ELLEN CRISHAM PELLEGRINI†
epellegrini@sidley.com
DINO L. LAVERGHETTA†
dlaverghetta@sidley.com
LUCAS W.E. CROSLOW†
lcroslow@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736–8760
Facsimile: +1 202 736–8711

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

SAMUEL A. FRYER YAVNEH ACADEMY *et al.*,

Plaintiffs,

*v.*

GAVIN NEWSOM *et al.*,

Defendants.

**No. 2:20-cv-7408 (JAK) (PLAx)**

**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Judge: Hon. John A. Kronstadt

Hearing: September 28, 2020
Time: 8:30 a.m.

There is much on which Plaintiffs and Defendants agree: COVID-19 presents a serious health challenge; children are less likely to contract or spread it; mitigation techniques are effective; and some gatherings may be safely conducted. And, importantly, the parties agree that Plaintiffs' substantial religious liberty interests enjoy heightened scrutiny. Nonetheless, Defendants defend their decision to suspend in-person religious schooling while allowing similar, if not identical, groups of children to congregate in similar, if not identical, physical spaces, for similar, if not identical, activities and periods of time. Defendants' justifications, however, are unfaithful to the facts on the ground and the laws on the books, and should be rejected.

*First*, Defendants assert they have not invaded Free Exercise because they treat secular and religious schools alike, and separately treat secular and religious camps alike. This argument fundamentally misapprehends that the test for general applicability concerns itself not with artificial government categories, but with the underlying government interest. Here the government seeks to control viral transmission in groups of children gathered indoors for an extended period of time. Given this interest, the state cannot grant nonreligious carve-outs, but deny comparable religious carve-outs. And yet the state has done precisely that. It has allowed camps to operate, but prohibited religious schools from operating even though camps and schools plainly are alike with regard to that interest. The state cannot avoid this comparison by declaring camps and schools to be different "sectors." Defendants offer but a single footnote, citing a single paragraph of declarant testimony, which itself cites no support for the proposition that schools and camps are different with respect to viral transmission. That fails even the common sense test. Because Defendants have determined that camps may operate with appropriate restrictions, so too may religious schools.

To save their scheme, Defendants pivot to their newly promulgated "Cohort Guidance," which, they assert, applies the same rules to schools and camps. This is patently false. Under the Cohort Guidance, camps may operate fully so long as they

organize students in small, physically distanced "cohorts." Schools, however, are prohibited from operating in cohorts at anything more than 25 percent capacity. Moreover, Defendants have empowered counties to modify the Cohort Guidance, resulting in a *10 percent* capacity limitation in Los Angeles. The Cohort Guidance also stresses that it is intended for students with special needs such as language-based or disability services, not religious needs. And, while a well-articulated mechanism exists to enforce the Cohort Guidance against schools, there is scant evidence of *any* meaningful enforcement threat against camps.

*Second*, Defendants argue that students can simply study school subjects remotely and access certain religious services in person. This, however, fundamentally misapprehends the rights at issue. Plaintiffs desire an educational setting in which religious teachings and values imbue the entire pedagogical experience in and out of class. This *cannot* be recreated by video chat, and the Government's suggestion that math and history can simply be uncoupled from sacramental services would be to destroy the very thing at issue. Defendants have offered no basis to call in question the sincerity of Plaintiffs' beliefs that this religious need can be met only in person.

*Third*, as predicted, Defendants invoke *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), to demand near-total deference to their prescribed pandemic response, without regard for Plaintiffs' constitutional rights. Defendants' assertion of unbridled executive power is as breathtaking as it is wrong. While the pandemic clearly poses a serious public health challenge, nothing in *Jacobson* or any other authority suspends the Constitution or requires courts to be anything less than vigilant of civil liberties.

*Fourth*, Defendants are equally wrong that their executive dictates are unchecked by due process. The legislative process has its own built-in protections, but executive orders and mandatory administrative "guidance" regulating every facet of public, private, economic, and religious life in the State, and burdening the core constitutional rights of millions of citizens, must most assuredly accord with due process.

## I. The School Closure Order Violates Plaintiffs' Religious Liberties.

### A. Defendants' restrictions are not generally applicable.

Defendants characterize their stay-at-home orders as generally applicable because they "establish the default rule that all Californians are to remain at home, with limited exceptions." Mem. of Points & Authorities in Opp'n to Pls.' Mot. for Prelim. Inj., ECF No. 53, at 16 (hereinafter "Opp."). It is passing strange to characterize as "limited" a set of exceptions comprising 38 categories spanning 522 printed pages,[1] but in any event, even "limited" exceptions suggest the regulations are not generally applicable. *See Cent. Rabbinical Cong. of U.S. & Can. v. N.Y. City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197–98 (2d Cir. 2014). "[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 884 (1990); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 537–38 (1993). Here Defendants have determined that exemptions are appropriate to serve varied secular interests, and the same must be extended to similarly situated religious interests.

Defendants argue that the School Closure Order is constitutional because it "applies statewide to *all schools*, not only religious schools," while rules regarding childcare and camps also "apply equally to religious and secular settings." Opp. 7. This is a *non sequitur*. As Defendants admit, the relevant legal question is whether their Order is "substantially underinclu[sive]" of secular activities in "comparable secular settings," and whether they are "denying exemptions when comparable secular ones [a]re available." *Id.* at 17–18, 20. This analysis begins with the "interest that the law is designed to protect" and must include all comparable activities that similarly bear on that interest. *Parents for Privacy v. Barr*, 949 F.3d 1210, 1235 (9th Cir. 2020); *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1079 (9th Cir. 2015).

The State interest here is controlling viral transmission in groups of children

[1] Cal. Dep't of Pub. Health, *Ind. Guidance to Reduce Risk*, https://bit.ly/35PLCDW.

gathered indoors for an extended period of time. And the State has chosen to allow children to gather for nonreligious reasons—to participate in daycare and daycamp—but they do not allow children to gather for religious reasons—to participate in religious education. By so doing, the State "devalues religious reasons . . . by judging them to be of lesser importance than nonreligious reasons," *Lukumi*, 508 U.S. at 537. This the First Amendment unambiguously prohibits.

The State seeks to avoid this inexorable conclusion by artificially classifying camps and schools under different categories. But it fails to offer any reason why this manufactured distinction should matter. The First Amendment inquiry focuses on the government's purposes and there is no reason to think that viral transmission or mitigation measures operate differently among children and teachers congregating for hours in school, daycare, or camp.[2] Defendants assert that camps generally have smaller groupings and can achieve greater distancing. Opp. 19 n.4. This assertion not only lacks any evidentiary basis, but also does not justify shutting schools entirely. So too, that public schools have an average student-to- teacher ratio of 21-to-1 is not necessarily relevant to plaintiff schools, and goes not to whether but rather how schools may operate safely in person. *Id.*

Defendants' prohibitions thus "substantially underinclude non-religiously motivated conduct" in the forms of day cares and day camps, which "endanger the same governmental interest" in public health that the restrictions on private religious

[2] Defendants' expert Dr. Watt, an epidemiologist, not an expert in camps and daycares, asserts without citation that camps and daycares are "generally" smaller or have smaller group sizes than schools. ECF No. 53-1 ("Watt Decl.") ¶ 99. *See* Fed. R. Evid. 702. Dr. Watt also misleadingly attributes a reported 90 percent increase in pediatric COVID cases in early July and August to school reopening. Watt Decl. ¶ 101. That same period saw a 200 percent surge in COVID cases nationwide, of which pediatric cases were a small fraction. *See* Peter Wells, *Summer COVID-19 Surge in US Shows Signs of Slowing*, Fin. Times (Aug. 25, 2020), https://on.ft.com/2RDryMK. Moreover, Dr. Watt's Exhibit 30 omits California data entirely.

schools are meant to protect. *Wiesman*, 794 F.3d at 1079. These restrictions are not generally applicable and are therefore subject to strict scrutiny. They clearly cannot satisfy such scrutiny, because less restrictive means are available to serve Defendants' interest in infection control. Mem. of Points & Authorities in Supp. of Mot. for Prelim. Inj., ECF No. 29-1, at 16–17 (hereinafter "Mot.").[3]

Recognizing the infirmity of their original scheme, Defendants promulgated their "Cohort Guidance," which they assert treats schools "at least as well as all other settings that involve structured supervision of children and youth, which must follow the same rules for small group supervision that apply to schools that are not permitted to reopen." Opp. 19. The State's litigation position is at war with its own published interpretation of the Cohort Guidance.[4] According to the State's Cohort Guidance FAQs, these other "structured" environments may operate normally so long as students are placed into small, stable, physically distanced "cohorts". *See* Cohort FAQs at 1. As for schools, however, "the number of students on a given school site should generally not exceed 25% of the school's enrollment size or available building capacity." *Id.* at 5. The Cohort Guidance is intended to make schools available for "specialized services, targeted services and support," such as speech and language services, for certain populations of students such as English learners and students with disabilities. *Id.* at 2. Indeed, unlike the guidance for camps, Defendants' FAQs for schools make clear that "the intent [is not] to allow for in person instruction for all students." *Id.*

Compounding the problem, Defendants are implementing their scheme through

---

[3] Defendants insist that reopening not occur until community transmission has been contained. The State may make that judgment but must apply it equally to similarly situated gatherings. Moreover, the American Academy of Pediatrics in California disagrees vigorously with Defendants' ongoing school closures. *See* Press Release, Am. Acad. of Pediatrics, *Local Pediatricians Dismayed that Children Are NOT Being Prioritized* (Sept. 3, 2020), https://bit.ly/2ZQZ7j5.

[4] Cal. Dep't of Pub. Health, *Providing Targeted, Specialized Support and Services at School* (updated Sept. 4, 2020), https://bit.ly/2ZRotNQ (hereinafter "Cohort FAQs").

counties, "political subdivisions of the State, subject to its control," which are implementing it unevenly. Opp. 21–22. Los Angeles County, for example, limits cohorts to 10 percent of a school's enrollment, but not camps or other structured environments.[5] Los Angeles has also, incidentally, refused to issue any waivers, Mot. 4, and has declared that schools will not open "until after the election" regardless of health conditions.[6]

The Cohort Guidance thus places greater restrictions on religious schools. And because the State has not seen fit to include religious needs among the "specialized services" permitted by the Cohort Guidance, Defendants' insistence that the guidance permits "necessary" education to take place in person is a figment. *See* Opp. 26.

**B. The restrictions on religious education intrude on Plaintiffs' fundamental right to direct their children's education.**

Defendants also fail to grapple meaningfully with Plaintiffs' showing that the School Closure Order inhibits parents' right to direct the religious education of their children. Defendants note that Parents "remain free to choose to enroll their children in religious schools to receive religious education." Opp. 24. Certainly, *enrolled* they may be; they just may not *attend*.

As an initial matter, Defendants ignore that strict scrutiny applies to a Free Exercise claim when a plaintiff demonstrates "a colorable claim that a companion right," such as parental rights, "has been violated," *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1032 (9th Cir. 2004) (quoting *Miller v. Reed*, 176 F.3d 1202, 1207 (9th Cir. 1999)), and that Plaintiffs have presented a colorable claim. Indeed, the Supreme Court has repeatedly held that strict scrutiny applies to even a generally applicable law when such a law impinges upon parents' ability to direct the religious education of their children. *See Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972); *Pierce v.*

---

[5] Cty. of L.A. Dep't of Pub. Health, Order of the Health Officer, *Reopening Protocols for K-12 Schools: Appendix T1*, at 2 (revised Sept. 9, 2020), https://bit.ly/3caZSZc.

[6] *LA County Health Director Says Schools Won't Reopen Until After November Election*, KCAL CBS L.A. (Sept. 10, 2020), https://cbsloc.al/2RHCxFb.

*Soc'y of the Sisters of the Most Holy Names of Jesus and Mary*, 268 U.S. 510, 535 (1925); *Smith*, 494 U.S. at 881–82 ("[T]he First Amendment bars application of a neutral, generally applicable law to religiously motivated action" in cases involving "the Free Exercise Clause in conjunction with other constitutional protections, such as . . . the right of parents, acknowledged in *Pierce v. Society of Sisters*, to direct the education of their children." (citations omitted) (citing *Pierce* and *Yoder*)).

Defendants note that some enterprising students have participated in some religious activities such as publishing prayers in newsletters and attending religious ceremonies outside of school. *See* Opp. 25–26. Thus, they assert, restrictions on religious education will not "gravely endanger if not destroy the free exercise of respondents' religious beliefs." *Id.* at 24 (quoting *Yoder*, 406 U.S. at 219). This gravely misapprehends the relevant laws and facts.

As a matter of law, that other religious activities remain available does not distinguish this case from *Yoder* or *Pierce*. Indeed, in both cases, children were able to worship outside of school. Yet the Supreme Court struck down generally applicable laws that prevented parents from directing the religious education of their children in accordance with their sincerely held religious beliefs. So too here, while Plaintiffs can attend religious services outside of school, and can obtain educational materials through online schooling, *see id.*, Defendants have forbidden Plaintiffs from engaging in the religious practice at issue: religious education.

Plaintiffs' sincere religious beliefs require in-person religious education that creates a community of faith where children can learn religious traditions and values through the examples of their teachers and peers in class and out. *See* Mot. 5–8. This simply cannot be replicated online. *See id.* And even if it could be, as Defendants' own evidence states, "[v]irtual education is often a pale shadow of the real thing." Evid. in Opp'n to Mot. for Prelim. Inj. Part 2, ECF No. 55, at Ex. GG; *see also* Mot. 5–8.

It is not for the Court—much less Defendants—to question the "truth, validity,

or reasonableness" of Plaintiffs' belief that religious education must take place in person. *Callahan v. Woods*, 658 F.2d 679, 685 (9th Cir. 1981). "The determination of what is a 'religious' belief or practice . . . is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 713–14 (1981). Defendants' opinion that "the Orders do not in any way interfere with" Plaintiffs' children's religious education, Opp. 24, is inappropriate. Plaintiff Parents sincerely believe that their children's religious education must take place in person, which the Orders prohibit.

### C. *Jacobson* and *South Bay* do not permit Defendants to suspend the Bill of Rights in response to a public health emergency.

At bottom, Defendants rely on their chilling assertion that Defendants can suspend certain rights indefinitely during times of emergency. *See* Opp. 13–16 (citing *Jacobson*, 197 U.S. 11). This is not and has never been the law. Nothing in *Jacobson* displaces the tiers of scrutiny developed subsequently specifically to protect core constitutional rights. Moreover, in *Jacobson*, the Supreme Court held that where epidemic-related regulations conflict with constitutional rights, the latter prevails. 197 U.S. at 30–31. The Opposition ignores this because acknowledging it would be fatal.

Simply put, "[t]here is no pandemic exception to the Constitution of the United States or the Free Exercise Clause of the First Amendment," *Berean Baptist Church v. Cooper*, No. 4:20-CV-81-D, 2020 WL 2514313, at *1 (E.D.N.C. May. 16, 2020), and the constitution requires that restrictions on religious worship and education "undergo the most rigorous of scrutiny," *see Lukumi*, 508 U.S. at 546. *Jacobson* is in accord. The plaintiff there failed to identify any constitutional right infringed by mandatory smallpox vaccinations; rather, he objected to being vaccinated because he "had no faith in vaccination as a means of preventing the spread of smallpox, or . . . thought that vaccination, without benefiting the public, put in peril the health of the person

vaccinated." *Jacobson*, 197 U.S. at 36. The holding in *Jacobson* is simple and limited: the police power of the state includes the power to compel healthy adults to be vaccinated *except when doing so violates the Constitution*. *Id.* at 38. The Court emphatically did *not* hold that a state's "broad emergency powers," even when exercised "to protect itself against an epidemic," Opp. 13, allow the State to shunt aside the Constitution. As the Court wrote, "[a] local enactment or regulation, even if based on the acknowledged police powers of a state, must always yield in case of conflict . . . with any right which [the Constitution] gives or secures." *Jacobson*, 197 U.S. at 25, 31.

Here, unlike *Jacobson*, Plaintiffs have identified "a plain, palpable invasion of rights secured by the fundamental law." *See id.* at 31. Moreover, Jacobson failed to prove that he would be injured by implementation of the state's compulsory vaccination law. Here, in contrast, Plaintiffs are being injured by the State's actions. Accordingly, this Court must "give effect to the Constitution" by enjoining Defendants from infringing Plaintiffs' constitutional rights. *Id. Jacobson* simply does not support lowering, or indeed, abandoning, protections for civil liberties. *See Boumediene v. Bush*, 553 U.S. 723, 765 (2008) ("To hold the political branches have the power to switch the Constitution on or off at will . . . would permit a striking anomaly in our tripartite system of government . . . .").[7]

Defendants also mischaracterize the *South Bay case*, in which Chief Justice Roberts wrote only for himself and did not rule that constitutional rights are suspended by pandemic. Rather, he cited *Jacobson* for the straightforward proposition that "[o]ur Constitution principally entrusts '[t]he safety and the health of the people'

---

[7] Other recent rulings have recognized that "just as constitutional rights have limits, so too does a state's power to issue executive orders limiting such rights in times of emergency." *Robinson v. Attorney Gen.*, 957 F.3d 1171, 1179 (11th Cir. 2020). *See id.* at 1182 (*Jacobson* does not justify restrictions on reproductive rights); *Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 927 (6th Cir. 2020) (same). *See also Cty. of Butler v. Wolf*, No. 2:20-cv-677, 2020 WL 5510690, at *8, *22 (W.D. Pa. Sept. 14, 2020); Lindsay F. Wiley & Stephen I. Vladeck, *Coronavirus, Civil Liberties, and the Courts: The Case Against "Suspending" Judicial Review*, 133 Harv. L. Rev. F. 179, 181–82 (2020).

to the politically accountable officials of the States 'to guard and protect.'" 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of stay) (second alteration in original). The Ninth Circuit's decision below did not even cite *Jacobson*. *See S. Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 939–940 (9th Cir. 2020).

This Court should reject Defendants' claim of extraordinary deference, which would allow the State essentially to suspend fundamental constitutional rights indefinitely, and instead apply the well-established and well-understood levels of constitutional scrutiny applicable to Plaintiffs' claims—here, strict scrutiny.

**II. The School Closure Order Violates Procedural Due Process.**

Finally, Defendants are wrong that *Halverson v. Skagit County*, 42 F.3d 1257 (9th Cir. 1994), relieves them of complying with due process. *Halverson* holds that legislative enactments satisfy due process. 42 F.3d at 1260; *see also Gallo v. U.S. Dist. Court for Dist. of Ariz.*, 349 F.3d 1169, 1181 (9th Cir. 2003). The orders here, however, are not legislative but rather executive. Defendants failed to hold "open hearings," to evaluate how school closures may impact religious liberties, or to consider less burdensome alternatives to closure. *Halverson* accordingly does not apply. *See Langevin v. Chenango Court, Inc.*, 447 F.2d 296, 300–01 (2d Cir. 1971) (Friendly, J.). Underscoring the point, Defendants in their unbridled discretion have already changed the rules at least twice since Plaintiffs filed suit, and to the confusion of all schools, will no doubt do so again.[8]

Defendants contest neither that they provided no pre-deprivation process, nor that the inadequate post-deprivation "waiver" process is categorically and indefinitely unavailable to most of Plaintiff Schools. The Order therefore violates procedural Due Process.

**CONCLUSION**

Plaintiffs' motion for preliminary injunction should be granted.

---

[8] *Halverson* also concerned a property, not a liberty interest, and none of Defendants' authorities apply *Halverson* to religious or other liberty interests. *See* Opp. 27.

Dated: September 18, 2020

Respectfully submitted,

By: /s/ Alexis Miller Buese

Alexis Miller Buese
Logan P. Brown
Ryan Stasell
Summer A. Wall
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: +1 310 595–9668
Facsimile: +1 310 595–9501

Gordon D. Todd*
David S. Petron*
Erika L. Maley*
Ellen Crisham Pellegrini*
Dino L. LaVerghetta*
Lucas W.E. Croslow*
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736–8760
Facsimile: +1 202 736–8711

Michael H. Porrazzo†
THE PORRAZZO LAW FIRM
30212 Tomas, Suite 365
Rancho Santa Margarita, CA 92688
Telephone +1 949 348–7778
Facsimile: +1 949 209–3514

*Attorneys for Plaintiffs*

* *Admitted pro hac vice*
† *Counsel for Plaintiff Montebello Christian School only*